IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSE

NASHVILLE DIVISION

FRANCES SPURLOCK AND JEFFREY SPURLOCK

ON BEHALF OF THEIR MINOR DAUGHTER, Keith Caldwell,on behalf of his

minor children,Minister Xuam Lawson and Rigena Lawson, on behalf of their

minor children,Carroll Lewis on behalf of her minor child,and Tennessee

Alliance for Progress PLAINTIFFS

v.                                        No. 3:09-cv-00756

DAVID A. FOX,

DEFENDANTS

PLAINTIFFS FIRST AMENDMENT TO COMPLAINT

Now come the plaintiffs before any answer or dispositive motion has been

filed in this case and amend their complaint by adding the following new

plaintiffs and allegations:

49. Plaintiffs and their children enjoy a protected interest and right to free school textbooks from the defendants. That specific right is protected by

T. C. A. § 49-3-310 that requires the books to be "available to them when the schools open."

50. T. C. A. § 49-3-310 (Instructional materials) provides:"Funding for textbooks and other instructional materials shall be provided through the BEP, subject to the following minimum amounts and conditions:(1)(A) It is the legislative intent that the board shall purchase the necessary textbooks and kindergarten materials early enough that the students shall have the textbooks and kindergarten materials available to them when the schools open." (emphasis added)

51. Plaintiffs and their child thus have a fundamental right in Tennessee to an education that is "substantially equal." 24 Mem. St. U. L. Rev. 393, Memphis State University Law Review Winter, 1994. The Tennessee Constitution directs the state to maintain a public school system for all students and in that system educational opportunities will be "substantially equal." Tennessee Small School Systems v. McWherter, 851 S.W.2d 139 (Tenn. 1993).

52. When a fundamental right, for example (education), is involved or the provision in question affects a "suspect" class, (such as race), the

Tennessee Supreme Court employs strict scrutiny. Under this approach, the state must show that its classification has been "precisely tailored to serve a compelling governmental interest." **Meyer v. Nebraska,** 262 U.S. 390 (**1923**), [24 Mem. St. U. L. Rev. 393](#), Memphis State University Law Review Winter, 1994.

53. U.S.District Court Judge Haynes' findings on the T.R.O. already in effect in this case concluded, inter alia, that the defendants' rezoning plan is not racially neutral as required by law. That court ruling also concluded that plaintiffs' T.R.O. application met the requirements for injunctive relief and ordered school books for students at John Early Middle School no later than September 2,2009 and the transfer of plaintiff Spurlock's child back to Bellevue Middle School.

54. Today plaintiffs present a motion for exactly the same problem and exactly the same issue- the defendants have willfully and wantonly failed to provide free schoolbooks for the students in the majority black schools where students were rezoned. School started August 14,2009 and yet as of September 3,2009 many, many students still lack required school books in the rezoned schools. See Affidavit of Larry Woods and the Defendants' Affidavit of Curry Corder.

55. Further, defendants have not complied with the original T.R.O. as required by law. Plaintiff Lawson's child, a student at John Early still has not received her mathematics book.

56. Students at Rosebank School have not received all their books due to insufficient number of school books as of September 3, 2009.

57. Further proof of the utter disregard for resources for the majority black schools in Nashville is in today's Tennessean newspaper:

"The lack of textbooks is not limited to John Early Middle School; it's a systemwide problem, parents said. The judge's order may have resolved the problem for John Early but not for the other 70,000-plus students in the district, some said.

Michelle Carter has had to deal with this for more than two years. Carter's daughter is a sophomore at McGavock High in the Donelson area. On Thursday, she had no textbooks and no locker.Her oldest daughter, who graduated in May, also had the same problems."I'm still waiting for phone calls from messages I left at the school over two years ago," Carter said."(A copy of the text of the entire article is attached hereto).

58. Proof on this issue comes from the affidavit of the defendants' own agent that was filed in this case. Affiant Curry Corder just three days ago (Sept. 1,2009) stated under oath: "I am the Textbook Coordinator for the Metropolitan Nashville Public Schools. … I receive multiple orders (from Metro Nashville schools) for textbooks each day." (emphasis added).Thus three weeks after school has started the defendants are still ordering necessary and required school books. Why were these books not ordered last spring?

59. The defendants pledged and promised over and over again last year that extra money ("millions") and extra resources would be delivered to the rezoned black majority schools. But the reality is in Affiant Corder's

affidavit:"All requests for textbooks are filled in the order in which they are received". No priority for rezoned schools. No extra resources-just business as usual.

60. Actually the discrimination is worse than that. The defendants' attorney was asked by United States District Judge Haynes in open court where the absent school books were located or could be found. The defendants' attorney after obvious consultation with the defendants replied that someone was driving around the city that day to other Nashville schools to pick up their leftover books to use. In other words, just like in the bad old pre-Brown v. Board of Education days, the majority black schools in Nashville once again will have to subsist on the leftovers as far as the defendants are concerned. Affiant Corder swore under oath on September 1,2009 and confirmed this wrongful intent: "I have located some of the textbooks to fill the order (for school books at John Early Middle School) within the MNPS school system and the balance of the needed books are being ordered from Tennessee Book Company." (emphasis added).

61. In fact, the defendants' use of Tennessee Book Company confirms another piece of the wrongful intent. One of its primary owners is Orrin Ingram, one of the secretive  members of the business group that recruited/funded candidates for the school board, such as its chair Defendant David Fox, who were selected for their willingness to push the rezoning plan

through. This book warehouse is not located across the world-it is only 20 miles from the Nashville defendants according to Mapquest.com.

62. The Tennessee Book Company website states "Who We Are" - "State law mandates that all publishers under contract with the State of Tennessee to supply state-approved instructional materials to our public schools must maintain a distribution center, or depository, within the state.Founded in 1935, Tennessee Book Company has served continuously in this role. <u>In 1964 the company was acquired by Ingram Industries, a privately held corporation with headquarters in Nashville, Tennessee.</u> Tennessee Book Company remains the K-12 academic products division of Ingram Content Group.Our primary purpose as a textbook depository is to provide Tennessee schools with a central source of supply at the lowest costs and with the fastest service possible. Within the arrangement we also afford our publishers an economical means of both distributing their products and sustaining their business relationships with the state's schools." (emphasis added).

63.  In Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007), the Court was definitive in ruling against school boards that use racially identifiable zoning plans to separate and assign children:"When it comes to using race to assign children to schools, history will be heard. In Brown v. Board of Education, 347 U. S. 483, the Court held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because the classification and separation themselves denoted inferiority. Id., at 493-494. It was not the inequality of the facilities but the fact of legally separating children based on race on which the Court relied to find a constitutional violation in that case. Id., at

494. The districts here invoke the ultimate goal of those who filed Brown and subsequent cases to support their argument, but the argument of the plaintiffs in Brown was that the Equal Protection Clause "prevents states from according differential treatment to American children on the basis of their color or race," and that view prevailed--this Court ruled in its remedial opinion that Brown required school districts "to achieve a system of determining admission to the public schools on a nonracial basis." Brown v. Board of Education, 349 U. S. 294, 300-301". Pp. 28-41.

64. The standard for preliminary injunction in federal court is a four-factor test: (1) the threat of irreparable harm to plaintiffs if the injunction is not granted; (2) the balance between this harm and the injury that granting the injunction would inflict on the defendant; (3) the probability that plaintiffs will succeed on the merits; and (4) the public interest. As set forth in the Motion for T.R.O. and memorandum of law filed simultaneously herewith: Plaintiffs' rights are being violated. Plaintiffs suffer and will continue to suffer immediate and irreparable injury pending a judgment in this case unless a TRO  is granted. The public interest balance between the harm to Plaintiffs and any alleged injury from granting the injunction balances in favor of Plaintiffs. There is a strong probability that Plaintiffs will succeed on the merits in this first application for injunctive relief.

65. The defendants have intentionally created a rezoning plan for Metropolitan Nashville school children that is a racially identifiable plan. It

marks a return to racially segregated schools in violation of the Fourteenth Amendment due process and equal protection guarantees and 42 USC 1983 et seq. Defendants' rezoning plan is a racially identifiable student assignment plan in direct violation of Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007). The defendants have intentionally decided to make majority black population schools blacker and majority white schools whiter. They accomplished this by a 5 to 4 vote of the School Board conditioned on the false and fraudulent promise of extra money and extra resources for the black majority schools in the Pearl Cohn school cluster in north Nashville. The defendants adopted this rezoning plan with every white member of the Metro Nashville school board voting for the rezoning plan and every black board member but one voting against the rezoning.

66. The truth of what is happening at John Early and other majority black schools exposes the Nashville rezoning plan as the segregationist fraud that it is. The failure of the defendants to take action to provide necessary and critically important school books is further evidence of their wrongful and illegal intent to re-segregate the Nashville schools.

67.  The Defendants started this segregationist rezoning plan with the opening of school in August 2009 and while students in white majority schools in Nashville received their school textbooks at the start of school, many black students rezoned from the white majority schools to the

majority black schools have still not received their textbooks even though school supposedly started three weeks ago. It is 2009 in America and the Nashville school system defendants have not seen fit to provide textbooks to majority black school students in north Nashville under this segregationist rezoning plan.

68. The evidence of wrongful intent is that the Defendants adopted this segregationist plan after a two year campaign to elect Board members to vote for the rezoning plan. They succeeded in electing school board members to accomplish this. The defendants then adopted this rezoning plan with every white member of the Metro Nashville school board voting for the rezoning plan and every black board member but one voting against the rezoning.

69. The defendants wrongful intent is that the Defendants claim constantly they are doing this only for the best interests of African American students. The defendants claim that their best interest, as stated by the white School Board chair more than once, is that black students are going to fail, so we need to put all the black students together in predominantly black north Nashville and encourage them to have more attentive parents and use the extra school resources (not delivered as evidenced by no textbooks) that will be promised by the defendants.

70. The further evidence of the defendants wrongful intent is that the white popularly elected leader in the Community Task Force on Student Assignment for rezoning that the defendants appointed have stated several times that black children need to go to their local neighborhood schools and not to white neighborhood schools and that will be better for everybody as well as stating that some of his best friends are black.

71.  The further evidence of the defendants wrongful intent is that the rezoning plan's primary purpose was to move African American students out of the majority white Hillwood schools cluster and out of the majority white Hillsboro schools cluster and send them to the majority black Pearl Cohn schools cluster. The defendants wanted black children out of schools located in the majority white Hillwood and majority white Hillsboro clusters (located in predominantly white neighborhoods).

72.  The further evidence of the defendants wrongful intent is that this rezoning plan returns Nashville to the old days of school segregation by race in violation of Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007), and in violation of Brown v. Board of Education, 347 U.S. 483 and 349 U.S. 294. The prior white School Board chair claimed and repeated that the motivation and intent of the rezoning plan was to move black students out of the white neighborhood schools in hopes that the white parents would return their children to the white schools once large numbers of black students were moved out.

73. The further evidence of the defendants wrongful intent is that the School Board proceeded to rezone based on this segregationist intent and assumptions. Amazingly for a school board that was the losing defendant for more than 40 years in a racial segregation of schools case, they never asked for and never obtained a legal opinion as to the legality of this rezoning action.

74. The intent of the defendants is obvious from the failure of the defendants to seek or to ask for any legal opinion concerning the rezoning plan from the Metropolitan Government Department of Law or any other legal counsel for the Board of Education. The defendants knew or should have known when they adopted the rezoning plan that in Goss v. Board of Education, the Supreme Court deemed invalid as necessarily contributing to racial segregation plans that permitted a student who was in a minority to transfer to a school where he would be in a majority.

75. The defendants knew or should have known when they adopted the rezoning plan that the Supreme Court rejected "freedom of choice" plans by school districts in Green v. County School Board of New Kent County, 391 U.S. 430, 431-32, 441, 20 L Ed 2d 716, 88 S Ct 1689 (1968). In Green, the Court held that student assignment plans, faculty, staff, transportation, extracurricular activities, and physical facilities had to be free from racial discrimination.

76. In fact, the Metro Nashville School Board never complied fully with the settlement agreement that ended that 40 year desegregation case in the late 1990's. The intent of the defendants is obvious from the failure of the defendants to live up to or to perform the agreements that were made in 1998 to settle the four decades long racial desegregation case of Kelly vs. Nashville Board of Education. That agreement by the School Board set forth two "immutable factors" along with certain principles such as "diversity." The second "immutable factor" is "consistent feeder patterns" meaning "children who start school together stay together during their thirteen years of school"- an immutable factor that has now been made mutable by the adoption of the rezoning plan. The  "Summary of Pupil Assignment Plan" prepared for the School Board by the School Board attorney summarizes the settlement of the four decade old desegregation lawsuit in Nashville. Under the rezoning plan, the defendants have created an immutability principle that will permanently segregate the Nashville schools. The new rezoning or student assignment plan moves the Nashville public school system in the direction of a dual, segregated school system since the rezoning plan passed by the defendant school board increases one-race majorities in the Nashville schools. Such a purposeful move by the defendants toward segregation of the schools is in violation of the 14th Amendment as well as the state constitution. This intentional move by the defendants is in violation of the agreement in settlement of the Kelly v. Board of Education desegregation

case in Nashville to remain unitary (a settlement that the defendants never complied with fully in many important respects).

77. The further evidence of the defendants wrongful intent is that before adoption of the rezoning plan, the defendants did not study any of the peer reviewed, published data on re-segregation and its effects. They did not study and did not rely on any of the numerous empirical studies of re-segregation and rezoning efforts. They rejected several requests for more time in order to study these factors. The intent of the defendants is obvious from their claim that they studied the so called rezoning policy at length but in fact have admitted numerous times that they did not read, rely upon, or consult any peer reviewed studies or other scientific data about student assignment plans and race (or any other factor) in Nashville or anyplace else before adopting the rezoning plan. There are hundreds of such studies

78. The further evidence of the defendants wrongful intent is that they made extraordinary efforts in March and April 2009 to contact black families about transfer and choice options (where for the next year some black children can attend their prior majority white schools). They made no such effort to persuade white families to send their white children to majority black schools.

79. The further evidence of the defendants wrongful intent is that under the student rezoning plan that took effect three weeks ago, Plaintiffs' children and other students identified as African-American have been removed from the Hillwood cluster (majority white) to the Pearl Cohn cluster (majority black). In many instances the defendants have stated that the purpose of this rezoning plan is to better utilize space and to increase parent involvement but the white chairman of the School Board has claimed more than once that the rezoned minority students cannot learn (in majority white schools) and that African Americans are failing so the School Board believes that they should separate and rezone African American students to the majority black Pearl Cohn cluster and send extra resources to the Pearl Cohn cluster schools and this rezoning is a way to give them extra help.

80. The further evidence of the defendants wrongful intent is that many times the defendants claimed that they would budget millions of extra dollars for the Pearl Cohn cluster schools and students to implement the rezoning plan. This false claim was made by the defendants many times in the Nashville community and was specifically pledged at the school board meeting that adopted the rezoning plan. The 1896 Plessy majority would have been delighted by this plan. "whites" will return.

81. Further evidence of the defendants' wrongful and illegal intent is that from the very beginning of the rezoning study group in 2007, the defendants recognized and knew their proposed rezoning was the road map to racial re-

segregation of the Nashville schools. This "massive rezoning of (Nashville) schools" was first announced by the defendants on October 10,2007. "Out from under the segregation lawsuit, Metro said it is attempting to stop busing people in a cross-town manner that resembles an airport flight schedule. But of course if schools stop busing, schools that are not as racially diverse will be the result...." (emphasis added).Source: October 10, 2007, Nashville NBC-TV affiliate at wsmv.com

82. The defendants have a heavy burden of strict scrutiny to show that the interest they allegedly seek to achieve (better utilization of school building capacity and parent involvement) justifies the extreme means they have chosen--discriminating among individual students based on race by relying upon racial classifications in making school assignment/zone changes. Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007) and Grutter v. Bollinger, 539 U.S.325.

83. As the Supreme Court recently ruled in Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007) "racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification, Fullilove v. Klutznick, 448 U. S. 448, 537 (Stevens, J., dissenting)." Governmental distributions of burdens or benefits based on individual racial classifications are reviewed under the strict scrutiny standard, e.g., Johnson v. California, 543 U. S. 499, 505-506. Thus, the defendants must demonstrate that their

use of such classifications is "narrowly tailored" to achieve a "compelling" government interest. Adarand, 515 U.S. 200, at 227.

84. These defendants are not remedying the effects of past intentional discrimination which might perhaps be a compelling interest under the strict scrutiny test, see Freeman v. Pitts, 503 U. S. 467, 494, since the court-ordered desegregation, and the desegregation decree to which the Metro Nashville Davidson County schools were previously subject was settled in the 1990s.

85.  In this case, race is not considered as part of a broader effort to achieve "exposure to widely diverse people, cultures, ideas, and viewpoints," Grutter v. Bollinger, 539 U.S.325, 330.The defendants cannot validly argue that other factors, such as choice options, student preferences, or transfer policies replace the rezoning/assignment decisions since under each plan when race comes into play, it is decisive in determining capacity and availability.

86. The defendants could have achieved their alleged goals in a far less restrictive and effective manner that is narrowly tailored. Instead the defendants are classifying and assigning school children according to a binary conception of race that is an extreme approach in light of Supreme Court precedents and the Nation's history of using race in public schools, and requires more than such amorphous ends to justify it. The defendants

have also failed to show they considered methods other than racial classifications to achieve their alleged goals. Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," Grutter at 339.

87. This rezoning plan is tied to specific racial demographics, rather than to any pedagogic concept of the factors needed to obtain the asserted educational benefits. Here the defendants worked backward to achieve their goal (less African American students in white majority schools), rather than working forward from some demonstration of a legitimate educational goal and benefits. Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007) This is a fatal flaw under the Court's existing precedent. See, e.g., Freeman v. Pitts, 503 U.S. 467, 494. While the defendants use various verbal formulations to describe the alleged interests they seek to promote (building capacity, parent involvement, "neighborhood schools")--they offer no definition suggesting that their interest differs from using race as the deciding factor. The agenda clearly became to have a student assignment plan that pushed for neighborhood schools as a disguised resegregation plan. It brings back to their neighborhood schools the African American students presently being bussed leaving white majority schools in the richer sections of town and black majority schools in the poorer section of town. The underlying assumption by their secret business/chamber of commerce financial

supporters is that if the rezoning is done successfully, white parents would returnto the majority white schools.

88. Government action by the School Board dividing people by race is inherently suspect because such classifications promote "notions of racial inferiority and lead to a politics of racial hostility," Richmond v. J.A. Croson, 488 U.S.469, 493; "reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin," Shaw v. Reno, 509 U. S. 630, 657, and "endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict," Metro Broadcasting, Inc. v. FCC, 497 U. S. 547, 603 (O'Connor, J., dissenting).

89. As the Supreme Court ruled in Parents Involved in Community Schools v. Seattle School District, 000 U.S. 05-908, 127 S.Ct. 2738 (2007), when it comes to using race to assign children to schools, history will be heard. In Brown v. Board of Education, 347 U. S. 483, the Court held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because the classification and separation themselves denoted inferiority. Id., at 493-494. It was not the inequality of the facilities but the fact of legally separating children based on race on which the Court relied to find a constitutional violation in that case. Id., at 494. The argument of the plaintiffs in Brown was that the Equal Protection Clause "prevents states from according

differential treatment to American children on the basis of their color or race," and that view prevailed. The Court ruled in its remedial opinion that Brown required school districts "to achieve a system of determining admission to the public schools on a nonracial basis." Brown v. Board of Education, 349 U. S. 294, 300-301 (emphasis added).

90. Under the pressure of school integration orders from the federal courts in the 1950s, 1960s, 1970s, 1980s, and 1990s, a great deal of "white flight" occurred in the Nashville Public Schools as white parents moved to surrounding counties, outside of Nashville, to flee integration of the schools and established many private schools to avoid integration. The Nashville Board of Education then continued to resist integration and continued the legal fight until the mid 1980s with the political justification of "neighborhood schools" and sending their children to schools closer to their home (the same justification stated by the defendants for this rezoning plan- "allow students to attend schools closer to home"). The Nashville Board settled the Kelly v. Nashville Board of Education lawsuit by making promises and agreements pertaining to unitary status that were never carried out.

99. The defendants are engaged in pretext. They are carrying out a thinly disguised set of policies and programs predicated on racial identity. This racial discrimination was never more obvious than in recent months when

the defendants, pursuant to their rezoning plan, claimed that many students would have an opportunity to choose, or to transfer schools if their parents made that election by a deadline of March 31, 2009. Yet when and as the deadline approached (and was extended), the defendants mounted a major effort to contact and inform parents of their so-called choices and that major effort was directed at African American parents. Not at white and other race parents. Not at all parents, but at African American parents.

100. The Defendants have engaged in deliberate racially discriminatory policies by their 5 to 4 official adoption of a student rezoning plan and student assignment plan that is predicated on racial identification and racial stereotypes, is based upon using race as a factor in the assignment of students, is intended and designed to remove African American students from the Hillwood High School cluster and other white majority schools. With the adoption of this racially discriminatory rezoning plan, 5 of the 9 school board members voted to return to the "separate but equal" doctrine of Plessy v. Ferguson. This school pupil assignment/rezoning plan attempts to confine many African American, Hispanic/Latino, and other racial minority students to schools in "their" neighborhoods while the School Board made empty, false promises to send extra resources to "their" schools to allegedly match the white majority schools.

101. These actions, policies, practices and deliberate inactions by the defendants to adopt and enforce racially discriminatory practices and policies

in the new student assignment plan/rezoning plan violate both the equal protection clause and the due process clause of the Fourteenth Amendment of the federal constitution and the state constitution.

102. While acting under color of law, these actions, policies, practices and deliberate inactions by the defendants to adopt and enforce racially discriminatory practices and policies in the new student assignment plan/rezoning plan violate 42 USC sec.1983 by depriving plaintiffs of their rights, privileges, or immunities secured by the Constitution and laws.

103. Plaintiffs have a substantial likelihood of success on the merits. Other than the injunctive relief sought herein, plaintiffs have no other plain, speedy or adequate relief. Furthermore, there will be and is an immediate and irreparable harm, loss, injury and threat of injury under the defendants' rezoning plan. Plaintiffs seek an immediate restraining order and in due course a preliminary and permanent injunction to enjoin the enforcement, use, practice and application of the rezoning plan and an order that the actions of the defendants herein be declared, unconstitutional and void as a violation of the 14th Amendment due process and equal protection clauses and in violation of 42 U.S.C. 1983 et seq.

104. Plaintiff's hereby amend to add as an additional plaintiff

Keith Caldwell, a Nashville resident who is a parent of two Metro Nashville public school students and to add as a plaintiff Minister Xuam Lawson and Rigena Lawson who are parents of a Metro Nashville Public School student in the 6th grade and to add as a plaintiff Carroll Lewis a Nashville resident who is the parent of a 7th grade student at John Early Middle School (that she chose only because last year it was a magnet school – which no longer exists under the rezoning plan)  and to ad as a plaintiff Tennessee Alliance for Progress . TAP is an eight year old think-tank and act-tank working to create healthy families and communities in Tennessee.

105.  Defendants have failed to deliver necessary and required school books to many schools including no assignment or delivery of the mathematics book to plaintiff Lawson's 6th grade daughter.

106.  Many mistakes have been made in the rezoning, option choices and transfers. Plaintiff Lewis's daughter was wrongly denied her transfer under the rezoning to Bellevue Middle School.

107.  While millions were promised by the defendants to attract more experienced teachers to the Pearl Cohn cluster, in fact very few teacher transfers have occurred.

108. The rezoning has been a failure.


                                                    _____ /s/Larry Woods

Larry D. Woods

Allen N. Woods II

707 18th Avenue South, Ste.9

PO Box 128498

Nashville, TN 37212

(615) 321-1426

Attorney for Plaintiffs

CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of the foregoing  has been served on all counsel of record this 4th day of September 2009 by placing same in the U.S.Postal Service,first class postage paid,addressed to their office (or by hand delivery to said counsel).

___/s/ Larry Woods_____