IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FRANCES SPURLOCK and JEFFREY SPURLOCK, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:09-cv-0756 |
| DAVID A. FOX, et al., | ) ) | Judge Nixon |
| Defendants. | ) ) | |

## ORDER

Pending before the Court, *inter alia*, is Plaintiffs Frances Spurlock, et al.'s ("Plaintiffs")

Motion to Strike ("Plaintiffs' Motion") (Doc. No. 127). Defendants responded (Doc. No. 132).

Also pending is Defendants David A. Fox, et al.'s ("Defendants") Motions to Strike

("Defendants' Motion") (Doc. No. 128). Plaintiffs have responded (Doc. No. 130), and

Defendants replied (Doc. No. 133). On June 28, 2010, Plaintiffs requested leave to respond to

Defendants' Reply ("Plaintiffs' Motion for Leave") (Doc. No. 136).

The Court has now considered the parties' filings and in-court testimony, and will

address each motion in turn.

## I. BACKGROUND

This is a proposed class action challenging the Metropolitan Nashville Board of

Education's July 2008 Student Assignment Plan ("Rezoning Plan"). Plaintiffs, suing on behalf

of approximately 3,200 students enrolled in the Metropolitan Nashville public school system and

their parents and guardians, claim that the Rezoning Plan violates Tennessee state law, the

Fourteenth Amendment due process and equal protection guarantees, 42 U.S.C. § 1983 *et seq.*,

and *Parents Involved in Community Schools v. Seattle School District*, 551 U.S. 701 (2007).

(Doc. No. 1.)  Under each claim of relief, Plaintiffs seek class certification, a

declaratory judgment, preliminary injunction, permanent injunctive relief, and attorneys' fees

and costs.[1]

From November 3, to November 20, 2009, the Court held a hearing on Plaintiffs' Motion

for Preliminary Injunction ("the Hearing").  Both parties presented witnesses and sought to admit

a large number of exhibits during the Hearing.  This Court's decisions on Parties' non-

evidentiary motions are forthcoming, but the Court must first resolve the evidentiary objections

contained in Parties' motions to strike.


## II.  PLAINTIFFS' MOTION TO STRIKE

### A.  Testimony of Milan Mueller

Plaintiffs generally cite Federal Rule of Civil Procedure 26(a)(2) in support of their

motion to strike portions of expert witness Milan Mueller's testimony.  (Doc. No. 128.)

Plaintiffs argue that Defendants failed to make the proper disclosures in preparation for the

Hearing.  (Doc. No. 127, at 3.)  Because Defendants didn't carry out the proper disclosures, the

reasoning goes, parts of Mueller's testimony came as a surprise to Plaintiffs.  Furthermore,

Plaintiffs allege that Mueller opined on issues in which he is not an expert.  (*Id.*)  Defendants

---

[1]A more comprehensive analysis of the facts in this case is unnecessary at this time.  The Findings of Facts

respond generally that they complied with Rule 26(a)(2): in all instances, the testimony or

evidence presented related directly to Mueller's report, or, at a minimum, the data on which he

relied in forming his opinions and which he referenced in his report.  (Doc. No. 132, at 2.)

The Seventh Circuit has interpreted Federal Rule of Civil Procedure 26 as requiring

parties to include in the expert's report:

> (1) a complete and detailed statement of all opinions to be expressed at trial and the basis and reasons in support of those opinions. In simple language, this means that the report must contain all information relating to "how" and "why" the expert reached the conclusions and opinions contained within the report;
>
> (2) the data or other information considered by the witness in forming the opinions. This means "what" the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions contained within the report. This includes factual information given to the expert by the attorney in forming an opinion;
>
> (3) all exhibits to be used as a summary of or support for the opinions. This category encompasses demonstrative evidence which summarizes or supports the expert's opinions;
>
> (4) the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years;
>
> (5) the compensation being paid for the study and testimony given by the expert; and
>
> (6) a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years. At a minimum, the identification of "cases" should include the name of the court or administrative agency, the names of the parties, the case number, and whether the testimony was by deposition or at trial.

*Salgado by Salgado v. GMC*, 150 F.3d 735, 742 (7th Cir. 1998) (citing Robert Matthew Lovein,

*A Practitioner's Guide: Federal Rule of Civil Procedure 26(a)—Automatic Disclosure*, 47

Syracuse L. Rev. 225, 257-58 (1996)) (other citations omitted).

---

and Conclusions of Law will contain all relevant facts in this case.

Rule 26 prevents one party from "sandbagging" an opposing party with new evidence. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 62649 (S.D.N.Y. July 20, 2009). "A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor. The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Salgado by Salgado*, 150 F.3d at 742 (citations omitted). "[T]he test of a report is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Id.* (quoting *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996). "Ideally, an expert report would contain every fact, conclusion, and detail of the planned testimony. However, '[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report . . . . The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.'" *Id.* (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Roberts ex rel Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (internal citations and quotation marks omitted).

### 1. Definition of "Segregative Effect"

During the Hearing, Mueller listed several factors used to measure segregative effect:

Q. And how do you define segregative effect?

A.    Segregative effect is where students are—when you look at students being assigned on the basis of race and it results in students being isolated.

Q.    What factors did you consider in determining whether there was a segregative effect in this case?

A.    The factors that we looked at were the diversities of schools, specifically looking at where we had *three or more ethnic groups with ten percent or greater at each school*.  [**"10 percent" metric**]  We used that as a measure.  Another diversity measure that we also used was how many schools—or count by schools the number of where the—there was *no single majority*.  [**"no majority" metric**] . . . And then on the other side to look at the isolation, we looked at *90 percent or more*.  [**"90 percent" metric**]

(Tr. Vol. A, at 10:24-11:8.)  Later in his testimony, Mueller also listed other considerations in reaching his conclusion:

A.    It's based on the increased diversity that we have seen at the schools with the new plan in place.  It's based on the increased *number of choices* that are now available to students that weren't available before **["choice" metric]**, the *provision of transportation* that was made available to the families, as well **["transportation" metric]**.

(*Id*. at 31-32.)

Plaintiffs move to strike Mueller's definition of "segregative effect," claiming he failed to disclose its meaning in his expert report.  Mueller does not explicitly define the phrase "segregative effect" in his report, although he describes how he assesses "the degree of school diversity."  He writes, "One approach to assess the degree of school diversity is to recognize schools with *three or more racial/ethnic groups with each group having at least 10 percent or greater of the student enrollment* [**"10 percent" metric**]."  (Doc. No. 132, Att. 1, at 1.)  In his examination of the Nashville public schools, Mueller also notes schools that have "a single ethnic/racial group with *90 percent or greater* [**"90 percent" metric**]."  (*Id.*)  He also noted "the percentage changes of the ethnic/racial enrollment before and after the rezoning."  (*Id.*)  Mueller did not mention any use of the "no majority," "choice," or "transportation" metrics in his report.

5

Defendants, citing *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201 (6th Cir. 2006), respond that Mueller's explanation of "segregative effect" is mere "expounding" upon what he disclosed in his report, as permitted by the Sixth Circuit. (Doc. No. 132, at 2.) In *Thompson*, the district court precluded an accounting expert from testifying that his opinion was based on generally accepted accounting principles (GAAP), because the expert report did not specifically refer to GAAP. The Sixth Circuit reversed, stating that Rule "26(a)(2)(B) does not limit an expert's testimony simply to reading his report" and instead "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson*, 470 F.3d at 1203. The court's decision was based largely on the fact that, "[i]n the absence of an alternative accounting convention pertinent to the case, it may be assumed that certified public accountants base their calculations and opinions on the normal general standards of their profession." *Id*.

The Court finds *Thompson* inapposite here. Defendants do not assert that Mueller's testimony regarding segregative effect is based on common background principles of his field. Instead, Mueller used his own methods that were not previously disclosed in his reports. Mueller's testimony regarding certain undisclosed metrics is therefore not the kind of "expounding" contemplated by the Sixth Circuit. *See Smith v. Pfizer Inc.*, 2010 U.S. Dist. LEXIS 47698, at *24-25 (M.D. Tenn. May 14, 2010) (distinguishing *Thompson* on similar grounds).

Defendants also state that "nothing (other than their own strategic decision) prevented Plaintiffs from deposing Mueller before the Hearing. To the extent Plaintiffs desired to know exactly how Mueller defined 'segregative effect,' they could have obtained that information

6

through an expert witness deposition."  (Doc. No. 132, at 4.)  It is true that if Mueller had been deposed and opinions not disclosed in his report were disclosed during his deposition testimony, those opinions would be admissible at his live testimony.  *EEOC v. Freeman*, 626 f. Supp. 2d 811 (M.D. Tenn. 2009).  This exception underscores the notion that one of the primary purposes of Rule 26 is to provide the opposing party with sufficient notice of what the expert witness intends to testify about so that unnecessary depositions are avoided, and costs are reduced.  *See also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 2009 U.S. Dist. LEXIS 62649.  To create an exception to Rule 26 when a party declines to depose a witness would defeat one of the primary purposes of Rule 26.

Because Mueller did not give notice to Plaintiffs about his use of the "no majority,"[2] "choice," and "transportation" metrics, the Court hereby **GRANTS** Plaintiffs' Motion with respect to any testimony regarding Mueller's conclusions regarding the Rezoning Plan's "segregative effect."[3]  However, in parts of Mueller's testimony, Mueller makes statements based solely upon the "10 percent" and "90 percent" metrics.  Because such statements are based upon methods described in his report, the Court finds they are in compliance with Rule 26 and deems such statements **ADMISSIBLE** under Rule 26.

---

[2] For elaboration on the inadmissibility of this factor, *see infra*.

[3] Defendants also argue that the Court should deny Plaintiffs' Motion because Plaintiffs' expert witness, Dr. Leslie Wade-Zorwick, testified to a matter that she did not present in her expert report.  (Doc. No. 132, at 3.) Defendants observe that Dr. Zorwick's expert report (*Id.*, Att. 2) did not opine on the impact of the rezoning plan, and in her deposition, she specifically stated that she was not offering an opinion about the impact of the plan (Tr. Vol. 3 at 377:1-12).  (*Id.*, at 3.)  Nevertheless, Defendants state, in her testimony, Dr. Zorwick testified about the impact of the plan, stating that "this plan would increase segregation in the schools (Tr. Vol. 3, at 412:9-413:14). (Doc. No. 132, at 3.)  This Court disagrees with Defendants.  Dr. Zorwick's expert report did state her opinion about the plan—in fact, a heading in her report reads, "Shifting to 'neighborhood schools' disproportionately hurts minority students. *This is empirically true in Nashville*."  (Doc. No. 132, Att. 2, at 6 (emphasis added).)  Dr. Zorwick's report proceeds by describing the plan as concentrating students "into segregated, neighborhood schools." (*Id.*)  The Court therefore declines to strike Dr. Wade-Zorwick's testimony on this subject.

### 2. *"Schools with no one race in the majority"*

Plaintiffs also seek to strike Mueller's testimony about "schools with no one race in the majority," used as a factor in assessing the Rezoning Plan's segregative effect (referred to by this Court as the "no majority" metric, *supra*). (Doc. No.127, at 6.) Plaintiffs note that the witness admitted that this factor was not addressed in his initial report. (*Id.*) During Mueller's cross-examination, he stated, "In that initial report, [the "no majority" metric] wasn't addressed there. It was a follow-up on sort of the consistent going forth of the information that we were compiling afterwards." (Tr. Vol. A, at 53:16-19.)

Defendants respond that Mueller's report repeatedly refers to the racial makeup (by percentage) of various schools and clusters, and specifically references the demographic data chart to which the parties and witnesses have referred throughout this case and during the Hearing. (Doc. No. 132, at 4.) Defendants allege that any percentages about which Mueller testified in this case came directly from his review of that data, and Plaintiffs were provided fair notice of his intent to rely and opine about that data. (*Id.*)

Defendants cite *Creative Waste Mgm't, Inc. v. Capitol Environmental Services, Inc.*, 495 F. Supp. 2d 353 (S.D.N.Y. 2007), in support of their argument. In *Creative*, the district court admitted expert testimony regarding the amount of damages suffered by the plaintiff, even though his expert report did not offer an analysis or conclusion regarding the plaintiff's damages. The court reasoned that the expert's testimony as to the amount of damages, although not explicitly noted in his report, was based solely on evidence admitted at trial. "Far from a complicated, in-depth analysis, [the expert's] testimony reflected a simple computation based on evidence already in the trial record." *Id.* at 357.

8

This Court finds *Creative* unconvincing, as Mueller's analysis of the demographic data went beyond a "simple computation." As described in the previous section, "segregative effect," at least as it appears from the Parties' memoranda, is a phenomenon that may be determined using an almost infinite number of computations and guidelines. While the consideration of the "no majority" metric may be a legitimate consideration in determining segregative effect, it is in no way an obvious metric to a non-expert looking at school demographic data. For the reasons set forth in this and the previous section, the Court hereby **GRANTS** this portion of Plaintiffs' Motion.

### 3.     *Building Capacity and Student Transportation*

Plaintiffs next move to strike Mueller's testimony regarding building capacity utilization and student transportation, stating that they were not mentioned in Mueller's expert report. (Doc. No. 127, at 6.) Defendants respond that Mueller's testimony is related to his opinion that the Rezoning Plan did not have a segregative effect. (Doc. No. 132, at 5.) Furthermore, they state, the "demographic data" to which Mueller's report refers in the first paragraph contains the data Mueller used to arrive at his contested conclusions. (*Id.*) Defendants also cite *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 908 (E.D. Mich. 2003) for the proposition that the Court should be more lenient in their enforcement of Rule 26(b)(2)(B) in preliminary injunction proceedings, since the time for discovery is compressed. (Doc. No. 132, at 5 n.1.)

The Court finds Defendants' justifications inapposite. First, an expert is not permitted to testify to subject matter not mentioned in his expert report merely because it is "related" to topics disclosed in his expert report. Defendants cite no case in support of this reasoning, and the Court

9

does not find the purposes behind 26(b)(2)(B) to be furthered by the creation of such a broad exception. Permitting an expert witness to testify about any subject matter "related" to a subject covered in her report would eliminate one of Rule 26's primary functions—to provide the opposing party with notice.

Second, in regards to Mueller's reference to his use of "demographic data" in his expert witness report, it is useful to include part of the report here. In his report, Mueller states: "My review involved reading several documents which included, but are not limited to, the objectives of the rezoning process, the *student demographic data used in the rezoning*, and the proposed and approved rezoning plans." (Doc. No. 132, Att. 1, at 1 (emphasis added).) Such a general statement summarizing the documents reviewed is not sufficient to put Plaintiffs on notice that Mueller was also going to testify about building capacity and student transportation. Indeed, Mueller wrote in the last sentence of his introductory paragraph, "My opinion based on the information I reviewed is that the District's 2009 student assignment plan did not segregate students based on ethnicity and race." (*Id.*) For the remainder of the report, Mueller analyzes the change in racial make-up of Metro public schools. Nowhere does he mention building capacity or student transportation.

Finally, the Court finds Defendants' use of *Midwest Guaranty Bank*, 270 F. Supp. 2d 900, unconvincing. First, the compressed timeline for preliminary injunction proceedings does not permit parties to deviate indiscriminately from Rule 26(b)(2)(B). Moreover, this Court granted the parties' joint request to continue the preliminary injunction expressly for the purpose of allowing parties to complete discovery. (Doc. No. 76.) If the Defendants found the two-month timeline too abbreviated, they could have stated so at this juncture and at later times once

10

they realized the expert reports would not be ready. Indeed, Defendants requested, and this Court granted, amendments to the Case Management Order regarding the final date for deposing witnesses. (Doc. No. 90.) Defendants also could have sought stipulations with the opposing party to permit more perfunctory expert witness reports in light of the hasty nature of the preliminary injunction. Defendants failed to do either. For these reasons, the Court hereby **GRANTS** this portion of Plaintiffs' Motion.

### 4. *General Movement Away from Non-Contiguous Zoning*

Plaintiffs move to strike the following statements by Mueller: (1) statements regarding a general movement across the country away from non-contiguous zoning and toward Nashville's example of neighborhood schooling (Tr. Vol. A, at 15:19-16:22); (2) testimony regarding how the Rezoning Plan provided for choice "in perpetuity as opposed to being a temporary grandfathering-type clause" (Tr. Vol. A, at 16:10-15); and (3) any of Mueller's observations about how Metro did not assign a default school to students (Tr. Vol. A, at 17:1-8, 29:20-30:5). (Doc. No. 127, at 6.) Plaintiffs argue, *inter alia*, that nothing about this subject was mentioned in his expert report. (*Id.*) Plaintiffs are correct in finding that nothing in Mueller's report suggested he would testify to these opinions. For the reasons stated herein and in previous sections, this Court agrees, and **GRANTS** this portion of Plaintiffs' Motion.

### 5. *Reference to Dr. Gary Orfield*

Plaintiffs also move to strike a portion of Mueller's testimony where he refers to literature by Dr. Gary Orfield (Tr. Vol. A, at 22:5-17). (Doc. No. 127, at 6-7.) Plaintiffs state that Dr. Orfield was not mentioned in Mueller's report, nor did the witness provide a relevant

citation or attach a copy of the article he relied on.  Defendants, while conceding that Mueller

does not mention Dr. Orfield in his report, respond that one of Dr. Orfield's theories, namely the

"10 percent" metric, is discussed in Mueller's report.

The Court construes Plaintiffs' motion as a request to strike references to Dr. Orfield, not

Mueller's use of the "10 percent" metric.[4]  The Court finds that because Dr. Orfield was not

mentioned in Mueller's report, his discussion of Dr. Orfield during his testimony was

inadmissible, and hereby **GRANTS** this portion of Plaintiffs' Motion.

### 6.    *Definition of "Racially Isolated Schools"*

Plaintiffs move to exclude Mueller's use of the "90 percent" metric to define "racially

isolated" schools, because the witness did not "clearly explain, in his report or elsewhere, why he

chose 90%." (Doc. No. 127, at 7.)  Defendants respond that throughout his expert report,

Mueller discussed this "90 percent" metric.  Further, they state, "Plaintiffs' argument goes purely

to the weight of Mueller's testimony, not its admissibility." (Doc. No. 132, at 7.)  The Court

agrees with Defendants, as Plaintiffs received notice as to Mueller's use of the "90 percent"

metric in his report—whether 90 percent is the proper metric to use in determining racial

isolation goes to the weight, not the admissibility, of the evidence.  The Court hereby **DENIES**

this portion of Plaintiffs' Motion.

---

[4] Defendants state that under Plaintiffs' reasoning, Plaintiffs' expert, Dr. Morton-Young, also made inadmissible statements.  (Doc. No. 132, at 6.)  Defendants state that, at the time of her deposition, Dr. Morton-Young was unable to identify the authorities she claimed supported her opinions in this case.  (*Id.*)  Defendants point out that Dr. Morton-Young only provided a bibliography of the sources for the bases of her opinion "just before she testified." (*Id.*)  The Court wishes to clarify: The Court is striking only the portions of Mueller's testimony in which he *refers to* literature by Dr. Orfield.  The Court declines to strike all of Mueller's testimony *based on* the writings on Dr. Orfield.

### 7. Exhibits Not Attached to Expert's Report

Plaintiffs also seek to strike Exhibits 81 through 85 in Mueller's direct examination which were not attached to the expert's report, as required by Rule 26(a)(2)(B)(iii). (Doc. No. 127, at 7.) Defendants respond that all of the information contained in these exhibits was contained either in Mueller's report or in the demographic data to which the parties have had access throughout this litigation. (Doc. No. 132, at 7.) "Exhibits 81 through 85 merely provide a *summary* of information already admitted into evidence," Defendants state. (*Id.* (emphasis added).) Defendants again cite *Creative*, 495 F. Supp. 2d 353, in support of their argument. (*Id.* at 8.)

Under Federal Rule of Civil Procedure 26(a)(2)(B)(iii), an expert witness report must contain "any exhibits that will be used to *summarize* or support" data or other information considered by the witness. Fed. R. Civ. P. 26(a)(2)(B)(iii) (emphasis added). The plain meaning of Rule 26(a)(2)(B)(iii) indicates that summaries of data must also be disclosed to the opposing party.

The Court finds that Exhibits 81 through 85 are inadmissible, as they were not attached to the expert witness report, and hereby **GRANTS** this portion of Plaintiffs' Motion.

### 8. Trip to Germantown

Finally, Plaintiffs move to strike Mueller's testimony regarding his tour of Germantown, which took place after he had already submitted his expert report. (Doc. No. 127, at 7.) Defendants respond that testimony was used "merely to bolster Mueller's belief that the plan was not 'segregative.'" (Doc. No. 132, at 8.) Defendants also argue that Plaintiffs cannot establish

they were harmed in any way by Mueller's testimony about Germantown, citing *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008), for the proposition that where non-disclosure is harmless, it may be admissible. (*Id.*)

Defendants neglect to cite any legal authority in support of the proposition that testimony that is merely used to "bolster" an expert's pre-existing opinion is admissible, and the Court was unable to find any cases that adopted this principle. Furthermore, the non-disclosure of Mueller's trip to Germantown is not harmless. Had Plaintiffs' counsel been made aware that Mueller planned on visiting the neighborhood, counsel may have made the decision to present additional witnesses, or at least prepare a more thorough cross-examination of Mueller's testimony on the experience. The Court hereby **GRANTS** this portion of Plaintiffs' Motion.

**B.      Defendants Counsel's Questions and Statements as to Matters of Law**

*1.      Milan Mueller*

Plaintiffs move to strike two of defense counsel's questions to Mueller. During the re-direct examination of Mueller, the following exchange took place:

Q. Sir, do you know whether it's lawful to assign students on the basis of race?

A. Yes, you are not supposed to assign on the basis of race.

Q. So the hypothetical that you were given was asking you to achieve an unlawful result?

THE COURT: Well, I think I can—

(Tr. Vol. A, at 64:23-65:4.) Plaintiffs move to strike these questions under Federal Rule of Evidence 403 as a waste of time with scanty probative value, as argumentative, as assuming facts not in evidence, as misleading, and under Rule 611 as harassment or

14

intimidation of the witness.  (Doc. No. 127, at 9.)  Defendants respond that once the Court said "Well, I think I can—," defense counsel moved on, in effect withdrawing the question.

As Defendants state that counsel withdrew the second question, the only question at issue is the first.  The Court finds Plaintiffs' arguments in support of this motion unconvincing.  The question went to the state of mind of Milan Mueller regarding his knowledge of the law regulating school rezoning.  While his answer does not have a high probative value, it does have some, and, without further questioning, only required a few seconds to answer, did not assume any facts, did not mislead Mueller, and in no way harassed or intimidated the witness.  The Court hereby **DENIES** this part of Plaintiffs' motion.

### C.  Dr. William Rock

Plaintiffs also seek to strike Dr. William Rock's reading of selected portions of 20 U.S.C. 1701 during the Hearing (Tr. Vol. 2, at 249:16-250:1), stating it was inapplicable.  (Doc. No. 127, at 9-10.)  Defendants respond that the point of reading this section "was to address Dr. Rock's assertion that he 'can't imagine' why the Metropolitan Nashville Board of Public Education ("Board") would adopt a Student Reassignment Plan that permits students to attend school closer to home.  (Tr. Vol. 2, at 215:17-23.)"  (Doc. No. 132, at 9-10.)  As the statute stated one of the general policies of the United States was to use "the neighborhood as the appropriate basis for determining school assignments," 20 U.S.C. § 1701 (2010), the Court finds Defendants' justification to be reasonable, and hereby **DENIES** this part of Plaintiffs' motion.

15

### D. Testimony of Dr. Jesse Register

Finally, Plaintiffs move to strike all testimony by Dr. Jesse Register, the Director of Schools for Metro, because Defendants did not provide any expert witness report for Dr. Register prior to the Hearing. (Doc. No. 127, at 10-11.) Plaintiffs argue that because Dr. Register was proffered as an expert in education and student assignment in addition to testifying in his capacity as the Director of Schools, his testimony must be accompanied by an expert witness report. However, the Court finds no language in the Federal Rules of Civil Procedure that requires as much. Rule 26(a)(2) reads:

> (A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

> (B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—*if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.*

Fed. R. Civ. P. 26(a) (emphasis added). As Dr. Register was not retained or specifically employed as an expert witness, and Dr. Register's duties do not regularly involve giving expert testimony, Rule 26(a)(2)(B) does not require a written report to accompany his testimony. The Court therefore **DENIES** this part of Plaintiffs' motion.

## III. DEFENDANTS' MOTION TO STRIKE

### A. Plaintiffs' Motion for Leave to File Surreply

After this Court granted Defendants' leave to file its Reply (Doc. No. 135), Plaintiffs'

sought leave to file a surreply in opposition to Defendants' Motion (Doc. No. 136). Defendants did not respond. Plaintiffs' Motion for Leave is hereby **GRANTED**.

**B.      The Garcia Memoranda**

Defendants move to strike any and all iterations of two memoranda authored by former Director of Schools, Dr. Pedro Garcia. The first, whose earliest version is dated January 16, 2008, recounts a series of events related to Garcia's attempts to implement an effective Rezoning Plan ("the January Memo") (Pls.' Ex. 61). The second, dated February 5, 2008, also describes events surrounding the Rezoning Plan, and also summarizes the history and current challenges of rezoning ("the February Memo") (Pls.' Ex. 120). Defendants argue that the memoranda are hearsay and that they do not fall under any hearsay exceptions.

### 1.      *The January Memo*

#### a)      *The Memo Generally*

Shortly after Garcia wrote his January Memo, he provided a copy to Board member George Thompson, who distributed the memo to members of the press. Plaintiffs argue that Thompson's release of the January Memo to members of the press qualifies as an adoptive admission by publication under 801(d)(2)(B). (Doc. No. 130, at 19-22.) Rule 801(d)(2)(B) provides for a hearsay exception when the out-of-court statement is "a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B).

It is important to note that there are two hurdles Plaintiffs must surmount in order to show the memorandum is admissible. First, Thompson's act of distribution to the press must manifest an adoption of the contents of the memo. Second, Thompson's adoption must be imputed to

Defendants, as he himself is not a defendant but an agent or employee of Defendants.

"Generally, when a party-opponent copies a document and distributes the copies to others, he or she has adopted the content of the document." 1 Matthew Bender, & Co., *Federal Evidence Practice Guide* § 6.04 (2010). Plaintiffs cite *Wagstaff v. Protective Apparel Corp.*, 760 F.2d 1074 (10th Cir. 1985), and *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994), for the proposition that reprinting or publishing of out of court statements constitutes an adoptive admission. (Doc. No. 130, at 19.) In *Wagstaff*, the court held that "reprinting the newspaper articles and distributing them to persons with whom defendants were doing business, defendants unequivocally manifested their adoption of the . . . statements made in the newspaper articles." 760 F.2d at 1078. The court in *Alvord-Polk* held similarly, concluding that statements were adoptively admitted when the party published them in company periodicals. 37 F.3d at 1005 n.6. The Court finds these cases persuasive—Thompson's testimony also confirms that his behavior was an adoption of the truth of the statement, as Thompson said he distributed the Garcia memoranda to the press "so they could call and talk to [Garcia] and confirm the authenticity of this document." (Tr. Vol. 1, at 132:13-20.)

After establishing that a third party's behavior qualifies as an admission, the proponent of the evidence must show the party's action may be imputed to Defendants. In general, "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" qualifies as a statement by the party-opponent, Fed. R. Evid. 801(d)(2)(D), and it is the proponent's burden to show that such a relationship existed at the time the statement was made. *Curtis v. Oklahoma City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1217 n.21 (10th Cir. 1998). Generally, for a statement to be considered

Case 3:09-cv-00756   Document 137   Filed 09/23/10   Page 18 of 41 PageID #: 4049

within the scope of the declarant's agency, "[t]he only requirement is that 'the subject matter of the admission match the subject matter of the employee's job description.'"  5 Matthew Bender & Co., *Weinstein's Federal Evidence* § 801.33 (2010) (citing *Aliotta v. Amtrak*, 315 F.3d 756, 761-63 (7th Cir. 2003); *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8-9 (1st Cir. 1986)).  The Court finds that Thompson's adoptive admission was within his scope of employment.  Thompson was a member of the Board at the time he released the January Memo to the press, and was speaking about a subject matter within his job description, as he was responsible for voting for or against the Rezoning Plan.

Defendants' motion to strike the January 16, 2008 Garcia memorandum in its entirety (Pls.' Ex. 61) is hereby **DENIED**.

### b) *Layers of Hearsay*

Federal Rule of Evidence 805 states that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."  Fed. R. Evid. 805.  "The party arguing for admission bears the burden of establishing the proper foundation for the admissibility of the statements."  *Liadis v. Sears, Roebuck and Co.*, 47 Fed. App'x 295, 303 (6th Cir. 2002).

Defendants move to strike any quotations within the January Memo, asserting that they contain at least two layers of hearsay.  (Doc. No. 128, at 6.)  As an example, Defendants point to a statement in the January Memo that recalls a statement made by Marsha Warden, the former Chair of the Board, to Kathy Nevill, former Board member ("the Marsha Warden Statement"):

> Kathy [Nevill] indicated Marsha Warden was facing significant pressure from the Hillwood cluster parents to get rid of the African American students presently assigned to that cluster.

19

(*Id.* (citing Pls.' Ex. 61, at 2).)  This statement contains three layers of hearsay: (1) Marsha Warden's statement to Kathy Nevill about the pressure she was receiving from Hillwood parents; (2) Kathy Nevill's statement to Pedro Garcia that Warden had relayed this statement to her; and (3) Pedro Garcia's statement in his memorandum that Nevill had relayed this information to Garcia.  As the January Memo has been admitted as an admission of a party-opponent, Plaintiffs have the burden of demonstrating that the remaining two layers of hearsay fall under a hearsay exception, or are otherwise admissible.

### (1)  Warden's Statement to Nevill is Non-Hearsay

In regard to the Marsha Warden Statement, Plaintiffs assert that the layers of hearsay are being offered not for the truth of the matter asserted, but rather for the fact that they were made. (Doc. No. 130, at 24.)  This argument is insufficient to admit all of the layers of hearsay, but succeeds in proving the admissibility of one layer.  The Court agrees that Warden's statement to Nevill need not be submitted for the truth of the matter asserted, but can rather be submitted to illustrate the effect of the parents' statements on Warden's state of mind, and that it is therefore admissible as non-hearsay.  However, Kathy Nevill's statement to Garcia must be submitted for the truth of the matter asserted.  In the context of the sentence, it is Warden's state of mind that would be the fact submitted for its truthfulness, and in order for Nevill's statement to be relevant to Warden's state of mind, Nevill's statement would have to be true.

Plaintiffs also request that the Court exercise its discretion to admit the sentence under the residual hearsay exception, citing Federal Rule of Evidence 807.  (Doc. 130, at 26.)  "Five findings must be made in order to determine the admissibility of evidence under [the residual hearsay exception].  The statement [1] must have circumstantial guarantees of trustworthiness equivalent to those in the first twenty-three exceptions, [2] it must be offered as evidence of a material fact, and [3] must be more probative on the point for which it is offered than any other evidence which can be secured through reasonable efforts. In addition, [4] admissibility must be consistent with the interests of justice, and [5] the proponent must give notice of his intent to offer the statement sufficiently in advance of trial.  *United States v. Popenas*, 780 F.2d 545, 548 (6th Cir. 1985).

In support of their argument, Plaintiffs cite *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1081-82 (6th Cir. 1999), in which the Sixth Circuit allowed the plaintiff's witness, Alan Marsee, to testify that David Morris, an employee of Defendant, told Marsee at a social occasion that Tom McCauley, the plaintiff's supervisor, told Morris to tell Marsee "some bad stuff's going to happen in the back," and that Marsee should stay out of it unless he wanted to be fired. McCauley, the supervisor, was also a witness in this case and was subject to examination by both sides.  The court found McCauley's statement admissible as an admission of a party-opponent under Fed. R. Evid. 801(d)(2).  Regarding the second level of hearsay, the court stated the following:

> The second level of hearsay, that is, the statement from Morris to Marsee, is more
> problematic.  Morris is clearly not an agent of KUKA.  However, given the fact
> that there is testimony that McCauley told Morris to pass the message along to

21

> Marsee allows some leeway in finding that McCauley considered Morris an agent
> and used him as an agent of the company. Under this circumstance, even the
> second level statement can be viewed as non-hearsay under Rule 801(d)(2)(D)
> and therefore admissible. This is particularly true given the fact that McCauley
> was a witness subject to examination in court, not simply an out-of-court
> declarant. Defendants therefore had an opportunity to put before the jury their
> version of the event in question. They could ask McCauley his version of the
> facts concerning the statement and its meaning. The hearsay dangers underlying
> out-of-court statements offered for their truth - sincerity, memory and not under
> oath - are not present when the declarant takes the stand as a witness.

*Id.* (citing E. Morgan, *Some Problems of Proof Under the Anglo-American System of Litigation*

141-68 (1956)). The Court finds the Sixth Circuit's reasoning applicable here. At the time

Nevill made the statement to Garcia, she was a member of the Board, the governmental body

responsible for approving rezoning plans. Nevill's statement therefore has similar guarantees of

trustworthiness as a statement by a party-opponent. Furthermore, as in *Moore*, the primary

declarant (here, Warden) was a witness subject to examination in court, and had an opportunity

to testify to her version of the facts. In fact, Warden did testify during the Hearing, denying that

such a conversation ever took place. (Tr. Vol. X, at 1630:19-1631:4.)

Plaintiffs bear the burden of proving the admissibility of their evidence, *Liadis*, 47 Fed.

App'x at 303, and the Court finds Plaintiffs have successfully proven the admissibility of the

sentence in question. Plaintiffs have declined, however, to offer any reason for admitting any

other quotations included in the January Memo, if any exist. Defendants' motion to strike the

Marsha Warden Statement is therefore **DENIED**, but in regards to any other quotations within

the January Memo not examined here, Defendants' motion is **GRANTED**.

c)      *Lay Opinion*

Defendants move to strike all parts of the January Memo that speculate about the

22

motivations of the Board and/or its individual members in designing and approving the Rezoning

Plan.  Defendants cite as an example a statement contained in the January Memo:

> I know that the situation I find myself in today, and the pressure exerted upon me
> by Marsha Warden, is the direct result of my decision to fight against her desire to
> move the African American children from the Hillwood Cluster so she could be
> re-elected.  Unfortunately, this is a racially-charged issue.

(Pls.' Ex. 61, at 3.)  Plaintiffs respond that this statement, as well as other portions of the

memoranda, is admissible, as it is rationally based on the perception of the witness and not based

on scientific, technical, or other specialized knowledge.  (Doc. No. 130, at 27.)

Federal Rule of Evidence 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of
> opinions or inferences is limited to those opinions or inferences which are (a)
> rationally based on the perception of the witness and (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in issue.

Fed. R. Evid. 701.  Under this rule, lay opinion regarding a third party's state of mind is

admissible if the witness has personal knowledge of the matter forming the basis of the witness's

opinion and is rationally based on his own perception.  *United States v. Tsekhanovich*, 507 F.3d

127, 129 (2d Cir. 2007).  Furthermore, the witness's opinion must be helpful to the jury.  1

*McCormick on Evid*. § 11 (citations omitted).  The modern trend among courts favors

admissibility of opinion testimony.  *Virgin Islands v. Knight*, 989 F.2d 619, 630 (3d Cir. 1993)

(citations omitted).  As the *Knight* court observed:

> The relaxation of the standards governing the admissibility of opinion testimony
> relies on cross-examination to reveal any weaknesses in the witness' [sic]
> conclusions.  If circumstances can be presented with greater clarity by stating an
> opinion, then that opinion is helpful to the trier of fact.  Allowing witnesses to
> state their opinions instead of describing all of their observations has the further
> benefit of leaving witnesses free to speak in ordinary language.

*Id.*

Unlike in *Knight*, Garcia was unable to testify in the Hearing, so Defendants were unable to cross-examine his testimony. However, to the extent the memorandum is admissible as non-hearsay, it meets the equivalent measures of reliability and trustworthiness typically valued by the Federal Rules of Evidence. Garcia's statement about the motivations of various individuals responsible for drafting and approving the Rezoning Plan are based on his personal familiarity with the rezoning process, and his years of experience with the individuals about whom he testified. For these reasons, Garcia's lay opinion opining on the motives of the Board and its individual members are admissible, and the Court hereby **DENIES** this portion of Defendants' motion.

### 2. *The February Memo*

#### a) *Adoptive Admission*

Rule 801(d)(2)(B) provides for a hearsay exception when the out-of-court statement is "a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B). Plaintiffs claim the February Memo was adopted in two ways: (1) At the Hearing, Kay Simmons, current Board member, failed to voice any disagreement with the memoranda and at times confirmed the events described in the Garcia memoranda (Tr. Vol. 9, at 1422:7-1430:18); and (2) Defendants included a copy in a packet of information Defendants sent to their expert witness, Dr. Milan Mueller. (Doc. No. 130, at 19-22.) The Court will address each of these arguments in turn.

#### (1) Admission by Silence

Plaintiffs submit that Defendants adoptively admitted the February Memo during the

Hearing, when Board member Kay Simmons acknowledged her familiarity with facts contained in the February Memo. (Doc. No. 130, at 22.) Defendants respond, "The fact that the party declares that he or she has heard that another person has made a given statement is not alone sufficient to justify finding that the party has adopted the third persons' statement." (Doc. No. 130, at 4 (citing 2 Kenneth S. Broun, *McCormick on Evid*. § 261 (6th ed. 2009).)

Defendants' interpretation of the rule is correct. "The fact that the party declares that he or she has heard that another person has made a given statement is not alone sufficient to justify finding that the party has adopted the third person's statement. The circumstances surrounding the party's declaration must be examined to determine whether they indicated an approval of the statement." 2 *McCormick on Evid*. § 261. In Simmons's testimony, she acknowledged having heard Garcia discuss events which were later outlined in the memoranda. However, Simmons did not acknowledge that the events Garcia described actually occurred as he alleged, only that she heard Garcia recount these events. A witness's statement that they have heard the author of a memo discuss the contents of his memo merely constitutes another form of hearsay, as Garcia's statements to Simmons were out of court statements used to prove the truth of the matter asserted. Thus, such statements do not qualify as admission by silence.

(2)    <u>Adoptive Admission by Sending Document to Expert</u>

Plaintiffs state that Defendants adopted the Garcia memoranda by including a copy of the memoranda in a packet of information Defendants sent to their expert, Milan Mueller. (Doc. No. 130, at 19.) Defendants respond that sending a copy of a document to an expert in no way constitutes an adoptive admission. (Doc. No. 128, at 5.) (citing 2 *McCormick on Evid*. § 261 ("furnishing a copy of an examining physician's report to the opponent under the requirement of

25

a discovery rule should not be considered an adoption"). The Court agrees with Defendants. Mere provision of a document to an expert witness does not reveal a manifestation of adoption or belief in the truth of statements therein. There are many possible reasons why a party may furnish a document to an expert even though the contents of the document are not believed true. For this reason, the Court finds Defendants did not adoptively admit the Garcia memoranda by providing them to expert witness Milan Mueller.

(3)    <u>Federal Rule of Evidence 807: Residual Hearsay Exception</u>

Plaintiffs also request that, if the February Memo does not fall within any enumerated hearsay exception, the Court exercise its discretion to admit the memorandum, citing Rule 807, which provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

Fed. R. Evid. 807.

The Garcia memorandum was an out-of-court statement written by Pedro Garcia around the time of his termination as Board director. As a memorandum written in the usual fashion, it lacks any circumstantial guarantees of trustworthiness—the memorandum was not written under oath, Defendants did not have an opportunity to cross-examine Garcia at the time of his

26

statement, and the circumstances under which the memoranda were written do not closely resemble any other hearsay exception. Furthermore, Garcia's statements would have been more trustworthy had he returned to testify or take a deposition.

The Court hereby finds that the February Memo is hearsay without an exception. Defendants' motion to strike the February Memo is therefore **GRANTED**.

### C. Expert Witness Reports and Portions of Testimony by Drs. Tommie Morton-Young and Leslie Zorwick

Defendants request that the Court strike portions of the testimony of Drs. Tommie Morton-Young and Leslie Zorwick, arguing that: (1) expert witness reports are inadmissible hearsay; (2) the testimony of Dr. Morton-Young is not based upon reliable facts or data and will not assist the trier of fact; and (3) the testimony of Dr. Zorwick is purely hypothetical.

#### 1. Expert Witness Reports

Defendants move to strike each of Plaintiffs' expert witness reports. Defendants contend that expert witness reports are, by definition, inadmissible hearsay. Plaintiffs respond that the expert witness reports are admissible as duly authenticated exhibits that were identified by the witnesses under Federal Rule of Evidence 901. (Doc. No. 130, at 9.) Plaintiffs add that because the expert witnesses were available for cross-examination and were in fact cross-examined, the evidence satisfies any reliability or hearsay concerns. (*Id.*)

Rule 901 requires authentication of documents as a condition precedent to admissibility. Fed. R. Evid. 901. Once a document is authenticated pursuant to Rule 901, it is still subject to all other rules of evidence. Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to

27

prove the truth of the matter asserted." Fed. R. Evid. 801(c). The reports, as statements made out of court offered for the truth of the matter asserted, conform to the common definition of hearsay. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008) (excluding expert reports considered in a motion for summary judgment as hearsay because they were not sworn statements); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006) (finding expert report inadmissible considered in a motion for summary judgment because it was unsworn); *Bishop v. R.E.B. Equipment Service, Inc.*, 735 S.W.2d 449, 451 (Tenn. Ct. App. 1987) (holding that an expert witness report was inadmissible hearsay). Plaintiffs have not offered any hearsay exceptions under which these expert witness reports would belong. The Court agrees with Defendants, and finds the expert witness reports of Drs. Tommie Morton-Young and Leslie Zorwick inadmissible hearsay. The Court hereby **GRANTS** this portion of Defendants' Motion.

### 2. *Expert Testimony*

"Under Rule 702, the district court must examine the expert witness's testimony for reliability and relevance." *United States v. Martinez*, 588 F.3d 301, 323 (6th Cir. Ohio 2009). The notes accompanying the 2000 amendments confirm that "[t]he amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702, Advisory Committee Notes (2000).

Although there is no simple test for determining whether a specific methodology is reliable, the *Daubert* court outlined several factors that a district court should consider when exercising its gatekeeper function. *See Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing *Daubert v. Merrell Dow Phar.*, 509 U.S. 579 (1993)). Those factors include: whether a

28

method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community. *Daubert*, 509 U.S. at 593-94. "Although the Daubert factors are neither definitive nor exhaustive, a court must consider whether they are reasonable measures of reliability in a given case." *MACTEC, Inc. v. Bechtel Jacobs Co., LLC*, 346 Fed. App'x 59, 76 (6th Cir. 2009) (citations omitted).

Six years after issuing *Daubert*, the Court made clear in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that these same factors are also applicable in the context of non-scientific testimony. The *Kumho* Court also made clear that the factors listed above do not constitute a "definitive checklist or test." *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593). "Rather, the gatekeeping inquiry must be tied to the facts of a particular case, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429-30 (6th Cir. 2007) (internal quotations and citations omitted).

In addition to requiring that a proposed expert's testimony be "reliable," Rule 702 requires that the expert's testimony assist the trier of fact. This requirement has been interpreted to mean that expert testimony must "fit" the facts of the case, that is, there must be a connection between the testimony being offered and the disputed factual issues in the case in which the expert will testify. *Pride*, 218 F.3d at 577-78 (citing *Daubert*, 509 U.S. at 592). Thus, a party must show, by a "preponderance of proof," that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case. *Id.* at 592, n.10.

29

*a)*     *Dr. Tommie Morton-Young*

Defendants object to the admission of portions of testimony by Dr. Tommie Morton-Young, a social psychologist and professional in education and educational administration.  In support of this motion, Defendants assert that Dr. Morton-Young's testimony should be stricken because it is not relevant or reliable.  (Doc. No. 128, at 10.)  In particular, Defendants seek to exclude Dr. Morton-Young's statements regarding: (1) what children or parents thought about the Rezoning Plan (Tr. Vol. II, at 275:12-20, 276:17-277:5, 278:8-11); (2) her opinion that "neighborhood schools" equates to "segregated schools" (Tr. Vol. II, at 277:12-20, 278:14-17, 290:22-291:1, 291:10-16, 291:21-292:3); (3) the purpose behind "school choice" (Tr. Vol. II, at 277:21-278:13); and (4) the effects of the Nashville Rezoning Plan (Tr. Vol. II, at 275:15-276:14).  (*Id.* at 10-11.)

(1)     What children or parents thought about the Rezoning Plan

Defendants seek to exclude Dr. Morton-Young's statements about what children or parents probably thought about the Rezoning Plan, asserting that they are unreliable, because they are generalized and speculative.  Regarding Dr. Morton-Young's statements (Tr. Vol. II, at 275:12-20, 276:17-277:5), Dr. Morton-Young makes two assertions, based on her review of the Rezoning Plan and Board documents: (1) that the effect of the Nashville Rezoning Plan is to isolate children in already depressed neighborhoods; and (2) the Rezoning Plan's effect impacts the children's motivations and inspirations, and makes them "feel that something is wrong with them."

As a social psychologist and professional in education and educational administration, the

30

first conclusion can reasonably be drawn from statistical information provided in the documents reviewed, and is therefore reliable and admissible. The Court hereby **DENIES** this portion of Defendants' Motion.

The second conclusion, regarding the Rezoning Plan's effect on children's motivations and inspirations, has an unclear foundation. Opinions about the Rezoning Plan's effect on the state of mind of the affected children cannot reasonably be drawn from statistical information provided in the documents reviewed. Later in the examination, Dr. Morton-Young states that she spoke with children and parents in Nashville who have been affected by the Rezoning Plan (Tr. Vol. II, at 276:4-277:5). However, Dr. Morton-Young does not make clear in what context she spoke with these individuals, nor does she speak about the methodology which she used to evaluate their statements. As a result, the Court hereby **GRANTS** this portion of Defendants' Motion.

Defendants also move to strike a statement by Dr. Morton-Young about the parents of the students in rezoned areas who "rely heavily on the concept of the village . . . . So whatever they do there, I'm going to trust that it's going to be alright." (Tr. Vol. II, 278:8-11.) Read in context, the witness appears to have made the statement in support of the assertion that families with low incomes rarely take advantage of school choices. Defendants move to strike this statement because it is unreliable. To support her observations, the witness points to her experience speaking with individuals in Nashville public schools and analogous populations in other parts of the country as a professional. As a social psychologist and professional in education and educational administration, these observations can reasonably be drawn from her work experience, and is therefore reliable and admissible. The Court hereby **DENIES** this

portion of Defendants' Motion.

(2)    <u>What "neighborhood schools" means</u>

Defendants move to strike Dr. Morton-Young's statements about the meaning behind "neighborhood schools" as unreliable and irrelevant. Generally, when a witness proposes to testify about a trade custom or usage, so long as the witness testifies that she has been a member of the industry for a considerable period of time and has encountered the use of the term by industry members on several occasions, the foundation is adequate. *See, e.g., Frigaliment Importing Co. v. BNS Internal Sales*, 190 F. Supp. 116 (1960). Courts, for example, frequently allow experienced police officers to testify on such topics as the meaning of code words used by drug traffickers. 1 *McCormick on Evid.* § 13 (citations omitted).

In her testimony, Dr. Morton-Young stated that, based on a review of literature and in her professional experience, "neighborhood schools" can be used as a code word for "segregated schools." (Tr. Vol. II, at 277:12-20, 278:14-17, 290:22-291:1, 291:10-16, 291:21-293:19.) Morton-Young was explaining a meaning of the phrase "neighborhood schools" as it had been used in the past, not stating whether such a meaning could be attached to any use of the phrase in this instant case. As a result, Dr. Morton-Young's foundation is sufficient. "[E]xperience alone . . . may . . . provide a sufficient foundation for expert testimony." Fed. R. Evid. 702, Advisory Committee Note (2000). The Court also finds this testimony to be relevant. To the extent that Defendants used the phrase "neighborhood schools," a factfinder may choose give weight to Dr. Morton-Young's testimony that the phrase has been used as a code word for racial segregation in the past. The Court therefore **DENIES** this portion of Defendants' Motion.

32

(3)     The purpose behind "school choice"

Defendants move to strike Dr. Morton-Young's testimony regarding the "choice" option in the Rezoning Plan (Tr. Vol. II, at 277:21-278:13), stating she presented no factual basis for her testimony. (Doc. No. 133-1, at 14.) In her testimony, Dr. Morton-Young describes why she believes "the population we have under discussion . . . is one that tends not to take advantage of choice." (Tr. Vol. II, at 278:4-5.) In this description, she speaks generally about how families do not have time to dedicate to their children's education (Tr. Vol. II, at 277:24-278:7), and how they "rely heavily on the concept of the village" (Tr. Vol. II, at 278:8-11). To support her observations, the witness points to her experience as a professional, speaking with individuals in Nashville public schools and analogous populations in other parts of the country. As a social psychologist and professional in education and educational administration, these observations about community's response to school choice can reasonably be drawn from her professional experience, and is therefore reliable and admissible. The Court therefore **DENIES** this portion of Defendants' Motion.

(4)     The effects of the Nashville Rezoning Plan

Defendants seek to strike Tr. Vol. II, at 275:15-276:14, alleging that Dr. Morton-Young provided no factual basis for her observations. The Court has already ruled on the admissibility of Tr. Vol. II, at 275:15-20, *supra*, so will only address the remaining section in this analysis. In the remaining analysis, Dr. Morton-Young: (1) speaks vaguely about "conflict among groups" witnessed in one unnamed Nashville public school; and (2) notes the absence of evidence that any intellectual or educational advantages will result from the Rezoning Plan. In her statements

33

regarding "conflict among groups," the witness speaks vaguely, only stating, "As children are compressed in prescribed boundaries, conflicts are occurring." (*Id.* at 276:8-14.) Dr. Morton-Young did not name any particular school, nor did she describe what she meant by "conflict." Because her statements were vague, they do not assist the trier of fact and are inadmissible. The Court therefore **GRANTS** this portion of Defendants' Motion.

Regarding her statement about the absence of advantages that result from the Rezoning Plan, the witness does not make any statement about the foundation for such an observation. As a result, the Court also **GRANTS** this portion of Defendants' Motion.

b) *Dr. Leslie Zorwick*

Defendants move to strike the testimony of Dr. Leslie Zorwick, a social psychologist specializing in the study of stereotyping, prejudice, and identity (Tr. Vol. III, at 356:7-10). (Doc. No. 128, at 11.) Defendants move to strike Dr. Zorwick's testimony regarding (1) "white flight"; (2) "code words" and stereotyping; (3) the meaning of the phrase "at risk communities"; (4) politicians' alleged use of code words, and the concept of "aversive racism"; and (5) the concept of "moral credentials." (*Id.* at 12-14.) Defendants assert that certain testimony by Dr. Zorwick should be excluded because: (1) it is purely hypothetical and does not assist the trier of fact in determining any issue in this case; and (2) Dr. Zorwick failed to apply the principles and methods from her field to the facts of the case. (*Id.* at 11.) The Court will address each contested section in turn.

(1)    <u>White flight</u>

Defendants seek to exclude Dr. Zorwick's testimony regarding white flight (Tr. Vol. III, at 364:13-365:14).  (Doc. No. 128, at 11.)  Defendants assert that the testimony is irrelevant and will not assist the trier of fact for two reasons: (1) Dr. Zorwick testified that she was not opining about the Metropolitan Nashville Public School system specifically (Tr. Vol. III, at 392:12-19; 393:3-7); and (2) during the Hearing, no party presented evidence that the Rezoning Plan had any relation to white flight.

In regards to their first listed reason, the Court finds Defendants line of argumentation inapposite.  As the Advisory Committee Note of Rule 702 states:

> Most of the literature assumes that experts testify only in the form of opinions.  That assumption is logically unfounded.  The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts.

Fed. R. Evid. 702, Advisory Committee Note (2000).  Experts are welcome to merely describe or summarize experience in his or her field without necessarily making any conclusions about the facts of the case.  *See also, e.g., Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F. Supp. 116 (S.D.N.Y. 1960) (implicitly admitting the evidence of several witnesses who testify to trade usage of the word "chicken", but who do not testify to the meaning of the phrase in the contract in dispute).

The Court also finds Defendants second argument unpersuasive.  Parties have not yet submitted their proposed findings of fact and conclusions of law—it is therefore still possible that white flight may factor into their theory of the case.  The Court therefore **DENIES** this portion of Defendants' Motion, and will determine the proper weight to afford such testimony in deciding Plaintiffs' motion for preliminary injunction.  Should white flight not constitute part of

35

Plaintiffs' theory of the case, the Court will weigh the testimony regarding white flight accordingly.

### (2) Code words and stereotyping

Defendants move to strike Dr. Zorwick's testimony regarding the use of code words and stereotyping (Tr. Vol. III, at 367:7-368:10; 369:17-372:18), arguing that her testimony was purely hypothetical, as she acknowledged she was not opining about any individual defendant in the case, nor was she testifying about the intent of the drafters of the Rezoning Plan or the legislators who adopted the Rezoning Plan (*Id.* at 357:19-22; 375:19-21; 383:21-23). Defendants state that absent any individualized assessment of the individuals whose intent is at issue in the case, Dr. Zorwick's testimony fails to satisfy the standards outlined by *Daubert* and its progeny. (Doc. No. 128, at 13.) As explained *supra*, experts are welcome to describe or summarize experience in his or her field without necessarily making any conclusions about the facts of the case. The Court therefore **DENIES** this portion of Defendants' Motion.

### (3) The meaning of the phrase "at risk communities"

Defendants seek to strike Dr. Zorwick's testimony regarding the meaning of "at risk" as used to describe certain communities (Tr. Vol. III, at 367:7-368:10; 369:17-372:18). Defendants allege that because Dr. Zorwick testified that there are a number of legitimate definitions of "at risk" that do not refer to race (*Id.*, at 390:25-391:6), any testimony by Dr. Zorwick regarding what "at risk" might mean does not assist the trier of fact and fails to satisfy *Daubert* principles. (Doc. No. 128, at 13.) The Court declines to strike Dr. Zorwick's testimony on this reasoning. An allegation that the witness's testimony illustrates a number of meanings of a phrase is proper

grounds for disputing the weight of the witness's testimony, not for excluding the witness's evidence entirely. The Court therefore **DENIES** this portion of Defendants' Motion.

### (4) Politicians' alleged use of code words, and the concept of "aversive racism"

Defendants move to strike Dr. Zorwick's allegation that politicians are more likely to use code words to try to make racist attitudes (Tr. Vol. III, at 371:18-372:18). Defendants also move to strike Dr. Zorwick's testimony regarding the concept of "aversive racism," where individuals attempt to articulate race-neutral ways to justify race-based policies (*Id.* at 372:22-372:16). Defendants allege that because Dr. Zorwick failed to liken her opinions to the facts of the case, they do not assist the trier of fact and does not satisfy *Daubert* principles. (Doc. No. 128, at 13-14.) As explained *supra*, experts are welcome to describe or summarize experience in his or her field without necessarily making any conclusions about the facts of the case. The Court therefore **DENIES** this portion of Defendants' Motion.

### (5) The concept of "moral credentials"

Defendants also seek to exclude Dr. Zorwick's testimony regarding the concept of "moral credentials," specifically in the context of someone allegedly saying, "some of my best friends are black" (Tr. Vol. III, at 368:11-369:16). Defendants allege that this portion of testimony is irrelevant, because no one at the Hearing testified that someone made the statement in question. (Doc. No. 128, at 14-15.) As a result, they assert, her testimony does not assist the tier of fact. (*Id.*) As explained *supra*, experts are welcome to describe or summarize experience in his or her field without necessarily making any conclusions about the facts of the case. The Court therefore **DENIES** this portion of Defendants' Motion.

**D.      Testimony by Walter Searcy**

In a footnote, Defendants move to exclude a portion of Walter T. Searcy, III's testimony about what Searcy considered to be "code words" (Tr. Vol. III, at 428:23-430:1).  (Doc. No. 128, at 14 n.5.)  Defendants state that part of Searcy's testimony is irrelevant and improper lay opinion, as there is nothing in the record to establish that Searcy is qualified to determine what is and is not a code word.  (*Id.*)  Defendants assert that only someone with the proper expertise can opine about what might or might not be a code word.  (*Id.*)  Plaintiffs respond that Searcy's testimony about code words only relates to those he heard at meetings with the Rezoning Plan.  (Doc. No. 130, at 5-6.)  The Court agrees with Plaintiffs.  Since his testimony is related to personal observations of intent by attendees of the meetings, the reasoning goes, it is properly in the realm of lay, not expert, opinion.  In his testimony, Searcy only testified about events he personally witnessed in meetings he attended with the Board about the Rezoning Plan.  As explained *supra*, lay opinion regarding a third party's state of mind is admissible if the witness has personal knowledge of the matter forming the basis of the witness's opinion and is rationally based on his own perception.  *Tsekhanovich*, 507 F.3d at 129.  Searcy was present during the meetings, and therefore had personal knowledge of the events in question.  The Court therefore **DENIES** this portion of Defendants' Motion.

**E.      All Testimony Regarding What Motivated the Task Force or Board in Drafting or Passing the Rezoning Plan**

Defendants seek to strike any lay opinion testimony as to: (1) the Community Task Force for Student Assignment's ("Task Force") motivations in creating the Rezoning Plan; and (2) the Board's motivation in adopting the Rezoning Plan.  (Doc. No. 128, at 26.)  Defendants

38

specifically cite former Board member George H. Thompson, III's testimony that "the focus, the motive, was to get the African American students out of the Hillwood cluster and dump them back in North Nashville." (*Id.* (quoting Tr. Vol. I, at 163:4-15).) Defendants argue that this is the type of "naked speculation" that the Court should exclude as improper lay opinion. (*Id.*) The Court agrees with Defendants. Unlike the previous admissible testimony about the motivations of third parties, Thompson's opinion about the state of mind of the Task Force was not based on personal knowledge and is therefore speculative and inadmissible. Fed. R. Evid. 701 (opinion testimony from lay witnesses is admissible only if it is "rationally based on the perception of the witness and . . . helpful to a clear understanding of the witness' testimony or the determination of the fact in issue"). The Court therefore **GRANTS** this portion of Defendants' Motion.

Defendants, in a footnote attached to this section, also move to strike Won Choi's testimony about a conversation he had with current Board member Sharon Gentry. (Doc. No. 128, at 17 n.7.) In the testimony in question, Choi relates a conversation he had with Gentry, where Gentry said that she was concerned about the impact that the school Rezoning Plan would have on minority and underprivileged children. (Tr. Vol. IV, at 526:22-527:13.) Defendants argue that since Gentry was not a member of the Board when the Board voted on the Rezoning Plan, her statements regarding the Rezoning Plan are irrelevant. Plaintiffs respond that Gentry in her official capacity supervises and monitors the implementation of the Rezoning Plan and oversees the work of the Task Force which continues to meet in order to monitor the Rezoning Plan through the present time. (Doc. No.130, at 6.) This Court agrees with Plaintiffs, and finds that Gentry's statements are relevant. The Court therefore **DENIES** this portion of Defendants' Motion.

**F.      Plaintiffs' Depositions**

Finally, Defendants move to exclude Plaintiffs' witnesses' deposition testimony as inadmissible hearsay.  (Doc. No. 128, at 19.)  Plaintiffs cite Federal Rules of Evidence 102 and 807(15) and Federal Rule of Civil Procedure 32(a)(6) in support of their request to the Court to exercise its discretion in admitting this testimony.  (Doc. No. 130, at 15-16.)

As stated *supra*, "[f]ive findings must be made in order to determine the admissibility of evidence under [the residual hearsay exception].  The statement [1] must have circumstantial guarantees of trustworthiness equivalent to those in the first twenty-three exceptions, [2] it must be offered as evidence of a material fact, and [3] must be more probative on the point for which it is offered than any other evidence which can be secured through reasonable efforts. In addition, [4] admissibility must be consistent with the interests of justice, and [5] the proponent must give notice of his intent to offer the statement sufficiently in advance of trial."  *United States v. Popenas*, 780 F.2d 545, 548 (6th Cir. 1985).  Depositions, without any explanation for why live testimony could not be secured, do not meet the requirements set forth in Rule 807.  *See* 8A Wright and Miller, *Federal Practice and Procedure: Civil* § 2142 ("[T]he federal rules have not changed the long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness is not available to testify in person.")

Plaintiffs only provide an explanation as to why deposition testimony is the best available evidence in the case of expert witness Dr. William Rock, who was prepared to testify in response to testimony by Defendants' witness Milan Mueller.  Plaintiffs state that Dr. Rock was too ill to travel to Nashville to testify, and consequently ask that the relevant portions of his deposition be

40

admitted (Pls.' Ex. 185, first day, p. 8-9, 117-120, 124-134, 141-45, 149-55).  (Doc. No. 130, at 16.)

The Court finds only Plaintiffs' argument in regards to Dr. William Rock's deposition testimony persuasive, and hereby **DENIES** that portion of Defendants' Motion under Federal Rule of Evidence 807 only.  The Court declines to exercise its discretion to admit all other deposition testimony.  The Court therefore **GRANTS** the remaining portion of Defendants' Motion regarding deposition testimony.


**IV.  CONCLUSION**

Finally, the Court will not consider any evidence that it strikes herein in drafting its Findings of Fact and Conclusions of Law.

The Court hereby **SCHEDULES** a meeting with the Parties to discuss further action in regards to Plaintiffs' Motion for Preliminary Injunction, set for Wednesday, October  27, 2010, 2010, at 10:00 a.m.

It is so ORDERED.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT