UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FRANCES SPURLOCK AND JEFFREY          )
SPURLOCK, et al.,                     )
                                      )
            Plaintiffs,               )
                                      )
v.                                    )          No. 3:09-CV-00756
                                      )
DAVID FOX, et al.,                    )          Judge Nixon
                                      )
            Defendants.               )

**DEFENDANTS' RESPONSE TO PLAINTIFFS' REZONING
PROPOSAL AND DESCRIPTION OF MODIFICATIONS
RECENTLY MADE TO THE METROPLITAN NASHVILLE
PUBLIC SCHOOLS' COMPREHENSIVE STUDENT ASSIGNMENT PLAN**

In response to this Court's October 27, 2010 Order requiring the plaintiffs to prepare a

"rezoning plan," plaintiffs instead submitted a "Proposal for a Comprehensive Rezoning and

Student Assignment Plan for the Metropolitan Nashville Public Schools" (filed December 6,

2010) (the "proposal"). As plaintiffs recognize, their proposal is not a rezoning plan. Rather, it

principally is a lengthy narrative arguing for the benefits of some undefined level of

socioeconomic integration in school enrollments. The proposal also makes a variety of vague,

expansive, and mutually inconsistent suggestions for completely revamping the student

assignment systems of the Metropolitan Nashville Public Schools ("District" or "MNPS").

More importantly, however, the proposal contains nothing that concretely addresses the

plaintiffs' allegations in this case: that the Rezoning Plan adopted by the Board of Education in

2008 (the "Rezoning Plan") and implemented beginning with the 2009-2010 school year

discriminates on the basis of race against African-American students residing in the Pearl-Cohn

Cluster. Plaintiffs' proposal, therefore, does not help the Court or the District "understand the

plaintiffs' position better," and it has no bearing on the legal question presented in this case – whether the Rezoning Plan was designed to, and has the effect of, intentionally discriminating against African-American students. Therefore, even if plaintiffs could prove their claims in this case – and they have not and cannot – the proposal would not be an appropriate remedy.

Rather, the proposal's general suggestions about student assignment in MNPS should have been addressed to the Board of Education or the District's Student Assignment Task Force (the "Task Force") when the rezoning plan was being created. This Court, however, is not the proper forum for a discussion of plaintiffs' educational philosophy and preferences. To the contrary, plaintiffs' ideas would be more appropriately vetted through the political, rather than the judicial, process – the Task Force continues to monitor the Rezoning Plan, and the Board of Education continues to implement a number of other student assignment mechanisms.

In contrast to plaintiffs' vague proposals, the District has implemented a comprehensive student assignment plan (the "MNPS Plan") successfully for many years. *See* Exhibit 1 (narrative description of comprehensive student assignment plan). The current version of the MNPS Plan consists of the Rezoning Plan challenged in this case and a wide variety of school choice programs that foster educational improvement and diversity. The MNPS Plan combines stable student feeder patterns based on a high-school cluster concept and a variety of innovative choice plans.

Furthermore, since the adoption of the Rezoning Plan, the District has continued to improve its comprehensive student assignment plan. Specifically, the District has modified the Rezoning Plan to accommodate growth and, most significantly, add magnet programs designed to reduce minority group isolation in six District schools, including three in the Pearl-Cohn

2

Cluster. These magnet schools are being funded by a $12 million grant from the U.S. Department of Education.

## BACKGROUND

Plaintiffs are parents of African-American school children who reside in the Pearl-Cohn Cluster. Plaintiffs all choose to send their children either to a school in the Pearl-Cohn Cluster or one in the Hillwood Cluster.

The Spurlock's child started the 2009-2010 school year at John Early Middle School in the Pearl-Cohn Cluster, transferred to Bellevue Middle School in the Hillwood Cluster, attends Bellevue this school year, and has had the option to attend H.G. Hill Middle School in the Hillwood Cluster both years. In addition, this student had the option of choosing a number of other magnet and choice schools throughout the District.

The Lewis's child started the 2009-2010 school year at John Early, and this year elected the zoned-choice option, Bellevue. This student had the option of choosing a number of other magnet and choice schools throughout the District.

The Lawson's child has been eligible for a zoned-choice option at Bellevue but, since the beginning of the 2009-2010 school year, has chosen to attend John Early. This student similarly had the option of selecting a number of other magnet and choice schools throughout the District.

Plaintiffs' central claim in this case is that the Rezoning Plan is a "racially identifiable student assignment plan" that makes "majority black population schools blacker and majority white schools whiter." Compl. ¶ 1.[1] In support of this claim, plaintiffs allege certain discriminatory conditions exist in Pearl-Cohn, Hillwood, and Hillsboro Cluster schools. For

---

[1] Plaintiffs have filed three amendments to their original complaint in this case, with each amendment simply adding additional claims to the original complaint. The original complaint, together with the three amendments, are hereinafter referred to as the "complaint."

3

example, plaintiffs allege that "the rezoning plan's primary purpose was to move African-American students out of the majority white Hillwood schools cluster and out of the majority white Hillsboro schools [sic] cluster and send them to the majority black Pearl-Cohn schools cluster." *Id.* ¶ 15. Plaintiffs also cite alleged changes in African-American and White enrollment in Pearl-Cohn, Hillwood, and Hillsboro cluster schools as supposed evidence of segregative effect. *Id.* ¶ 110.2

Based on the alleged discriminatory conditions in the Pearl-Cohn, Hillwood, and Hillsboro Clusters, plaintiffs have asked the Court to grant preliminary and permanent injunctive relief for a putative class of individuals under 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution. In November 2009, the Court heard evidence over a three-week period on plaintiffs' motion for preliminary injunctive relief. The Court has not issued any opinion on the merits of plaintiffs' claims and has not certified a class.

At the status conference on October 27, 2010, the Court requested that plaintiffs submit a "rezoning plan" to help the Court "understand the plaintiffs' position better." *See* Transcript of Proceedings Before the Honorable John T. Nixon, Senior Judge, at 3 (Oct. 27, 2010) ("Transcript"). The Court also gave the District the option, at its discretion, "to submit any proposed modification of their plan[.]" *Id.* The Court determined that it would hold "another

---

[2] On November 2, 2009, plaintiffs' filed a second amended complaint with allegations about alleged discriminatory conditions in Pearl-Cohn, Hillwood, and Hillsboro cluster schools, apparently in response to the District's motion to dismiss filed on October 8, 2009. In its motion to dismiss, the District made clear that plaintiffs' insufficient and untrue allegations of discriminatory animus, even if true, alone did not state a Fourteenth Amendment discrimination claim, which requires a showing of both discriminatory intent and discriminatory effect in a case such as this one where no student is classified on the basis of race. *See Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 205-06 (1973) (the essential elements of unlawful segregation are "*a* current condition of segregation resulting from intentional state action"); see also *NAACP v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1047 (6th Cir. 1977).

Case 3:09-cv-00756    Document 144    Filed 12/23/10    Page 4 of 25 PageID #: 4142

hearing and have experts testify to the strengths and weaknesses of the two plans." *Id.* That hearing is scheduled for January 13, 2011.

Plaintiffs submitted their proposal on December 6, 2010. Plaintiffs' counsel has represented to the District that plaintiffs do not intend to proffer expert testimony in support of their proposal.

**ARGUMENT**

## I. PLAINTIFFS' PROPOSAL IS NOT A REZONING PLAN AND HAS NO RELEVANCE TO THE ISSUES BEFORE THE COURT IN THIS CASE

The Court requested that the plaintiffs submit a rezoning plan so that it and the District could more fully understand and analyze the merits of plaintiffs' allegations of discriminatory conditions in Pearl-Cohn, Hillwood, and Hillsboro Cluster schools. Rather than preparing a rezoning plan, however, plaintiffs have submitted a set of general suggestions that have no bearing on the allegations in the Complaint. The plaintiffs' proposal does not show that the District rejected a specific alternative plan that would have met MNPS' student assignment goals, while avoiding the conditions that plaintiffs claim are discriminatory. Nor would the plaintiffs' proposal constitute an appropriate remedy tailored to the violation that they have alleged (even if they could prove that claim). Rather, plaintiffs' suggestions would be far more appropriately addressed directly to the Board of Education or the student assignment Task Force, rather than to this Court.

### A. Plaintiffs' Proposal Is Not a "Rezoning Plan"

Although plaintiffs' task was to draft a "rezoning plan," the proposal itself acknowledges that it is not a "plan for assignment of MNPS' 76,000 students[.]"[3] Proposal at 3. Thus, rather than design a rezoning plan, plaintiffs chose instead to address a broader philosophical question:

---

[3] Actually, MNPS student enrollment for the 2010-2011 school years is 78,096.

"The question here, in our view, is not how to develop a new rezoning plan, but why—and the 'why' is what has to change." *Id.* at 48. Plaintiffs attempt to answer that "why" question by explaining, at length, their views on the merits of socioeconomic integration, *see, e.g.*, *id.* at 10-17, by reiterating their opposition to what they term a "neighborhood school" plan, *see id.* at 7-9, and by proposing a hodgepodge of often inconsistent ideas about the types of student assignment methods that they believe should be implemented in MNPS. But plaintiffs do not explain how their suggestions could be implemented. And their suggestions, independently or collectively, do not amount to a "rezoning plan", as this Court requested. *See* Exhibit 2 (Expert Report of Milan Mueller); Exhibit 3 (Expert Report of Dr. Leonard Stevens).

In fact, plaintiffs' proposal is a scattershot collection of vague ruminations on educational philosophy, the specific practical implications of which are never considered or addressed in the proposal itself. For example, socioeconomic diversity—the apparent linchpin of the proposal—is never even defined. The closest the proposal gets to suggesting a standard to evaluate socioeconomic diversity is an approving mention of the socioeconomic integration plan allegedly being implemented in Louisville, Kentucky, which plaintiffs claim has as its goal "no less than 15% and no more than 50%" of students from a lower income area in any school. Proposal at 12. But such a standard could not be applied in MNPS, where, by plaintiffs' calculations, the percentage of the District's student population eligible for Free and Reduced-price Meals ("FARM") in 2009-2010 was 69.7%. *See id.* at 9, n.9.

Nor do plaintiffs provide a meaningful explanation of their proposed strategies for redesigning the Rezoning Plan. Plaintiffs, for example, suggest that the District develop four "megaclusters" to replace the present 14 high school clusters that currently provide stable feeder patterns throughout the District. *See id.* at 24. The proposal, however, provides no explanation

6

of what purpose "megaclusters" would serve or how they would work. Likewise, the proposal does not provide: (a) maps or drawings of the megaclusters or any specific attendance boundaries; (b) school-by-school enrollment projections; (c) documentation identifying feeder patterns, if any; or (d) any description of the specific factors that would be used in assigning any of Nashville's 78,000 students to a particular school. Without any of these crucial elements, plaintiffs' proposal simply is not a "rezoning plan" at all.

**B.**   **Because It Is Not an Actual Plan, the Plaintiffs' Proposal Sheds No Light on the Legal Issue Before the Court**

The legal question currently before the Court is whether the Board of Education, through adoption of the Rezoning Plan, intentionally discriminated against the named plaintiffs, who are African-American students residing in the Pearl-Cohn Cluster, on the basis of their race. A rezoning plan that met the various competing student assignment goals of the District and also resulted in significantly fewer racially isolated schools conceivably might be relevant to that question, assuming that plaintiffs also could show that the plan had been considered and rejected by the Board of Education because of a discriminatory motive. But as noted above, the plaintiffs did not submit an alternative to the Rezoning Plan at all, let alone one that was a plausible alternative to the one adopted by the Board in 2008. Moreover, they make no showing that their proposal would satisfy the District's various student assignment goals or that it would result in more racially integrated school enrollments.

In particular, plaintiffs' proposal does not even acknowledge numerous key issues that any school district has to consider—and that MNPS did consider in adopting the Rezoning Plan. For example, plaintiffs' proposal does not address building utilization and overcrowding, how to improve academic achievement, how to enhance opportunities for extracurricular activities, how

to spend money wisely, how to get parents more involved, or how to give parents and students stability and certainty.

As a result, plaintiffs' proposal sheds no light on the question of whether the District might have adopted an alternative plan that met its various competing needs, while avoiding the discriminatory conditions alleged in the Complaint. As a result, the proposal is not relevant to the legal question to be decided—whether the Rezoning Plan has a discriminatory purpose that actually has the effect of discriminating against African-American students in the Pearl-Cohn Cluster. *See Keyes*, 413 U.S. at 205 (the essential elements of unlawful segregation are "*a current condition of segregation resulting from intentional state action*"); *Lansing Bd. of Educ.*, 559 F.2d at 1047.

Plaintiffs' proposal also does not concretely address the purportedly discriminatory conditions in Pearl-Cohn, Hillwood, and Hillsboro Cluster schools that are alleged in the Complaint. First, the proposal does not address the racial discrimination alleged in the Complaint, but rather focuses on "socioeconomic diversity." Second, the proposal provides no specific information that would allow the Court or District to evaluate whether any of their suggestions (such as "megaclusters") actually would have been feasible; the extent to which the projected school enrollments within the Pearl-Cohn-Hillwood-Hillsboro megacluster would have affected African-American students; or whether, if feasible, plaintiffs' proposed megacluster would have been a better alternative to the Rezoning Plan and choice options currently provided under the MNPS Plan. These would be central issues in evaluating whether the plaintiffs' proposal in any way illustrates that the District's Rezoning Plan was designed to, or actually does, discriminate against African-American students in the Pearl-Cohn Cluster. But without such information, plaintiffs' proposal is irrelevant to the liability issues in this case.

### C.    Plaintiffs' Proposal Is Inappropriately Fashioned as a Remedy

Rather than specifically identify what they might have done differently had they been the Board of Education, plaintiffs improperly present a "remedy" to an alleged Constitutional violation that has not been found. *See* Proposal at 5 (goal of the proposal "is to remedy the unlawful effects of the Defendants' rezoning plan"). But plaintiffs' framing of their proposal as a remedy is troubling on numerous levels.

For one, a remedy could not issue at this stage in the litigation because the District has not been found to have violated any law. In *Swann v. Charlotte-Mecklenburg Board of Education*, the Supreme Court established that a court's remedial authority may only be exercised *after* it has found a violation. 402 U.S. 1 (1971). "[I]t is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose power are plenary. Judicial authority enters only when local authority defaults." *Id.* at 16. The *Swann* rule—i.e., that an injunction may issue only after a court has found a violation—is well-settled and longstanding in American jurisprudence.[4]

The *Swann* rule is based on two important principles. First, a remedy must be tailored to the scope of a known violation. *See Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410 (1977). As a result, a federal court must first find a violation before even contemplating a remedy. The

---

[4] *See, e.g.*, *Connecticut v. Massachusetts*, 282 U.S. 660, 673 (1931) ("Injunction will not issue in the absence of actual or presently threatened interference."); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) ("A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law.") (quoting *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1067 (6th Cir. 1998)).

Supreme Court in *Dayton* stated as much in elucidating the appropriate sequence for considering claims of racial discrimination in school districts:

> The duty of both the District Court and the Court of Appeals, in a case such as this, where mandatory segregation by law of the races in the schools has long since ceased, is to first determine whether there was any action in the conduct of the business of the School Board which was intended to, and did in fact, discriminate against minority pupils, teachers, or staff. . . . If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. *The remedy must be designed to redress that difference*, and only if there has been a systemwide impact may there be a systemwide remedy.

*Dayton*, 433 U.S. at 420 (emphasis added) (citation omitted).

Second, the *Swann* rule is based on the longstanding principle that judicial interference in local school district affairs is disfavored and should be exercised only in limited situations where a clear violation of law has been established. As *Dayton* explained, while federal courts have authority to grant appropriate relief when "constitutional violations on the part of school officials are *proved*," *Id.* at 421 (emphasis added and citation omitted),"our cases have just as firmly recognized that local autonomy of school district is a vital national tradition." *Id.* at 410 (citing *Milliken v. Bradley*, 418 U.S. 717, 741-42 (1974) ("*Milliken I*"); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973); *Wright v. Council of City of Emporia*, 407 U.S. 451, 469 (1972). It is for this reason that the case for displacement of the local authorities by a federal court in a school desegregation case must be "*satisfactorily established by factual proof and justified by a reasoned statement of legal principles.*" *Dayton*, 433 U.S. at 410 (emphasis added); *cf. Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424 (1976).

The *Swann* rule and the principles on which it is based call into doubt the propriety of the plaintiffs' suggestion that their proposal be considered by the Court as a "remedy" before any

Constitutional violation has been found. Since the Court has not found a violation and, therefore, has not defined the scope of any supposed harm, it is improper for plaintiffs to suggest their proposal as a remedy or for the Court to consider it as such.

### D. Plaintiffs' Proposal is Not Tailored to Address the Violations Alleged in Their Complaint

Even *assuming arguendo* that the Court at some point found a violation as alleged by plaintiffs, plaintiffs' proposal sheds no light on an appropriate remedy for the claims in their Complaint. The plaintiffs' proposal, on the one hand, fails to address the violation alleged in their Complaint and, on the other hand, is vastly overbroad.

Plaintiffs' actual claim in this case is that the Rezoning Plan intentionally discriminates against African-American students in Pearl-Cohn Cluster schools on the grounds of their race. The proposal, however, does not address alleged *racial* discrimination in student assignment at all. Rather, the proposal focuses on "socioeconomic diversity," but socioeconomic status and race are not the same thing. Moreover, there is no evidence whatsoever that creating schools with the undefined degree of socioeconomic diversity contemplated by the plaintiffs would result in schools that were more racially diverse or that provided a better education to African-American students. Additionally, plaintiffs have represented that they do not intend to offer such evidence through expert testimony. Indeed, under their vague proposal, there is no way of knowing what schools the named plaintiffs themselves would attend, what the racial composition of those schools would be, or what quality of education they would offer.

The plaintiffs' proposal also is so much broader than the allegations in their Complaint that it could not serve as the framework for a remedy to the violations they allege, even if those allegations could be proven. It is well-settled that a remedy must be tailored to the scope of a

11

violation.[5]  Contrary to this rule, plaintiffs propose wholesale changes that would affect the school assignments of all MNPS students throughout the District, despite the fact that the named plaintiffs are parents of African-American students who reside in the Pearl-Cohn Cluster and complain only about conditions in the Pearl-Cohn, Hillwood, and Hillsboro Clusters.[6]  Such broad-ranging proposals clearly are not tailored to remedy the violations alleged in the Complaint.

## II.     MNPS HAS A COMPREHENSIVE STUDENT ASSIGNMENT PLAN THAT IS LAWFUL, EFFECTIVE, AND IMPROVING

The District already has a comprehensive student assignment plan, the "MNPS Plan," that is the product of many years of thought, educational expertise, and community input.  One of its two major components is the Rezoning Plan challenged in this case, which allows every student the opportunity to attend a school from kindergarten through high school in a contiguous attendance area.  The Rezoning Plan expanded on the cluster concept and feeder patterns adopted more than a decade ago when the District was declared unitary in 1998.  The other major part of the MNPS Plan consists of a wide variety of school choice programs that foster educational improvement and diversity, some of which have been added and improved since the Rezoning Plan went into effect.

---

[5] *Dayton*, 433 U.S. at 420 ("Once a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'") (quoting *Milliken I,* 418 U.S. at 744; *see also Milliken v. Bradley*, 433 U.S. 267, 280 (1977) ("*Milliken II*")) ("In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation.").

[6] In addition to the suggestions outlined above, plaintiffs propose (again without any real detail or plan), *inter alia*, transforming magnet schools throughout the District, *see* Proposal at 27-34; closing enhanced option schools throughout the District, dispersing those students to undefined schools throughout the District, *see id.* at 34-39; and reassigning all school personnel and teachers throughout the District, *see id.* at 39-40.

By way of background, the District worked for years to desegregate its schools and finally achieved unitary status in 1998 through the settlement of *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, Tennessee*, Docket No. 3:55-2094/2956. The student assignment plan adopted in 1998 provided for students in the Pearl-Cohn area of central Nashville to be assigned using non-contiguous boundaries to schools relatively distant from the area in which they lived with transportation provided by the District. Students in almost every other area of the city, including almost every area with a predominately non-minority population, were assigned to schools in their area of residence using contiguous attendance areas.

Over time, the District also developed a system of magnet schools and other school choice programs to which students from throughout the District could apply if they did not want to attend their zoned school. By the 2008-2009 school year, the District's system of school choice programs had expanded so that it included more than 70 different schools.

In July 2008, ten years after the *Kelley* case had been dismissed, the Board of Education adopted the new Rezoning Plan that is at issue in this case. The Rezoning Plan, which was first implemented during the 2009-2010 school year, provided a contiguous attendance area for all students in the District, including those residing in Pearl-Cohn Cluster and other former non-contiguous areas. The Rezoning Plan, however, also provided students in the former non-contiguous areas the option of attending a school in the cluster to which they previously had been assigned, with school bus transportation provided by the District.

In addition, as noted above, the District already had in place and continues to offer a wide variety of other choice options, magnet schools, and charter schools. Together, the Rezoning Plan and the District's choice options (i.e., the MNPS Plan) constitute a comprehensive and

13

effective student assignment plan. The MNPS Plan provides all students in the District—particularly those formerly in "non-contiguous zones"—with stable feeder patterns and many choice options. In addition, the MNPS Plan has been improved in significant ways since the adoption of the Rezoning Plan in 2008.

A.    **The District's Rezoning Plan Was a Product of a Broad Collaboration of School and Community Leaders and Was Designed to Address the Broad and Diverse Needs of the School System**

At the prompting of school board member Karen Johnson, the MNPS Board of Education formed a task force to study student assignment in January 2008. When the Task Force came together, it was a diverse group of individuals with a broad range of life experiences. The group spent the next six months studying and considering a number of issues, including building underutilization and overcrowding, choice options, diversity, how to enhance academic achievement, how to enhance opportunities for extracurricular activities, how to spend money wisely, how to get parents more involved, whether there is an advantage to going to school closer to home, and how to give parents and students stability and certainty.

The Task Force also considered "non-contiguous zones." For years, Nashville, like a great many cities, was under a court-supervised desegregation plan. And for years, students were bused from all over Davidson County to schools all over the District. But over time, that plan changed. And as Nashville approached and achieved unitary status, fewer and fewer students were being bused. In fact, when the Task Force was looking at this issue, busing to non-contiguous zones only applied to students in the Pearl-Cohn Cluster and small areas in the Hillsboro, Hunters' Lane, and McGavock Clusters. Moreover, more than 90 percent of the students in non-contiguous areas were African-American. *See* Exhibit 2 (Mueller Report).

After gathering, studying, and considering information, the Task Force determined that while some students were happy with their school of assignment, other families objected to being

14

transported relatively long distances. As a result, the Task Force recommended that the School Board allow families in non-contiguous zones to choose whether they would like for their children to go to school closer to home or in the more suburban, non-contiguous zone. In addition, the Task Force recognized that families in high poverty areas face unique challenges. To address these challenges, the Task Force recommended additional resources for schools in the Pearl-Cohn Cluster, Napier Elementary School in the McGavock Cluster, and Shwab Elementary School in the Maplewood Cluster. The Task Force also recommended a number of other supplemental or enhanced features for schools with the greatest need, such as a stand-alone ninth-grade academy at McKissack Academy to feed Pearl-Cohn High School and additional Advanced Placement courses at Pearl-Cohn High School.

The Board, which had consulted with and provided input to the Task Force throughout the process, approved the Task Force's recommendation as part of the Rezoning Plan. The Rezoning Plan went into effect during the 2009-2010 school year.

### B. The MNPS Plan Provides Students Who Previously Attended School in a Non-Contiguous Zone Maximum Choice

The MNPS Plan, which includes the Rezoning Plan and other choice options, provides all MNPS students with a significant degree of choice in deciding where to attend school. The most choice under the MNPS Plan, moreover, is provided to students who previously attended school in a non-contiguous zone, including the named plaintiffs in this case. *See* Exhibit 1 (narrative description of comprehensive student assignment plan).

Under the Rezoning Plan, students who previously attended school in non-contiguous zones, such as students in the Pearl-Cohn Cluster, have two guaranteed options: (1) attend a school in the cluster previous assigned (the "zone-choice" option) or (2) attend a school closer to

home.  Furthermore, the Board voted to continue to provide transportation to and from school for all students who select the zone-choice option.  *See id.*

In addition to the two guaranteed options, students in the former non-contiguous areas, like any students in MNPS, also may apply in the fall to attend one of the District's many magnet or optional schools.  In addition, under the MNPS Plan, all students also can apply to attend other schools, if those schools have seating available, during an Open Enrollment period each spring. *See id.*

One of the key components of the Board's new Rezoning Plan is that there is no "default" choice for students in the prior non-contiguous attendance areas; each such student *must* exercise a choice.  *See id.*; Exhibit 3 (Stevens Report).  Students are not assigned by the District to one school or another.  The Superintendent and his staff conducted aggressive outreach prior to both the 2009-2010 and the 2010-2011 school years to make sure that every family was contacted, informed of their options, and able to choose one option or another.

Another important aspect of the Rezoning Plan, and something that distinguishes it from the majority of choice plans nationwide, is *that the guaranteed options for students in the prior non-contiguous areas remain available in perpetuity.  See* Exhibit 1 (narrative description of comprehensive student assignment plan).  So if a family moves into the Pearl-Cohn Cluster next year (or the year after that, or the year after that), the choice option is available.  Additionally, if a family in the Pearl-Cohn Cluster decides to send their child to a school closer to home this year (the zoned school), they still can elect to send their child to the zoned choice school next year. Under the Rezoning Plan, those choices are available to students in the prior non-contiguous zones *forever.*

**C. The Changes to the District's Student Assignment Plan Implemented Since the Adoption of the Rezoning Plan in 2008 Continue to Improve the MNPS Plan**

The MNPS Plan also is not static. Rather, it has been improved since the adoption of the Rezoning Plan in 2008 as part of the District's normal planning for continuous improvement. Numerous modifications to the MNPS Plan, including the Rezoning Plan, were developed and adopted prior to the Court's invitation on October 27, 2010 "to submit any proposed modification of their plan." *See* Tr. at 3. Each of these changes to the MNPS Plan will improve it in significant respects.

**1. A Magnet School Assistance Program grant will increase diversity in Pearl-Cohn Cluster schools**

In the summer of 2010, the District applied for and received a $12 million grant from the federal government under the Magnet Schools Assistance Program ("MSAP"). One of the purposes of this program is "to bring students from different social, economic, ethnic and racial backgrounds together." 34 C.F.R. § 280.1.

To be awarded an MSAP grant, a school district, like MNPS, which is not under a desegregation order, must submit for approval to the U.S. Department of Education, Office for Civil Rights ("OCR") a new or existing voluntary plan to reduce, prevent, and eliminate minority group isolation and increase diversity. *See* 34 C.F.R. § 280.2(a)(2). The District submitted the MNPS Plan as its voluntary plan, providing both a description of the Rezoning Plan and a chart summarizing its many school choice programs. *See* Exhibit 4 at 35-41 (District MSAP Application). In awarding the District MSAP funds, OCR approved the MNPS Plan as a voluntary plan and determined that the MNPS Plan will reduce, prevent, and eliminate minority group isolation in each magnet school. *See* 34 C.F.R. § 280.2(b) ("The Secretary approves a voluntary plan under paragraph (a)(2) of this section only if he determines that for each magnet

school for which funding is sought, the magnet school will reduce, eliminate, or prevent minority group isolation within the period of the grant award, either in the magnet school or in a feeder school, as appropriate.").

The MSAP grant will fund six magnet schools over the next three years to enhance the choice options and increase diversity. To achieve these goals, MNPS's magnet schools combine broadly attractive theme curricula, such as a museum theme, with open choice enrollment policies. As the District explained in its MSAP application, "[m]agnet theme development and implementation facilitated by the Director of Magnet Schools will increase diversity and choice because the curricula are distinctive (not offered at other schools at the same grade levels) and innovative (combine systemic reforms and magnet themes)." *See* Exhibit 4 at 28 (District MSAP Application). As part of the MSAP application, school districts also identify "feeder" schools that will help facilitate diversity at the magnet schools. In MNPS, "[t]he feeder schools identified and pursued as active recruitment are predominately composed of non-minority students . . . ." *Id.* at 51.

Three of the six new magnet schools are in the Pearl-Cohn Cluster. The old Wharton Elementary School (now renamed Churchwell Elementary School) and John Early Middle School are in the initial stages of implementing Museum Magnet programs during the 2010-2011 school year. Pearl-Cohn High School is planning a magnet program focused on the Music Business and Industry for implementation beginning with the 2011-2012 school year. These magnet programs will help to attract more diverse student enrollments to these schools and will improve the education offered to students currently enrolled. The three-year enrollment projections included in the MSAP application for these schools illustrate the type of increases in diversity that can be expected:

(1)  Churchwell Elementary School (pre-Kindergarten through grade 5):  Projected White enrollment will increase from 7.6% in 2010-2011 to 12.2% in 2012-2013 and projected Black enrollment will decrease from 87.13% in 2010-2011 to 81.8% in 2012-2013.  *Id.* at e0-e3.  More tellingly, the projected increase in White enrollment and decrease in Black enrollment will be largest in the earlier grades, meaning that diversity at Churchwell Elementary School can be expected to continue to increase after the 2012-2013 school year.   For example, White Kindergarten enrollment is projected to increase from 11.1% in 2010-2011 to 18.9% in 2012-2013, and Black Kindergarten enrollment is projected to decrease from 85.6% in 2010-2011 to 76.7% in 2012-2013.  *Id.*

(2)  John Early Middle School (grades 6-8):  Projected White enrollment will increase from 3.0% in 2010-2011 to 10.3% in 2012-2013 and projected Black enrollment will decrease from 95.8% in 2010-2011 to 87.9% in 2012-2013.  *See id.* at e4-e7.  Similarly to Churchwell, the projected increase in White enrollment and decrease in Black enrollment will be largest in the earlier grades, meaning that diversity at John Early can be expected to continue to increase after the 2012-2013 school year.  For example, grade-six White enrollment is projected to increase from 1.7% in 2010-2011 to 12.1% in 2012-2013, and grade-six Black enrollment is projected to decrease from 97.4% in 2010-2011 to 86.1% in 2012-2013.  *Id.*

(3)  Pearl-Cohn High School (grades 9-12):  Projected White enrollment will increase from 6.5% in 2010-2011 to 11.5% in 2012-2013 and projected high school Black enrollment will decrease from 89.3% in 2010-2011 to 84.2% in 2012-2013.  *Id.* at e8-e11.  As with the other two schools, the projected increase in White enrollment and decrease in Black enrollment will be largest in the earlier grades, meaning that diversity at Pearl-Cohn High School can be expected to continue to increase after the 2012-2013 school year.  For example, grade 9 White enrollment is

projected to increase from 7.1% in 2010-2011 to 14.7% in 2012-2013, and Black grade 9 enrollment is projected to decrease from 87.1% in 2010-2011 to 79.4% in 2012-2013. *Id.*

      **2.**      **Other improvements to the MNPS Plan will improve it in significant respects**

The MNPS Plan is integrally related to other educational reform efforts in the District. *See* Exhibit 5 (Rule 26 Disclosure for Dr. Jesse Register). For example, as noted above, all of the additional resources called for in the Rezoning Plan have been provided to schools with high percentages of students from low-income families. *See* Exhibit 1 (narrative description of MNPS Plan); Exhibit 3 (Stevens Report). In addition, the District is taking dramatic measures to encourage high-quality teachers to teach at schools with high percentages of students from low-income families and/or with relatively low levels of student performance, including an innovative partnership with Vanderbilt University that will provide teachers with a free masters degree in exchange for a commitment to teach for at least five years at a high-poverty, low-achieving school. Such measures make clear the District's belief that for the MNPS Plan to be as successful as possible, all schools in the District need to be excellent. For all schools to excel, MNPS must continue to ensure equity throughout the system.

In addition, during the 2009-2010 school year, the District also implemented two new choice programs for at-risk high school students. These programs are the Academy at Old Cockrill (in the Pearl-Cohn Cluster) and the Academy at Hickory Hollow. These academies and other educational reforms, including a transitional program for students re-entering school from the juvenile justice system, have helped MNPS achieve a dramatic increase in its high school graduation rate. With the addition of the two new academy programs last year and the six new magnet programs in progress, the District will have approximately 80 different choice options for the 2011-2012 school year.

Furthermore, the Rezoning Plan itself is being modified to accommodate growth in the Antioch and Cane Ridge Clusters. The District administration has prepared a ten-year plan, and the Task Force has reviewed and the Board has approved the first phase of that plan, including the construction of a new elementary school. These changes also likely will include the construction of another new elementary school and a new middle school.

Finally, the MNPS Plan is subject to ongoing monitoring, review, and modification by the Board of Education. *See* Exhibit 1 (narrative description of MNPS Plan). In addition, the District's student assignment Task Force continues to monitor the implementation of the Rezoning Plan and make recommendations about its improvement. Indeed, the Task Force met recently on December 2, 2010, and discussed the status of implementation and possible modifications to the plan, including both those discussed above and others.

### D. The MNPS Plan Serves Its Intended Purposes and is Not Discriminatory

As shown above, the Rezoning Plan was not designed with the intent to discriminate, nor has it had any discriminatory impact. *See* Exhibit 2 (Mueller Report); Exhibit 3 (Stevens Report). To the contrary, the Rezoning Plan, together with the other choice elements of the MNPS Plan and more recent changes to the plans, were designed in part to bring greater equity to the District's student assignment system. Moreover, the Rezoning Plan, the District's choice options, and changes to the plan actually have led to more diverse schools overall and resulted both in more options and resources for students choosing to attend school in the Pearl-Cohn Cluster.

First, the Rezoning Plan was not adopted with a discriminatory intent, but instead, as discussed above, and in even more length during the November 2009 hearing, one of the District's primary motives in passing the Plan was to give parents and students more choice. Rather than simply requiring parents in the Pearl-Cohn Cluster to attend a school in a non-

contiguous zone, the District permitted them to choose their preferred option. Any alleged animus toward minorities in the Pearl-Cohn Cluster therefore is squarely refuted by the record: Parents and students in Pearl-Cohn have more choice options than most anyone else in the District, including transportation, and this choice does not expire under the Plan. Indeed, during the 2010-2011 school year, nearly half of the students in formerly non-contiguous areas in the Pearl-Cohn Cluster either attend a zoned option school in the Hillwood Cluster or take advantage of another choice option under the MNPS Plan. *See* Exhibit 3 (Stevens Report). Moreover, that the District has made significant efforts to improve the student assignment plans—and in particular, applied for and received an MSAP grant—is evidence that the District has continued to implement the plans to the benefit of, not with an intent to discriminate against, minority students. *See id.*

Second, neither the MNPS Plan as a whole, nor the Rezoning Plain in particular, has had a discriminatory effect. Rather, the MNPS Plan in recent years actually has had a positive impact on the overall level of diversity within the District's schools. The number of schools in the District with at least 10% or more of three racial groups increased by five from the 2008/09 school year (before the Plan was implemented) to the 2009-2010 school year (after the Rezoning Plan was implemented). *See* Exhibit 2 (Mueller Report). And the number of schools in the District that had no majority race or ethnic group increased over this same time period. *Id.* Furthermore, there was no net increase in the number of schools in the District with 90% or more of students from one racial or ethnic group. *Id.. See also Keyes v. Sch. Dist. No. 1*, *Denver, Colo.*, 413 U.S. 189, 206 (1973) (noting number of 90% one-race schools in evaluating segregation claim); *Dayton*, 443 U.S. at 535 ("54.3 percent of the black students were assigned to schools that were 100 percent black").

With respect to students in the Pearl-Cohn Cluster in particular, the MNPS Plan has increased diversity and expanded choice with no corresponding discriminatory impact. As explained above, parents and students in Pearl-Cohn have expanded choice options—they choose from either a "zoned-choice" school or a school closer to home. They also can apply to attend one of the District's magnet or optional schools and a school outside of their zone lines during an Open Enrollment period each spring. And under the MSAP grant, the Pearl-Cohn Cluster will have more magnet programs that will further increase choice and diversity. Moreover, the schools in the Pearl-Cohn Cluster have added resources and programs that make them more effective and attractive.[7]

Third, the MNPS Plan effectively is serving its other critical purposes. For example, the cluster system and the workable feeder patterns it includes allow for families to have stability and predictability in their school assignments. In addition, utilization rates in the District have improved with fewer schools being severely underutilized now than before the adoption of the Rezoning Plan. *See* Exhibit 2 (Mueller Report). Moreover, the additional resources targeted at high-poverty schools under the Rezoning Plan have all been provided. *See* Exhibit 3 (Stevens Report). Finally, academic achievement levels in the District are improving.

---

[7] Nor, as the Complaint suggests, has the Rezoning Plan led to discriminatory effects in the Pearl-Cohn Cluster. In Pearl-Cohn, there was no increase in the number of schools with a majority of one race or ethnic group. In addition, there was an increase of only one school with 90% or more of one race in Pearl-Cohn. As noted above, schools in the Pearl-Cohn Cluster also received and continue to receive substantial additional resources that are not available to most schools in the District. Moreover, insofar as the demographics in the schools changed, *the Rezoning Plan did not cause that change*. The District did not "assign" students who formerly attended schools in other clusters to schools closer to their homes. Instead, the Plan gave parents the *choice* of several schools, and parents decided which school their children would attend. Furthermore, every student actually exercised such a choice.

## CONCLUSION

In sum, the District has an effective comprehensive student assignment plan that is evolving to do an even better job of meeting MNPS's various student assignment goals, including, above all, providing a high-quality educational opportunity to all students. Moreover, the MNPS Plan has been, and continues to be, improved.

Therefore, the plaintiffs' ideas about the use of socioeconomic data in student assignment and their other policy suggestions are best directed, not to this Court, but to the elected Board of Education and to the Student Assignment Task Force that the Board has charged with ongoing monitoring of the Rezoning Plan.

Respectfully submitted,

/s/ Kevin C. Klein
James L. Charles, #9007
Kevin C. Klein, #22301
Allison L. Bussell, #23538
Elizabeth Sanders Burke, #23873
P.O. Box 196300
Nashville, Tennessee 37219
(615) 862-6341

*Counsel for Defendants*

## Certificate of Service

I hereby certify that a copy of the foregoing has been sent via the CM/ECF electronic filing system, on this 23rd day of December, 2010 to:

Larry D. Woods
Allen N. Woods II
Michael S. Lottman
707 18th Avenue South, Ste. 9
P.O. Box 128498
Nashville, TN 37212

/s/ Kevin C. Klein_____
Kevin C. Klein