UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FRANCES SPURLOCK AND JEFFREY SPURLOCK, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:09-cv-00756 ) ) JUDGE SHARP |
| DAVID FOX, *et al.*, | ) MAGISTRATE JUDGE BRYANT ) |
| Defendants. | ) |

# MEMORANDUM

Presently before the Court is Defendants' motion to dismiss the Fourth Amended Complaint (Docket Entry No. 241), to which Plaintiffs filed a response (Docket Entry No. 250), and Defendants filed a reply (Docket Entry No. 254). Also presently before the Court is Defendants' motion for summary judgment (Docket Entry No. 248), to which Plaintiffs filed a response (Docket Entry No. 251), and Defendants filed a reply (Docket Entry No. 256). For the reasons stated below, the Court will convert the motion to dismiss to a motion for summary judgment and will deny both motions for summary judgment.

# FACTS

The parties are familiar with the facts of this case, originally filed in 2009 to challenge the constitutionality of the re-zoning plan for the Metropolitan Nashville Public Schools ("MNPS"). The Court previously recited the facts in its April 27, 2012 memorandum explaining its decision to grant Plaintiffs' motion for class certification. (Docket Entry No. 304.) The Court repeats that recitation of the facts here. Any additional facts germane to the present motions for summary judgment appear in the appropriate section of the analysis.

1

The Metropolitan Board of Public Education first implemented the re-zoning plan at the beginning of the school year in August 2009. Plaintiffs Frances and Jeffrey Spurlock and Carroll Lewis ("Plaintiffs") each have a dependent enrolled in MNPS whose school assignment was affected by the re-zoning plan. Plaintiffs allege that the re-zoning plan assigned (or reassigned) students on the basis of race to exacerbate racial segregation in MNPS and deprive African-American students of equal educational opportunities.

MNPS is divided into sub-districts, or "clusters," and students generally attend a school within their geographical cluster. Prior to the re-zoning plan, however, students living in certain predominantly African-American areas were required to attend schools outside of their geographical cluster, pursuant to rulings in prior cases involving racial discrimination in Nashville schools. The parties describe these areas as "mandatory non-contiguous transfer zones." Plaintiffs and their dependents resided in one such zone in the Pearl Cohn cluster. Prior to the re-zoning plan, rather than attending a school within their home cluster, Plaintiffs' dependents were assigned to a school in the Hillwood cluster.

The Board of Public Education's re-zoning plan eliminated the mandatory non-contiguous transfer zones and replaced them with "choice zones." The parents and guardians of children living in these zones were allowed to pick between a school in their neighborhood cluster and a school in a different cluster farther away from home. The terms of the re-zoning plan, and not the children's parents or guardians, selected the schools that the parents and guardians were choosing between. So, while Plaintiffs now choose between a school in the Pearl Cohn cluster and a school in the Hillwood cluster, they are limited to the school in each cluster that the re-zoning plan prescribes. Prior to the issuance of a temporary restraining order in this case, the Spurlocks were not allowed to continue sending their daughter to the school she had

been attending in the Hillwood cluster. Similarly, the re-zoning plan closed the Hillwood cluster school that Lewis's granddaughter had been attending. When Lewis attempted to move her granddaughter from a Pearl Cohn cluster school to a Hillwood cluster school a few days into the 2009-10 school year, Defendants denied the application for transfer.

The gravamen of Plaintiffs' allegations is that the re-zoning plan pushes African-American students living in the mandatory non-contiguous transfer zones out of racially diverse schools and forces them to choose among academically inferior, racially homogeneous schools. Plaintiffs allege that the re-zoning plan amounts to school assignment on the basis of race, in violation of the federal constitutional guarantees of equal protection and due process, and achieves intentional de jure segregation in the MNPS system.

## ANALYSIS

### I.     Legal Standard

When a court decides a motion to dismiss for failure to state a claim, "[i]f . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Whether the Court must give notice of the conversion to the opposing party depends on the facts and circumstances of each case. *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998).

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The

ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Conversion of Motion to Dismiss to Motion for Summary Judgment

Defendants' motion to dismiss is appropriate for conversion to a motion for summary judgment. In large part,[1] the issues raised in Defendants' motion to dismiss overlap entirely with

---

[1] The single issue unique to the motion to dismiss is Defendants' argument that Plaintiffs lack standing (Docket Entry No. 242, at 19 n.11) because they have not alleged a "concrete and particularized" injury that is "fairly traceable to the defendant[s'] action." *See Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002). Because of this issue, Defendants couch their motion as being, in the alternative, one to dismiss for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). This additional basis for the motion does not limit the Court to the operative pleading alone. *See United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (explaining that

4

the issues in their motion for summary judgment. Both parties present the Court with matters outside the operative pleading in their moving papers. Indeed, Plaintiffs, the party opposing the motion to dismiss, cite interchangeably to exhibits filed separately with their response to the motion for summary judgment. (*See* Docket Entry No. 250, at, *e.g.*, 4 & n.3.) All parties having a reasonable opportunity to present all the pertinent material, *see* Fed. R. Civ. P. 12(d), the Court will treat Defendants' motion to dismiss as a motion for summary judgment and consider matters outside of the operative pleading.

### III. Standard for Strict Scrutiny Review

The essential question at issue in these motions is whether the Court will review Defendants' re-zoning plan under the strict scrutiny standard. If applicable, strict scrutiny would require Defendants to show their plan "is 'narrowly tailored' to achieve a 'compelling' government interest." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). There are two possible avenues by which the Court can conclude that strict scrutiny applies. First, "[i]t is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Schs.*, 551 U.S. at 720. This inquiry seeks out "explicit racial classifications for the distribution of benefits." *See Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82 (1st Cir. 2004).

Second, where the government action is race-neutral on its face, strict scrutiny will still apply if the policy has a discriminatory effect and discriminatory purpose. *See Hunt v.*

---

factual challenge to subject matter jurisdiction leaves the Court "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case").

*Cromartie*, 526 U.S. 541, 546 (1999); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Sources of evidence relevant to discerning the existence of discriminatory intent include the historical background of the decision, the sequence of events leading up to the decision, departures from normal procedure, departures in the substantive factors considered, and the legislative or administrative history. *Vill. of Arlington Heights*, 429 U.S. at 267-68. The mere awareness of a program's discriminatory effect, without more, does not amount to discriminatory intent. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006).

**IV.     Racial Classifications**

Defendants argue that the first avenue of strict-scrutiny review is inapplicable to this case because the re-zoning plan assigns students to schools based on where they live and does not rely on explicit racial classifications. *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 545-46 (3d Cir. 2011); *Anderson*, 375 F.3d at 82. In response, Plaintiffs rely on the appellate decision in *Lewis v. Ascension Parish School Board*, 662 F.3d 343 (5th Cir. 2011) (per curiam). In *Lewis*, the district court had refused to apply strict scrutiny to a race-neutral plan that reassigned students based on geographical location. *Id.* at 349. Nonetheless, evidence in the record indicated that the school board members considered the race of reassigned students so as to preserve the racial balance in existing schools and maintain the district's unitary status. *Id.* The Fifth Circuit found "troubling" any consideration of race, in light of the Supreme Court's decision in the *Parents Involved* case. *Id.* Ultimately, the court was able to decide the case on other grounds, remanding for further factual findings on the question of discriminatory impact and motive.

This case is similarly situated. For reasons explained subsequently, Plaintiffs will survive summary judgment on the questions of discriminatory effect and purpose. Therefore, the Court does not have to decide today whether, as a matter of law post-*Parents Involved*, a reassignment plan can escape strict scrutiny review simply by placing students in schools based on geographical location, even if the evidence indicates that race was a factor in the formulation of the plan. The upshot of the Court's resolution of this issue is that Plaintiffs remain free to put on proof at trial that Defendants' re-zoning plan relies on "explicit racial classifications."

## V. Race-Neutral Action

### A. Discriminatory Effect

Defendants contend that, as a matter of law, Plaintiffs cannot show that the re-zoning plan has had a segregative effect on MNPS. To the contrary, Defendants maintain that the data do not show meaningful segregation in MNPS, as compared to other cases where the Supreme Court has found actionable segregation. (*See* Docket Entry No. 242, at 11 (citing *Dayton v. Brinkman*, 443 U.S. 526, 529 n.1 (1979) and *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 452 (1979)). Furthermore, Defendants claim that MNPS have not become significantly more racially isolated since the re-zoning plan was implemented. For example, the data show a 1.5% increase in African-American enrollment in Pearl-Cohn schools from 2008-09 (the year before the re-zoning plan took effect) to the current school year.

Given the volume of data and the different levels of generality at which it can be analyzed (*i.e*, by district, cluster, and school), the Court declines to enter summary judgment for Defendants on the question of discriminatory effect. At trial, expert witnesses from both sides will offer testimony on the significance of the data for purposes of evaluating the consequences of the re-zoning plan. In the meantime, the Court observes that none of Defendants' cases hold

7

the data in this case are insufficient for a finding of racial segregation in the MNPS. In other words, those cases establish no bright-line percentages for how segregated a school district must be in order to violate principles of equal-protection law, or how much more segregated a particular cluster or school must become in order to support a finding of discriminatory effect.

### B. Discriminatory Purpose

Defendants contend that Plaintiffs cannot establish discriminatory purpose, as a matter of law. Defendants point to the improved utilization of school facilities, the meaningful expansion of options for students who formerly lived in mandatory non-contiguous transfer zones, and the opportunity to provide additional resources to certain clusters (including the Pearl Cohn cluster) as legitimate, non-discriminatory reasons for adopting the plan.

Plaintiffs set forth the following evidence of discriminatory intent. Referencing the *Arlington Heights* factors of historical background and procedural departures, Plaintiffs point to the testimony of George Thompson, a school board member during the relevant time frame. Thompson testified that the board utilized "absolutely no standards or guidelines" for membership on the task force that developed the 2008 plan. (Docket Entry No. 252-16, at 96:24—97:7.) He "was very concerned" because the task force included individuals "with no real attachment to this community or knowledge of history of this community." (*Id.* at 97:8-13.) Furthermore, Thompson could not recall the prior creation of a task force on the question of student assignment during his fourteen years on the school board.

Plaintiffs also point to a January 5, 2008 memorandum by Dr. Pedro E. Garcia, former MNPS director until early 2008. Dr. Garcia's memorandum was introduced as evidence (Plaintiffs' Exhibit 61) during a prior hearing before another department of this Court, which

8

denied Defendants' motion to strike the memorandum.[2] (*See* Docket Entry No. 137, at 17-24.) It discusses the political pressures applied to school board members by white parents in the Hillwood cluster who wanted African-American students from the non-contiguous transfer zones to be reassigned out of the cluster to different schools.

Finally, Plaintiffs contend that Defendants' purported reasons for implementing the re-zoning plan, particularly the utilization of school resources, are pretextual. Plaintiffs point to specific Hillwood schools that were actually utilized less the year after the re-zoning plan took effect and after the African-American student population in the Hillwood cluster dropped by twelve percent. (*See* Docket Entry No. 251, at 5 (citing to the record); Docket Entry No. 252-3, at 16 (Table E summarizing racial composition by cluster pre-plan versus post-plan); & Docket Entry No. 252-14 (implementation update describing demographic changes from October 2008 to September 2009).)

In summary, Plaintiffs have presented adequate evidence to survive summary judgment and create a triable question of fact on discriminatory intent.

### C. Causation

A discriminatory effect violates the equal protection clause "only if that impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272; *see Alexander v. Youngstown Bd. of Educ.*, 675 F.2d 787, 791 (6th Cir. 1982) (describing "a causal relationship between the official conduct and the segregation in the schools" as a "prerequisite[] to a finding of de jure segregation"). In this case, Defendants contend that, even if they acted with a discriminatory

---

[2] Defendants strenuously protest the prior decision denying their motion to strike the Garcia memorandum. Given that the case was reassigned to this judge long after that ruling, Defendants remain free to renew their objections at trial. For now, however, the memorandum remains in evidence for the Court's consideration.

purpose to implement the re-zoning plan and even if the plan had a discriminatory effect, the plan's parental choice provisions break the causal chain.

The parties' competing arguments on the causation prong crystallize the dispute in this case. Plaintiffs acknowledge the choice provisions in the re-zoning plan but contend that Defendants deliberately provided them, on the basis of their race, with inferior options from which to choose. The schools to which Plaintiffs can now send their dependents—whether located in the Pearl Cohn cluster or the Hillwood cluster—allegedly are academically inferior to and more racially homogeneous than the schools Plaintiffs' dependents were attending previously. In summary, Plaintiffs allege that Defendants have structured the choice in a way that puts Plaintiffs' dependents in worse schools and deprives those dependents of an equal educational opportunity. Plaintiffs have submitted adequate evidence pertaining to academic performance and racial composition to receive a trial on the merits of those claims. Defendants are not entitled to summary judgment on causation grounds.[3]

## VII. Remaining Motions

### A. Motion to Strike Weber Affidavit

With their reply in support of their motion for summary judgment, Defendants submitted the affidavit of Christopher N. Weber, the MNPS Director of Student Assignment Services. Weber's affidavit describes the race-neutral management and operation of MNPS. Plaintiffs have moved to strike the Weber affidavit. (Docket Entry No. 260.) Plaintiffs contend that Weber lacks personal knowledge, makes only conclusory statements, and does not meet the

---

[3] In a footnote of the motion to dismiss, Defendants contend that the choice provisions in the re-zoning plan deprive Plaintiffs of standing to bring their claim. This contention is wholly without merit. The allegations of racial discrimination in education give rise to a long-established cognizable injury in the tradition of *Brown v. Board of Education*, 347 U.S. 483 (1954) and continuing through the Supreme Court's 2007 decision in the *Parents Involved* case.

requirements for admissibility of expert opinion testimony set forth in Federal Rule of Evidence 702. Taking the last objection first, the Court observes that Weber's affidavit does not purport to offer expert testimony. Instead, Defendants make clear that Weber is a fact witness. (Docket Entry No. 262, at 5.) As for the remaining objections, the Court will overrule them without prejudice. Plaintiffs may renew these objections when and if Weber testifies at trial.

> **B.** **Motion for Preliminary Injunction**

Prior to the reassignment of the case to this department of the Court, Plaintiffs were granted a temporary restraining order on September 1, 2009, allowing the Spurlocks' child to attend Bellevue Middle School for the 2009-10 school year. Thereafter, but still prior to reassignment to this department, the Court held a preliminary injunction hearing but never ruled on the injunction. In adjudicating a motion for a preliminary injunction, the Court considers "(1) the likelihood that the movant will succeed on the merits, (2) whether the movant will suffer irreparable harm without the injunction, (3) the probability that granting the injunction will cause substantial harm to others and (4) whether the public interest will be advanced by issuing the injunction." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006) (citing *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997)). This case has now reached the eve of trial and will be promptly decided following the conclusion of trial proceedings. Therefore, Plaintiffs will not suffer irreparable harm in the absence of a preliminary injunction. The absence of irreparable harm given the current posture of the case warrants denial of the preliminary injunction and makes it unnecessary for the court to reach the remaining factors. *See id.* (relieving the district court from specific findings as to all four factors when fewer factors dispose of the issue).

**CONCLUSION**

For the reasons stated herein, the Court will convert Defendants' motion to dismiss into a motion for summary judgment and deny both motions for summary judgment. (Docket Entry Nos. 241 & 248.) The question of whether the strict-scrutiny standard of review applies to Defendants' re-zoning plan will be decided at trial. The Court will also deny Plaintiffs' motion to strike the Weber declaration (Docket Entry No. 260) and motion for a preliminary injunction. This case remains set for trial to begin on Tuesday, May 1, 2012.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE