# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **FRANCES SPURLOCK and JEFFREY SPURLOCK, CARROLL LEWIS, and TENNESSEE ALLIANCE FOR PROGRESS,** | ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| | ) | **No. 3:09-cv-00756** |
| **v.** | ) | |
| | ) | **JUDGE SHARP** |
| **METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, METROPOLITAN NASHVILLE BOARD OF PUBLIC EDUCATION, MARK NORTH, GRACIE PORTER, EDWARD T. KINDALL, JO ANN BRANNON, MICHAEL W. HAYES,[1] ANNA SHEPHERD,[2] CHERYL D. MAYES,[3] KAY SIMMONS, SHARON DIXON GENTRY, and JESSE REGISTER,** | ) ) ) ) ) ) ) ) ) ) ) ) | **MAGISTRATE JUDGE BRYANT** |
| | ) | |
| **Defendants.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Frances and Jeffrey Spurlock, suing on behalf of themselves and their minor

daughter; Carroll Lewis, suing on behalf of herself and her minor granddaughter; and Tennessee

Alliance for Progress (collectively, "Plaintiffs") seek a judgment against the Metropolitan

---

[1] Hayes is substituted as the successor to former Nashville Board of Public Education member David A. Fox. *See* Fed. R. Civ. P. 25(d).

[2] Shepherd is substituted as the successor to former Nashville Board of Public Education member Steve Glover. *See* Fed. R. Civ. P. 25(d).

[3] Mayes is substituted as the successor to former Nashville Board of Public Education member Karen Johnson. *See* Fed. R. Civ. P. 25(d).

1

Government of Nashville and Davidson County; the Metropolitan Nashville Board of Public Education ("School Board"); the elected members of the School Board, sued in their official capacities; and Dr. Jesse Register, sued in his official capacity as the School Board-appointed Director of Metropolitan Nashville Public Schools (collectively, "Defendants"). Plaintiffs allege that the re-zoning plan adopted by the School Board in July 2008 and first implemented in the 2009-10 school year violates Plaintiffs' Fourteenth Amendment equal protection and due process rights by assigning students on the basis of race and/or segregating students by race under color of law. Plaintiffs seek an order undoing the re-zoning plan and implementing a new plan that overhauls the structure of the Metropolitan Nashville Public Schools ("MNPS").

Because Plaintiffs are bringing this action pursuant to 42 U.S.C.A. section 1983 (2003) to enforce their rights under the United States Constitution, the Court has federal-question jurisdiction. *See* 28 U.S.C.A. § 1331 (2006); *cf. id.* § 1343(a)(3)-(4) (2006). Pursuant to subsections (b)(1)(A) and (b)(2) of Federal Rule of Civil Procedure 23, the Court has certified this case as a class action. (Docket Entry No. 305.) Plaintiffs represent all African-American students in the Metropolitan Nashville public school system whose school assignment was affected by the elimination of mandatory non-contiguous transfer zones in the 2008 re-zoning plan, and the parents, guardians, or other representatives of such students.

The Court held a bench trial in this action on May 1-4, 7-10, 14-16, 2012. Previously, on November 3-5, 9-10, 12-13, 16-20, 2009, another department of this Court conducted a hearing on Plaintiffs' motion for a preliminary injunction.[4] At the conclusion of the bench trial, the Court instructed the parties to designate portions of the transcript from the preliminary injunction

_____

[4] The Hon. John T. Nixon, who had presided over the preliminary injunction hearing, recused himself from the case on May 6, 2011. The case was then randomly reassigned to the Hon. Todd J. Campbell and then reassigned again to this department on May 31, 2011.

proceedings for the Court's review and to attach the exhibits referenced in those designations but not reintroduced during the trial proceedings. (Docket Entry No. 316.) Each side filed their designations on May 23, 2012. (Docket Entry Nos. 323-24.) Defendants filed counter-designations on June 4, 2012. (Docket Entry No. 334.) This department also instructed the parties to prepare proposed findings of fact and conclusions of law, which were filed on June 26, 2012. (Docket Entry Nos. 338, 340.) Plaintiffs filed their response on July 6, 2012 (Docket Entry No. 343), and Defendants filed their response on July 17, 2012 (Docket Entry No. 351).

Having reviewed the record, the exhibits received in evidence, the testimony of the witnesses, and the parties' proposed findings and conclusions, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on an issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found.

## I. FINDINGS OF FACT

A.    **Substance of the Student Assignment Plans and Available School Choices**

In 1998, after decades of litigation, the Metro Nashville School District ("District") achieved unitary status through the settlement of *Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, Tennessee,* Docket No. 3:55-2094/2956. The student assignment plan adopted as part of that 1998 settlement agreement organized the District's schools into a number of "clusters" based on geographic areas. Some students in the Pearl-Cohn area of North Nashville were assigned to schools in the Hillwood Cluster outside the area in which they lived, with transportation provided by the District. Students in other areas of Davidson County, including almost every area with a non-minority population, were assigned to schools in their area of residence using contiguous attendance zones. Other key features of the

3

1998 Plan were "enhanced option schools," which provided additional resources and enhanced instruction to a number of schools serving low-income communities, and the use of magnet schools to promote diverse enrollments through student choice. Over time, the District also expanded its system of magnet schools and other school choice programs to which students throughout the District could apply if they did not want to attend their zoned school. Against this backdrop, in July 2008, the Board of Education adopted the Rezoning Plan that is at issue in this case. In many respects, the 2008 Rezoning Plan built on the 1998 Plan. First implemented for the 2009-10 year, the 2008 Rezoning Plan maintained the cluster concept and the enhanced option schools. Additionally, for the most part, the 2008 Rezoning Plan did not alter the District's system of magnet schools and other schools of choice, though it did modify certain boundaries throughout the District.

The key points of the previous paragraph, taken from Stipulation of the Parties Number 2 (Docket Entry No. 307), merit further elaboration. The student assignment plan implemented in 1998 geographically organized Metro Nashville into clusters, one for each of Nashville's comprehensive high schools.[5] The boundaries of the cluster set the attendance boundaries for the high school within that cluster. Most clusters consisted of contiguous areas, *i.e.*, the area surrounding the schools in that cluster. Certain clusters, however, included non-contiguous zones, *i.e.*, areas zoned to the schools within a particular cluster but not physically connected to that cluster. Besides the Metro Center area in the Hillwood Cluster (which is the primary focus of this lawsuit), other non-contiguously zoned areas were assigned to the Hunters Lane, Maplewood, McGavock, and Whites Creek Clusters. (*See* Def. Trial Exhibit 3.) Organizing

---

[5] Originally, there were eleven such clusters, and a twelfth was created for the opening of Cane Ridge High School in 2008.

around the cluster system provided the basis for stable feeder patterns: the elementary schools within a given cluster funneled into a smaller number of middle schools, and those middle schools, in turn, funneled into a single high school. The 1998 plan also introduced a standardized three-tier grade configuration for elementary school (kindergarten through fourth grade), middle school (fifth through eighth grade), and high school (ninth through twelfth grade).

The 2008 plan eliminates the non-contiguous zones and instead implements a "zoned option choice." The formerly non-contiguous zones are now part of the cluster to which they are physically connected, and students within those non-contiguous zones are assigned to a school within that cluster ("zoned school"). As compared to the school the child formerly attended, the zoned school is much closer to the child's home. Bus transportation is available to the zoned school if the child lives a minimum distance from the school, as determined by a District-wide standard. These students also have a "zoned option choice," which allows the parents living in the formerly non-contiguous zones to send the child to a school in the cluster where the child previously attended ("zoned option school"). Although the plan originally recommended a study to determine whether bus transportation to the zoned option school should be conditional on sufficient demand, the School Board subsequently voted in October 2008 to guarantee that bus transportation to parents choosing the zoned option school. Save for children subject to the grandfathering provision,[6] however, the re-zoning plan offers no guarantee of a space in the particular school that the child was previously attending. In other words, while the 2008 re-zoning plan offers students in the formerly non-contiguous zones a choice between attending a

_____

[6] Children who, when the re-zoning plan took effect, were rising into either of the last two years at a given school (*e.g.*, the seventh or eighth grade at a middle school) could continue to attend that school, but the District would not provide them transportation. This grandfathering provision is not limited to children living in a non-contiguous zone.

5

zoned school close to home and a zoned option school in the previous cluster, the District decides which particular schools to offer in that choice. Even within the same cluster, families living in different parts of a non-contiguous zone may be offered different school choices for their children.

As discussed in greater detail *post*, a Community Task Force on Student Assignment ("Task Force") prepared the 2008 re-zoning plan. The Task Force's recommendations explicitly took into account the concerns of facility under-utilization. Within the Hillwood Cluster, the Task Force recognized that, even with the zoned option choice, enough Pearl-Cohn families would choose the zoned school within their own cluster that some Hillwood schools should be closed (euphemistically described in the plan as "made available for other instructional uses"). Accordingly, the Task Force recommended that Brookmeade Elementary School[7] and Martha Vaught Middle School[8] no longer serve as zoned schools. The Task Force recognized that its recommendations would result in a low enrollment and utilization percentage for Hillwood High School. The Task Force opined, however, that the Hillwood area was "ripe for some development that will increase the student population at Hillwood" and that Hillwood High School needed adequate space to accommodate the choices of students from the formerly non-contiguous zones in the Pearl-Cohn Cluster. (Pl. Trial Exhibit 9, at 23.)

Concerns about facility under-utilization prompted similar recommendations in other clusters. Noting that the Whites Creek Cluster was overbuilt with middle school facilities, the

---

[7] Brookmeade Elementary did serve as a temporary site in 2009-10 for Wharton Elementary, a Pearl-Cohn Cluster school that underwent renovation.

[8] Martha Vaught Middle became the site of the Big Picture High School, an unzoned, application-only specialty school.

6

Task Force recommended that Ewing Park Middle School no longer serve as a zoned school.[9] Also, noting that the Stratford Cluster had the most under-utilized buildings in the District, the Task Force recommended that Cora Howe Elementary School no longer serve as a zoned school and instead become the site for a special education school. In addition to the closure or repurpose of particular schools, the Task Force interspersed recommendations throughout the clusters for the adjustment of boundary lines to make greater use of under-utilized facilities and relieve the pressure on schools with enrollments above their capacity. To make more robust usage of schools in the Metro Center area and to encourage students to attend school closer to home, the Task Force recommended re-zoning the portion of downtown north of Interstate 40 from the Hillsboro Cluster to the Pearl-Cohn Cluster. (*Cf.* Pl. Trial Exhibit 9, at 16 (showing proposed boundary of Pearl-Cohn Cluster adjoining Interstate 40).)

In addition to the zoned schools and (for families living in the formerly non-contiguous zones) the zoned option schools, the District offers open enrollment for parents to apply to zoned and optional schools with available space. The application period takes place in the preceding March. The District gives priority in open enrollment at a school to a particular student who is (1) a child of an employee of the school, (2) a sibling of someone already attending the school, or (3) a current student at another school that feeds into the school. Besides the open enrollment process, the District conducts an annual lottery from November through February for all seats in its magnet schools and for any seats in its enhanced option schools[10] and design centers[11] left

---

[9] Ewing Park Middle did serve as a temporary site for Madison Middle during the 2009-10 school year while it underwent renovations.

[10] Enhanced option schools offer smaller class sizes, longer school days, afterschool care, pre-K programs, social services, and a special teacher for gifted students.

7

over after students living within the school zone have received first priority at enrollment. The District does not provide transportation for children admitted through open enrollment or the lottery, although, in some circumstances, Metropolitan Transit Authority ("MTA") bus passes are available to students who qualify for free and reduced-price meals ("FARM").

The District is also subject to the provisions of the federal No Child Left Behind Act enacted in 2001. If a school does not make annual yearly progress for two consecutive years, the District must notify the families that the students attending said school have the option to attend a school that is in good standing, *i.e.*, making annual yearly progress. The District must also provide the student with transportation to that other school, either by a school bus or by reimbursement of the parents.

The District also has charter schools. Application to charter schools is governed by the relevant state law. *See* Tenn. Code Ann. § 49-13-107 (Supp. 2011). Alan Coverstone, the District's Executive Director of the Office of Innovation, testified that "[a] charter school is an independently operated school that has its own boards and has a contract with the school district to serve students." (Transcript at 2154:3-5.) Charter schools receive funding according to a per-pupil allocation calculated with a formula provided by the state. Pursuant to state law, each charter school offers a 30-day open enrollment process, followed by a lottery and waitlist if the school is over-enrolled. The District communicates with families about charter school options to the same extent that it informs them of magnet school options.

As of the 2011-12 school year, MNPS offered ten charter schools. (*See* Def. Trial Exhibit 5B.) Pursuant to filings after the conclusion of trial, the School Board approved two

---

[11] Design center schools offer a specialized thematic program tailored to serve their specific cluster at the elementary and middle school levels.

charter applications and denied eight charter applications at its May 29, 2012 meeting. (Docket Entry No. 333.) Five of the eight unsuccessful applicants filed amended applications; the School Board granted two of these and denied the other three at its June 26, 2012 meeting. (Docket Entry No. 345.) In particular, the School Board denied the original and amended application of Great Hearts Academies of Nashville, which proposed limited transportation for the first two years of operation to a charter school location in West Nashville.[12]

Besides its conclusions on re-zoning, the Task Force recommended that the District provide additional resources to schools in areas with a high concentration of poverty, including the schools within the Pearl-Cohn Cluster. At all levels of schools in the Pearl-Cohn Cluster, these additional resources included 5% differentiated pay, a full-time social worker, and lower ratios of students to teachers and guidance counselors. Pearl-Cohn High School would offer

---

[12] The growth of charter schools is a significant development in MNPS. Indeed, after the conclusion of trial, Great Public Schools filed a motion for leave to file an amicus curiae brief (Docket Entry No. 339), later joined by the Tennessee Charter Schools Association (Docket Entry No. 349). As described in Great Public Schools' motion, the State of Tennessee has recently amended its statutes to allow for a larger number of charter schools and to make a larger cross-section of the student population eligible for enrollment. Amici claim to have an interest in the lawsuit because new allegations in the final amendment of the operative pleading contend that charter schools provide evidence in support of Plaintiffs' equal protection claim.

While the Court denied Defendants' motion in limine to exclude evidence of charter schools and heard such evidence at trial, the Court finds that the issue of charter schools is not central to the dispositive questions in this case. Specifically, none of the named Plaintiffs attempted to enroll a child in a charter school, and no provisions of the 2008 re-zoning plan pertained to charter schools. To the extent the application of Great Heart Academies of Nashville might have been corroborative of Plaintiffs' argument that Defendants intentionally discriminated against African-American students on the basis of race, the School Board's decision to deny the original and amended application runs counter to Plaintiffs' theory. Therefore, the Court will deny the motion for leave to file the amicus brief.

more Advanced Placement and CTE[13] courses and would hire a full-time college and career counselor. Qualifying students from John Early Middle School would be allowed to bypass the lottery and have a guaranteed spot at Hume-Fogg High School, an academic magnet located within the cluster. Elementary schools would have the same extended hours and pre-K options as all the enhanced option schools throughout the District. To ensure that the Metro City Council consistently budgeted for these resources each year, the Task Force recommended a separate budget account number and a separate page in the budget. The District has provided these additional resources in each year of the re-zoning plan's implementation and has included them in the budget for the upcoming 2012-13 school year.

**B.      History of the Re-zoning Plan**

Prior to the 2008 re-zoning plan, the under-utilization of schools in the MNPS system was a longstanding concern of Nashville's political leaders, including several mayors and the Metro City Council. The School Board struggled to deal with this issue on its own because the closure of schools proved to be so politically sensitive. The problem became more acute after the failure of a September 2005 referendum to increase funding for schools. In 2006, the District contracted with the Council of Great City Schools, an association of the sixty-six largest urban school districts in the country. This organization provides technical assistance, advocacy, and strategic support teams covering most aspects of school operations. (Transcript at 89:12-19.) At the invitation of then-Director of Schools Dr. Pedro Garcia, the Council of Great City Schools sent a team to Nashville to study zoning patterns and make recommendations to the School

---

[13] "CTE" stands for Career and Technical Education and involves the kind of training associated with a vocational program.

Board.  After its arrival, however, the team "fell apart" without making substantive recommendations.  (*Id.* at 89:6.)

Larry Collier, the District's then-Director of Student Assignment Services, testified that he became involved in re-zoning issues in 2007 because the School Board and MNPS administration wanted to develop a plan for the anticipated opening of Cane Ridge High School the following year.  In May 2007, Collier presented an overview of MNPS zoning to the School Board.  (*Cf.* Def. Prelim. Inj. Exhibit 11 (Power Point from Collier's presentation).)  Collier's presentation focused on seven core questions:

> --How can we best utilize our existing facilities?
> --How can we maximize choice opportunities and locations?
> --How can we reduce transportation costs?
> --Are non-contiguous zones still necessary?
> --Can our pupil assignment plan enhance parental/family involvement?
> --What aspects of the [1998 school improvement plan] have NOT been successful and perhaps need changing?
> --What is truly best for students and families?

(*Id.* at 7.)

Over the summer of 2007, Collier drafted a re-zoning plan that he presented in the fall to Garcia and to the School Board.  According to this draft plan, elementary and middle school students living in the formerly non-contiguous zones of the Hillwood Cluster would no longer be bused to distant Hillwood schools but would instead be zoned to neighborhood schools in the Pearl-Cohn Cluster close to their homes in Metro Center.  The high school students from the formerly non-contiguous zones in the Hillwood Cluster would continue to attend Hillwood High School for the time being.[14]

---

[14] Collier's plan recommended further study of (1) whether portions of the Hillwood Cluster could be reassigned to Pearl-Cohn and (2) whether high school students in the formerly non-

11

In late 2007, Garcia held a meeting with the faculty of Brookmeade Elementary School, a Hillwood Cluster school that was recommended for closure. According to evidence introduced during the preliminary injunction proceedings, the Brookmeade faculty argued that the recommendation was unnecessary. Instead, if African-American students currently bused from non-contiguous zones were returned to Metro Center-area schools, white Hillwood families would withdraw their children from private schools and enroll them in Hillwood public schools. (*See* Pl. Prelim. Inj. Exhibit 61.) Garcia also understood that School Board Chair Marsha Warden was facing pressure from Hillwood Cluster parents to remove African-American students from their schools and was concerned that Garcia's plan did not reassign enough African-American students to Metro Center schools. Shortly thereafter, Garcia pulled Collier's draft plan and substituted a scaled-down plan that established the Cane Ridge Cluster and made cosmetic changes to boundaries in East Nashville. Garcia accepted a buyout of his contract as Director of MNPS at the beginning of 2008.

In January 2008, the School Board passed a motion by Karen Johnson (one of its members) to create a Community Task Force for Student Assignment. (*See* Def. Trial Exhibit 91.) Johnson developed the idea after attending a Council of Great City Schools breakout session on Austin, Texas, where the school district had conducted its re-zoning by soliciting the input of many different stakeholders, including parents and community members. (Transcript at 3367:13—3369:18.) The Task Force's mission was to recommend to the School Board a comprehensive student assignment plan for MNPS. Consistent with Johnson's proposal, the Task Force consisted of twelve appointed members, one by each of the nine School Board

---

contiguous zones of the Hillwood Cluster should have the option to attend Pearl-Cohn High School, with transportation provided.

12

members, one by the Director of MNPS, one by the Nashville mayor, and a current School Board member selected by Chairperson Warden. Mark North, the School Board member whom Warden appointed, chaired the Task Force. After the members appointed by the MNPS Director and by the mayor withdrew from the Task Force, the composition of the remaining members was five whites (including North) and five African-Americans.

Prior to a day-long orientation, the School Board provided the Task Force with training materials. These materials included a chronology of the history of student assignment issues in Nashville, the *Kelley* desegregation case, and the 1998 school improvement plan. The Task Force also received the re-zoning plan that Garcia proposed and withdrew in 2007, along with the demographic data accompanying that plan. The School Board also provided the scaled-down plan that it had ultimately adopted. (*See* Def. Trial Exhibit 94.)

As chair, North prepared a document for the Task Force of "Goals and Factors to Consider" that was based on School Board discussions of student assignment. (*See* Def. Trial Exhibit 93.) This document stated that the Task Force's goal was "to develop a plan that promotes excellent academic and scholastic opportunities for every school-age resident of Davidson County." (*Id.*) It enumerated these non-exclusive factors for the Task Force's consideration:

> --Building under-utilization and overcrowding
> --Choice options for students and parents
> --Diversity (defined as "the benefit of different perspectives and backgrounds to the student, the classroom, the school, and the school system as a whole")
> --Enhanced academic achievement
> --Enhanced opportunities for extracurricular activities
> --Fiscal responsibility
> --More parental involvement
> --Benefits of neighborhood schools
> --Stability and certainty for students and parents evaluating their options
> --Potential unintended consequences.

13

(*Id.*)

North also provided the Task Force with additional training materials. He included two summaries, one from the Metro Legal Department and another from the NAACP Legal Defense Fund, of the Supreme Court's then-recent decision in *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) ("*Parents Involved*"). The analysis of the *Parents Involved* decision made clear that it would be unconstitutional for the Task Force to consider an individual student's race in school assignment.

North also distributed to each Task Force member a draft of "Neighborhood Schools in the Aftermath of Court-ended Busing: How Context and Composition Matter," a professional article authored by Professors Ellen Goldring and Claire Smrekar of Vanderbilt University. (*See* Def. Trial Exhibit 95, at 001952-001978.) This article studied the return to neighborhood schools in Nashville's high-poverty communities during and after the phased-in implementation of the 1998 school improvement plan. In their conclusion, Professors Goldring and Smrekar wrote that "concentrated poverty leads to concentrated disadvantage in the social and geographical space shared between high-risk neighborhoods and nearby schools." (*Id.* at 001974.) Their case studies of particular Nashville schools "expose[d] the limitations of strategies focused exclusively on *in*-school supports that ignore the ecology of schooling and the realities of high risk neighborhoods." (*Id.*) They recommended housing policy reform as part of educators' efforts to counteract these trends. In addition to this professional article, North provided the Task Force with other articles on student assignment, data on school enrollment and capacity, and a summary of the District's performance under No Child Left Behind.

Beginning on January 8, 2008, the Task Force met weekly on Friday evenings for at least two hours, but sometimes as long as four. The meetings were open to the public. The Task

14

Force did not keep minutes of these meetings. North testified that his goals as the chairperson were to keep the Task Force focused, run orderly meetings, and serve as a liaison to MNPS administration to get information the Task Force requested. The Task Force held brainstorming sessions and then focused its work on the individual clusters, starting with Pearl-Cohn and Hillwood. According to the testimony of Task Force member Anderson Williams,[15] the Task Force began with those clusters because they embodied virtually all the issues in the Task Force's charge, *e.g.*, building utilization, transportation costs, diversity, and school performance. The Pearl-Cohn Cluster caught Williams's attention because of its small and shrinking size, levels of under-utilization, absence of a meaningful feeder pattern, and loss of students through busing to the Hillwood Cluster. The Task Force attempted to increase utilization of Pearl-Cohn Cluster schools by zoning the relatively high-income, increasingly dense Hope Gardens neighborhood into the cluster. Affluent areas in Germantown and Downtown Nashville were also zoned into the Pearl-Cohn Cluster in order to be consistent in making clusters compact and increasing socioeconomic diversity. The loop of Interstate 40 running adjacent to downtown became the southern boundary line for the Pearl-Cohn Cluster.

Furthermore, to comport with the District's "mov[e] towards choice as an overarching strategy," the Task Force converted the formerly non-contiguous areas into choice zones. (Transcript at 4088:8-22.) North testified that he became a proponent of choice for the non-contiguous zones after personally taking a bus ride with Metro Center students from Harpeth

---

[15] At the time that School Board member Gracie Porter appointed him to the Task Force, Williams was employed by the Oasis Center, a non-profit organization that serves Nashville's youth through such services as homeless outreach, family counseling, and leadership development. Williams has prior experience as a community organizer for youth in the Stratford and Maplewood clusters. He has published three professional articles in his field. He will graduate this summer with a masters of business administration from Vanderbilt University's Owen School of Management.

Valley Elementary School[16] in the Hillwood Cluster. His experience caused him to conclude that, while Harpeth Valley was a better school for having Metro Center students among its enrollment, parents were in the best decision to choose whether to bus their children to Harpeth Valley or send them to a school much closer to home in Metro Center. (Transcript at 2908:20—2909:9.) Task Force member Cheryl Mayes[17] also testified about personal experience that convinced her of the advantages of having children in a school closer to home. Mayes transferred one of her own children to a closer middle school so she could get to the school more quickly if the child became ill during the school day. (*Id.* at 1461:21—1462:9.)

Task Force members testified favorably regarding the diversity of the Task Force's composition and its ability to work together effectively. Mayes described the Task Force as "a very eclectic group of people" and "really enjoyed working with everyone because . . . everybody came from a different background [and] had different ideas." (Transcript at 4144:21—4145:1.) Williams similarly described the group as "the task force with the most difficult challenge and the best functioning task force that I've been on." (*Id.* at 4073:10-11.) He commended the group's "openness to difficult dialogue . . . [and] conflicting opinions," (*id.* at 4073:5-6), citing the challenges of re-zoning an entire school system as opposed to advocating for the parochial interests of a particular school or cluster. Chairperson North described the Task

---

[16] Harpeth Valley Elementary is located in the southwest corner of Davidson County.

[17] At the time that School Board member Karen Johnson appointed her to the Task Force, Mayes was employed in the accounting department at Nissan North America. Prior to her appointment, Mayes had a history of ever-increasing involvement in MNPS. She began as a member of the Parent-Teacher Organization and later became chair of a cluster group consisting of parent representatives from each of the schools within a particular cluster. Mayes then became the Antioch Cluster's representative on the Parent Advisory Council, which consisted of parent representatives from each of the clusters. Mayes subsequently replaced Johnson on the School Board and continues as a School Board member to the present day.

16

Force as a "good group" because it was "dedicated" and "sincere" and "worked tirelessly." (*Id.* at 2946:21-23.)

Task Force members consistently testified that they neither had personal racial bias nor perceived such bias among the group. Williams offered especially pointed testimony on this issue:

> Q:     Did your vote [for the re-zoning plan] have anything to do with a desire to move African[-]American students out of the Hillwood Cluster?
> A:     No.
> Q:     Did you see or hear anything that led you to believe that other Task Force members had some ulterior motive?
> A:     No.
> Q:     . . . As a community organizer, if you had seen something like that, what would you have done?
> A:     I would have voted against it.  And I would have been vocal about why I voted against it.
> Q:     And if you saw that, what would you be doing today?
> A:     I would be raising hell against the plan.  That's what community organizers do.

(Transcript at 4105:18—4106:6.)  Mayes, an African-American, answered "No. Not at all" when asked if she had heard any statements or re-zoning proposals from Task Force members that she considered racially discriminatory.  (*Id.* at 4145:12-19.)  If she had believed that the Task Force was pursuing the agenda to move African-American children out of the Hillwood Cluster, she would have left.  (*Cf. id.* at 4148:1-12.)

Task Force members testified that they read and considered the Goldring and Smrekar article on neighborhood schools.  (Transcript at 1460:17-21 (Mayes), 4095:19-22 (Williams).)  In fact, because he was confident that all Task Force members had studied the article, North arranged for Professor Smrekar to attend a Task Force meeting.  Professor Smrekar cancelled the meeting the day before, and North was unable to reschedule her participation.  (*Id.* at 3026:18—3027:9.)  According to Williams, it was significant that the authors concluded their analysis with

17

a discussion of housing policy. Rather than stating in absolute terms that additional resources cannot help student achievement, Williams instead interpreted the article to "talk[] about this larger system of how schools interplay with communities and poverty in communities and violence in communities and so forth." (Transcript at 4097:16-18.) Besides a few brief articles that North provided in the orientation materials, no Task Force member could point to any other professional scholarship that it considered during its deliberations.

As the Task Force contemplated various re-zoning scenarios, it requested and received from District staff various kinds of demographic data—*e.g.*, school enrollment broken down by race if a particular proposal were adopted. North testified that the Task Force requested this data because racial and socioeconomic diversity was one of the factors under consideration, and the Task Force wanted to monitor the impact of its re-zoning proposals on that diversity. Mayes similarly testified that having this demographic data was important for looking at the "big picture" and accurately projecting the impact of different re-zoning scenarios on the District's diversity. Williams testified that the demographic data specifically helped the Task Force analyze its feeder patterns, giving the example of what would happen to the poverty level and occupancy percentage of a middle school if the Task Force re-zoned a particular elementary school.

The Task Force ultimately voted unanimously in support of its recommendation to the School Board. At a May 28, 2008 School Board work session, North gave a detailed presentation of the Task Force's proposal.[18] During and after North's presentation, School

---

[18] At trial, Defendants played a portion of the recorded work session in which North outlined the Task Force's broad goals and discussed its specific recommendations for the Pearl-Cohn Cluster. (Transcript at 2978:1—3021:25.)

Board members asked questions and made comments. North testified that he came away from the work session with the feeling that, once the Task Force provided more specific details, the School Board would adopt its recommendations.

In the subsequent days, the School Board obtained input from the community. This process began with a community meeting at East Literature Magnet on June 3, 2008. Public interest was sufficiently strong that the School Board held additional meetings at Fall-Hamilton Elementary School (South Nashville), Hillwood High School (West Nashville), and John Early Middle School (North Nashville). Also, prior to the work session, the School Board had scheduled meetings with various interested groups to take place throughout June.[19] These meetings included both an explanation of the plan and an opportunity for the interested groups to make comments.

Following North's initial presentation, the Task Force met again to amend its proposal. The Task Force was responsive to the School Board's request for more details concerning the additional resources the Task Force recommended for the Pearl-Cohn Cluster, setting forth the precise ratios for students to teachers and counselors and the amount of differentiated pay for teachers, administrators, and staff. The schools receiving the additional resources were expected to enroll higher concentrations of low-income students as a result of the plan: Napier Elementary in the McGavock Cluster, Shwab Elementary in the Maplewood Cluster, and all zoned schools in the Pearl-Cohn Cluster. The Task Force also responded to feedback it received from the community. For example, in response to skepticism whether the additional resources would be

---

[19] Specific groups included the Interdenominational Ministers' Fellowship (IMF), NAACP, Parents Advisory Council, COPLA (a Hispanic parents' organization), Metropolitan Nashville Education Association teachers' union, Service Employees International Union, the Mayor's office, and Professors Goldring and Smrekar.

19

adequately funded in subsequent years, the Task Force called for a separate budget document conspicuously showing the provision of the additional resources. Similarly, because a NAACP representative had requested stronger academics for schools with high-poverty concentrations, the Task Force called for more advanced placement and honors courses.

The Task Force also worked out the details of the zoned option choice. In deciding which schools to designate as zoned option schools, the Task Force had to take into account school closures, rates of utilization, and consistency of feeder patterns. North testified that, after considering several different alternatives, the Task Force ultimately selected those schools that had the capacity for more students and stood to gain from a more diverse student body. The Task Force declined to select schools geographically closer to the non-contiguous zones where those schools already had a good amount of diversity.

## C. School Board Deliberations on the Re-zoning Plan

The Task Force unanimously voted in favor of its revised plan, which the School Board considered at its Tuesday, July 8, 2008 meeting. Consistent with School Board practice, the revised plan was circulated on the Thursday of the prior week, which happened to come immediately before the Fourth of July holiday. Most sections that the Task Force had amended since the presentation of the draft proposal were emphasized in boldfaced type. (*See* Pl. Trial Exhibit 9.[20]) The revised plan included projections of the re-zoning plan's impact, broken down by cluster, school, and race. For example, the plan was projected to remove 473 out of 693 African-American students from Hillwood High School and to add 144 African-American students to the 548 already attending Pearl-Cohn High School. (*Id.* at 21, 30.) North testified

---

[20] Although not placed in bold type, the details of the additional resources for the Pearl-Cohn Cluster are found at pages 8-11 of Plaintiffs' Trial Exhibit 9.

that these numbers were uncertain because the Task Force did not know exactly how many parents in the formerly non-contiguous zones would actually select the zoned school in the Pearl-Cohn Cluster versus the zoned option school in the Hillwood Cluster.

At trial, the parties played a video-recorded excerpt from the School Board's July 8 meeting featuring discussions relevant to the re-zoning plan. (*See* Transcript at 1946:6—2039:4.) The excerpt began with Marilyn Robinson, president of the NAACP's Nashville branch, participating in the public-comment session. Robinson recommended delaying the plan because the School Board could not guarantee the additional resources and because the re-zoning would create separate-but-equal schools by "warehousing students" in the Pearl-Cohn Cluster and segregate housing in downtown developments. (*See* Transcript at 1948:2—1950:3.)

Then, the Board began its deliberations on the revised plan. North began by presenting the revisions the Task Force had made to the draft proposal and explaining the zoned option choice in detail. Toward the conclusion of his remarks, North stated, "And no matter what happens with this proposal, no matter where children are zoned or where they choose or where they go to school, the most important thing is that every school be a good one." (Transcript at 1973:7-10.)

After North finished his remarks, School Board member Ed Kindall moved to defer the vote on the re-zoning plan for two weeks. Upon making his motion, Kindall distributed a document entitled "Task Force Plan Issues," which other School Board members had not previously seen. Kindall contended that the Task Force's plan would increase racial and socioeconomic isolation without meaningfully accomplishing its stated goals of facility utilization, academic enhancement, and maintaining diversity. (Transcript at 1976:10-15.) With respect to choice, Kindall argued that the Task Force was simply "reversing" the default option,

as parents in the non-contiguous zones (such as Metro Center) already had the option to select a neighborhood school for their child through the open enrollment process. (*See id.* at 1981:5-12.) Kindall then presented an alternative proposal, which would have enhanced choice for children in the non-contiguous zones by offering transportation to Pearl-Cohn Cluster schools if the children lived a minimum distance from the school.[21] Some of Kindall's ideas—*e.g.*, smaller class sizes, increased advanced placement and honors courses—mirrored the recommendations of the Task Force. And, for some clusters, Kindall recommended adopting the Task Force's recommendations with no changes. In conclusion, concerning the efforts to bring parents back into the MNPS system, Kindall stated, "The way to do it is to make all of our schools excellent schools, be they located in North Nashville, Hillsboro, or wherever." (*Id.* at 1997:20-22.)

In the subsequent discussion, School Board member Gracie Porter asked about obtaining more specific information concerning the cost of the proposal. Chairperson Warden then spoke in favor of the plan. She described the past political gridlock on the re-zoning issue, the costs wasted by the inefficient utilization of buildings, and the School Board's responsibility to the Task Force to vote on its plan. School Board member Steve Glover pointed out that he could not meet in two weeks because of another pre-scheduled commitment. By a 5-4 margin, the Board voted not to defer its decision on the Task Force's plan. The five members in the majority were four whites—North, David Fox, Glover, and Warden—and one African-American—Johnson. The four members in the minority were all African-American: Kindall, Jo Ann Brannon, Porter, and George Thompson, III.

---

[21] Although not specifically mentioned in the Court's subsequent chronology, Kindall would go on to speak several more times during the July 8 meeting, repeatedly returning to this feature of his proposal.

Following the vote against deferral, Fox and Johnson spoke in favor of the plan.[22] Fox emphasized its call for additional resources "to supplement educational services for the benefit of students most in need." (Transcript at 2018:22-24.) He valued the opportunity that the re-zoning plan created for at-risk students to attend their neighborhood schools, where they could more easily participate in extracurricular activities and their parents would be more willing to visit. Fox went on to comment that MNPS "must do better at enabling at risk children to achieve their potential." (*Id.* at 2019:15-16.) Johnson wanted to vote for the Task Force plan because of the group's diversity in its composition and unanimity of its recommendation. She believed that the School Board members "were supposed to be stepping back and giving this responsibility to a task force of diverse individuals to present a plan, not the board members to interfere and present an alternate plan that none of us have deliberated on at all." (*Id.* at 2028:10-14.)

Thompson then moved to accept the Task Force's report, excepting the Pearl-Cohn, Hillsboro, and Hillwood Clusters. Referencing Nashville's long history of segregated public schools, Thompson argued that the School Board should look to organizations such as the NAACP for assistance in developing a plan that comported with the Supreme Court's decision in *Parents Involved*. Reducing utilization at Hillwood Cluster Schools by sending Metro Center students back to Pearl-Cohn Cluster schools would be "forcing something down the community's throat" so "you can go out and find whoever you want to come to your school."

---

[22] In between these speeches, Thompson moved for the recusal of School Board members who went on a business trip to Miami with executives from the Chamber of Commerce. Some of the designated testimony from the preliminary injunction transcript likewise touched on this trip. Because that testimony is largely contradictory and riddled with hearsay on the issue of the extent and substance of discussion about the re-zoning plan on that trip, the Court declines to make findings. It is sufficient to note that a representative of the Metro Legal Department articulated the standard for recusal at Chairperson Warden's request, and no School Board members recused themselves from the remaining votes.

(Transcript at 2032:3-4, 8-9.)  Thompson asked the board to "defer this thing and deal with this matter in a reasonable and peaceful way to maintain peace in this community."  (*Id.* at 2031:24—2032:1.)  Brannon, who had earlier proposed voting on the plan one cluster at a time, added that she wanted Metro Center students to be able to remain in the Hillwood Cluster schools where they were succeeding because "[t]here's no need in switching them back and forth."  (*Id.* at 2033:8-12.)

The School Board rejected Thompson's motion by a 5-4 vote.  Then, it adopted the Task Force's re-zoning plan by the same 5-4 margin.  The five members who had voted against the two-week deferral again comprised the majority on both of these votes.

Even after the enactment of the re-zoning plan, some members of the community lobbied the School Board to amend terms or postpone implementation of the plan.  At the preliminary injunction hearing, Won Choi testified about his efforts in his capacity as the executive director of Tying Hands Together, a social justice organization, and co-chair of the NAACP Education Committee.  In his meeting with Alan Coverstone, who had won election to Warden's School Board seat, Choi testified that Coverstone said his Hillwood Cluster constituents would vote him out of office if he delayed implementation of the re-zoning plan.  According to Choi's testimony, Coverstone had spoken with constituents who used racial epithets, including the N-word, to describe African-American students bused into the Hillwood Cluster.  Choi testified that, during separate individual meetings, School Board members David Fox and Mark North each said that they could not use the words "black" or "African-American" to describe students in the Pearl-Cohn Cluster who were affected by the re-zoning plan.  Instead, they had to use race-neutral terms—such as "children receiving free and reduced meals," "at risk children," or "underperforming children"—to describe this group.  (*See* Transcript at 511:4-25.)  Choi further

24

testified that School Board and Task Force members he met with could not point to scholarly research that supported their conclusions about the benefits (*e.g.*, greater parental involvement) of attending neighborhood schools.

Some of the individuals who met with Choi also testified at the preliminary injunction hearing and offered conflicting testimony on their conversations with Choi. Coverstone, for example, testified that he told Choi he had found "overwhelming support in my District for the plan." (Transcript at 1778:4-5.) While he encountered at least one instance of race-based opposition to the plan when soliciting campaign support from potential constituents, Coverstone testified that such a response was not the norm. Also, Fox testified that he defines at-risk students as "children who come from homes that either are not intact or homes that are unable to support the educational pursuits of their children." (*Id.* at 1038:24—1039:1.) Fox considers enrollment in the free and reduced-price meal program as merely a "rough proxy" (*id.* at 1038:19-21), and he does not consider race because it is not a critical variable in determining student success (*id.* at 1030:17-19). Because Plaintiffs did not call Choi as a witness at trial, and because the trial witnesses who met with Choi were not asked to testify at trial about the substance of their conversations with him, the Court is unable to determine whether Choi is a credible witness.[23]

---

[23] In their transcript designations, Plaintiffs identified several other witnesses who, like Choi, unsuccessfully lobbied the School Board to reconsider its adoption of the re-zoning plan and offered testimony at the preliminary injunction hearing. For sake of completeness, the Court provides capsules of these witnesses' pertinent testimony here. None of these witnesses testified at trial.

Inman Otey, chair of the IMF's education committee, testified that Fox, who succeeded Warden as School Board chair, reluctantly agreed to meet with Otey and representatives of other community groups at the Urban League. During this meeting, Fox made multiple references to "at risk" students, which Otey interpreted as meaning the African-American community. Fox

The Task Force continues to meet approximately twice a year to monitor the implementation of the re-zoning plan and vote on amendments to the plan. For example, the Task Force originally called for opening a separate ninth-grade building in the Pearl-Cohn Cluster. After two years, the Task Force voted to move the ninth-grade students onto the campus of Pearl-Cohn High School, having received assurance that there was adequate space and

ultimately refused to grant this same group a meeting with the entire School Board. Although the transcript is unclear, Otey attempted to testify that he believed Fox had contacted executives from the Chamber of Commerce before denying that meeting with the entire School Board.

Marilyn Robinson, the president of the NAACP's Nashville branch discussed *supra*, testified that, after the School Board adopted the re-zoning plan, she and Walter Searcy wrote to the School Board asking that it not implement the plan. The School Board did not respond. She testified that Task Force member and state legislator Mike Turner later requested a meeting with the NAACP and Chamber of Commerce, in which he stated his support for neighborhood schools. Robinson testified she had never heard any member of the Task Force or School Board make a racially discriminatory statement. (Transcript at 593:21—594:2.)

Searcy, former president of the NAACP's Nashville branch, corroborated Robinson's testimony about the meeting with Representative Turner and the Chamber of Commerce. Unlike Robinson, however, Searcy testified that Turner, who attended the Nashville public schools before desegregation, said that his childhood experience in neighborhood schools was superior to the experience that children were presently receiving in the public school system and that his view of neighborhood schools was shared city-wide. (Transcript at 424:13-20, 425:15-18.) Searcy further testified that, in an early 2009 meeting, North acknowledged the re-zoning plan would result in more segregated schools, but the segregative effects would be "a small price to pay" for the ultimate improvement in school quality. (*Id.* at 431:2-5, 19-23.) Searcy also testified that he heard Task Force and School Board members use code words such as "North Nashville," "inner city," and "free and reduced lunch." (*Id.* at 429:12-14.)

Jerry L. Maynard, II, at-large member of the Nashville City Council, testified that he also attended the meeting with Representative Turner, who stated that returning to neighborhood schools would restore the community pride he experienced while growing up that had been lost through busing. When asked how that statement made him feel, Maynard testified, "I've known [Representative Turner] for a while, so I gave him a pass. I wasn't offended because I know Mike." (Transcript at 483:14-15.)

that students would be protected from gang elements in the higher grades.[24]  Similarly, the Task Force originally zoned fifth-grade students to elementary schools in the Pearl-Cohn Cluster (consistent with the grade configuration of certain elementary schools in the Antioch Cluster). Realizing that the existing physical infrastructure would not sustainably support this configuration, the Task Force has recommended, effective this upcoming school year, that fifth-grade students attend middle schools in the Pearl-Cohn Cluster.

The Task Force's composition has remained the same, save for the resignation of Mark Hill.  At the time that Warden appointed him to the Task Force, Hill was employed as the Chief Education Officer for the Nashville Chamber of Commerce.  At the preliminary injunction hearing, Hill testified that he had resigned in June 2009 because he thought the Task Force was a "temporary assignment" rather than a lifetime appointment and because he believed his work was done following the approval of the re-zoning plan.  (Transcript at 1576:12-17.)

## D.    Implementation of the Re-Zoning Plan

Dr. Jesse Register, the Director of MNPS since January 2009, testified that, because of the number of choices involved, the District faces the challenge of not letting the plan become so complicated that it confuses parents.  (Transcript at 3948:14-17.)  Chris Weber, the District's current Director of Student Assignment Services, testified about the District's efforts during the 2008-09 period to notify parents what their options would be under the new re-zoning plan for the following school year.  In late October 2008, the District both mailed and sent home from the

---

[24] According to Tony Majors, MNPS Assistant Superintendent of Student Services, Pearl-Cohn High School has gang members and gang activity, but it does not have more gang-related issues than any other high school in the district.  (Transcript at 2840:3-12, 2866:13-20.)    Williams testified that, because of its concern about Nashville's growing gang problem, the Task Force met with Ralph Thompson, the District's top official for school safety.  Thompson indicated to the Task Force that its re-zoning plan would not increase any risk related to gangs.

27

school a letter to the family of every affected student notifying them of the changes to come. This letter identified the zoned school and the zoned option school (based on the child's legal address), explained the grandfathering option, and briefly referenced magnet and open enrollment options.[25]  In early February 2009, the District sent a second letter re-stating the zoned school and zoned option school and asking the family to check the box next to the school of choice.  It included this statement: "Failure to return this letter means that your child will be assigned to the zoned school."  In May 2009, the District sent a third letter notifying the family of the student's school assignment for the upcoming year and directing the family regarding the steps to take by a given deadline if the school assignment was incorrect.  The District adopted a goal of a 100% response rate from families with a zoned option choice.  Out of approximately 3,200 students in the affected areas, the District ultimately received a decision from all but seventeen students, yielding a response rate of about 99.5%.

In addition to this series of letters, the external communications campaign to the formerly non-contiguous zones included home visits by social workers and direct phone calls to families. The District prepared a video to explain the zoning changes and released maps and flyers to public libraries and other public locations.  In March 2009, the District hosted six Ask and Enroll Nights in locations throughout Davidson County where parents could learn about school options within the relevant cluster, interact with school representatives and District staff, and submit enrollment applications.[26]  Register also testified that he personally attended a series of question-and-answer-based community meetings.  For example, at a meeting at Pearl-Cohn High School,

---

[25] After the first year of implementation, the District stopped sending the late October letter.

[26] For an Ask and Enroll night in Pearl-Cohn, *e.g.*, the District made available representatives from both Pearl-Cohn zoned schools and Hillwood zoned option schools.

Register told parents that Pearl-Cohn and Hillwood High Schools were both good schools, and parents needed to make an informed choice for their children between these two good options.

Since the initial implementation of the re-zoning plan, the District has prepared an annual brochure entitled "Finding Where You Fit: Parent's Guide to School Selection." (Def. Trial Exhibits 5A & 5B.) This brochure describes the various categories of MNPS schools and identifies the dates when various application forms are available and due. The District distributes this brochure to all families. It also prepared a booklet entitled "Parents' Guide to Public Schools." (Def. Trial Exhibits 4A & 4B.) Because of the cost of production, the District makes this booklet available in school offices, in the customer service area at the District's central office, and online. The booklet contains a page of facts for each of the schools in MNPS. The 2010 version of the booklet includes among those facts each school's status under No Child Left Behind. Because Tennessee has obtained a federal Department of Education waiver from the No Child Left Behind standards, the 2011 version of the booklet omits that status on each school's page of facts.

The District now focuses its goal of a 100% response rate on the so-called "transition tier levels," *i.e.*, those grades when a student moves from elementary to middle school, or from middle to high school. Prior to the 2011-12 school year, the District received responses from the families of 487 out of 493 students with zoned option choices at transition tier levels, achieving a response rate of 98.8%. (Def. Trial Exhibit 33.) The same progress report document indicates that the District received responses from less than half of the families of students with zoned option choices outside of transition tier levels. This "no response" category included students whose families responded in previous years, did not submit another response for the upcoming school year, and would remain assigned to the previously selected school. In addition to the

29

available literature, Dr. Register testified that the District is now encouraging parents with zoned option choices to make campus visits during the school day to understand available programs and offerings and communicate with personnel at the school. (Transcript at 3826:11-16.)

Weber testified that the District's website[27] was also a "key part" of its outreach, and parents and families were expected to go to that website to find information and forms. (Transcript at 2757:15-23.) Register testified that parents can go online to find data about student achievement and school success. Although the District can make access available at the schools, only about half of the families in the Pearl-Cohn Cluster have Internet access in their homes. (*Id.* at 3827:14-17.) Until early this year, when a user from a formerly non-contiguous zone went to the transportation portion of the website to obtain bus stop information for the zoned option school, the user would obtain a screen saying "Transportation not available."

**E.      Demographics of Affected Areas**

North Nashville, the location of the Pearl-Cohn Cluster and specifically the formerly non-contiguous zones of Metro Center, is approximately 95% African-American. Within the boundaries of the Pearl-Cohn Cluster are three public housing projects that the Metropolitan Development and Housing Agency has rebuilt since 1994 within heavily African-American areas. Each of these public housing projects is at least 90% African-American. (Transcript at 598:19-600:9.)

Corrected Stipulation of the Parties Number One (Docket Entry No. 313) describes the results of the zoned option choice. Since the 2008 re-zoning plan took effect in the fall of 2009, the percentage of eligible students in the District selecting their zoned option school was 25.4%

---

[27] http://www.mnps.org.

in 2009-10, 18.7% in 2010-11, and 16.4% in 2011-12.  Within the Pearl-Cohn Cluster, the percentage of eligible students selecting the zoned option school was 20.2% in 2009-10, 15.4% in 2010-11, and 15.3% in 2011-12.  The percentage of students in the District making other choice options (*e.g.*, open enrollment and magnet schools) was 28.8% in 2009-10, 27.8% in 2010-11, and 27.5% in 2011-12.  Within the Pearl-Cohn Cluster, the percentage of eligible students selecting another choice option was 29.4% in 2009-10, 28.1% in 2010-11, and 23.0% in 2011-12.

The following table, taken from Defendants' Trial Exhibit 32,[28] summarizes the trends in over- and under-utilized facilities in District zoned schools before and since the 2008 re-zoning plan took effect.  Over the period of time captured in this table, the District's student population has increased by about four thousand students.

| Facility Utilization in MNPS | | | | |
|---|---|---|---|---|
| | 2008-09 | 2009-10 | 2010-11 | 2011-12 |
| Schools >100% capacity | 38 | 31 | 35 | 40 |
| Schools <70% capacity | 28 | 22 | 19 | 21 |

The following table, compiling data from Defendants' Trial Exhibits 7 through 9,[29] records the percentage of African-American students enrolled District-wide and within the schools of each cluster from 2008-09 (before the re-zoning plan took effect) to 2011-12 (the most recent school year as of the time of trial).

| Percentage of African-American Enrollment in MNPS | | | | |
|---|---|---|---|---|
| | 2008-09 | 2009-10 | 2010-11 | 2011-12 |
| District-wide | 48.0 | 47.5 | 46.6 | 46.0 |
| Antioch | 47.5 | 46.3 | 41.6 | 40.8 |
| Cane Ridge | 41.0 | 44.1 | 44.1 | 43.2 |

---

[28] This exhibit is also Plaintiffs' Trial Exhibit 202.

[29] Defendants originally provided this material to the Court in their proposed findings of fact and conclusions of law for the preliminary injunction hearing.  (*See* Docket Entry No. 213, at 24.)

| | | | |
|---|---|---|---|
| Glencliff | 28.4 | 28.6 | 28.7 | 27.9 |
| Hillsboro | 41.2 | 40.1 | 40.3 | 37.0 |
| Hillwood | 37.5 | 26.4 | 26.1 | 25.5 |
| Hunters Lane | 54.7 | 52.0 | 51.9 | 50.6 |
| Maplewood | 69.8 | 69.7 | 68.2 | 66.1 |
| McGavock | 36.1 | 35.2 | 36.6 | 36.2 |
| Overton | 27.9 | 24.3 | 23.0 | 21.5 |
| Pearl-Cohn | 79.4 | 80.5 | 80.5 | 80.9 |
| Stratford | 69.4 | 69.3 | 68.5 | 67.4 |
| Whites Creek | 76.1 | 79.0 | 78.3 | 78.3 |

The most striking detail in the above table is the substantial and sustained decline of the African-American student population in Hillwood Cluster schools. After the re-zoning plan took effect, the total number of African-American students in the Hillwood Cluster dropped by more than ten percentage points and continued to decrease in subsequent years. The following chart, taken from Defendants' Trial Exhibit 7, explores in greater detail the changes in African-American enrollment in the Hillwood Cluster, in terms of both percentages and raw numbers:

| African-American Enrollment in Hillwood Cluster Schools Before/After Re-zoning Plan | | |
|---|---|---|
| Name of School | % African-American 2008-09 | % African-American 2009-10 | Δ African-American Student Population |
| Brookmeade Elementary | 58.4% | CLOSED | -150 |
| Charlotte Park Elementary | 40.1% | 26.1% | -123 |
| Gower Elementary | 21.6% | 23.8% | +8 |
| Harpeth Valley Elementary | 12.5% | 11.3% | -1 |
| Westmeade Elementary | 46.3% | 23.6% | -77 |
| Bellevue Middle | 30.8% | 22.0% | -57 |
| H.G. Hill Middle | 49.4% | 32.9% | -48 |
| Martha Vaught Middle | 50.3% | CLOSED | -198 |
| Hillwood High | 47.4% | 38.4% | -144 |

Added together, these data indicate that 790 fewer African-American students were enrolled in Hillwood Cluster schools in the 2009-10 school year immediately following the implementation

of the re-zoning plan.  After the re-zoning plan took effect, only one Hillwood Cluster school—Charlotte Park Elementary—had more than 80% of its students qualifying for FARM status.

Furthermore, that same year in the Pearl-Cohn Cluster, three of the four elementary schools and one of the two middle schools had African-American student populations in excess of 95%.  Pearl-Cohn High School's student body was more than 90% African-American.  As of the most recent school year, four of these five schools—Buena Vista Elementary, Park Avenue Elementary, Churchwell Elementary, and Pearl-Cohn High School—remain more than 90% African-American.  John Early Middle is now 84.5% African-American.  When asked about the trends in student enrollment in the Hillwood and Pearl-Cohn Clusters after the implementation of the re-zoning plan, Coverstone testified they were "[m]oving in the direction of more" racial isolation.  (Transcript at 2134:23.)  Coverstone agreed that, based on increasing African-American and decreasing white enrollment, Pearl-Cohn High School fits "the definition of a school that's got a high percentage of [African-American] students and it's moving in the wrong direction[.]"  (*Id.* at 2201:17-20.)   After the re-zoning plan took effect, more than 80% of the students in every Pearl-Cohn Cluster school qualified for FARM status, and that figure exceeded 90% in all but two schools.

**F.    History of School Performance in MNPS**

Despite the rhetoric of the School Board and administrators about making every school in the District a good school, the reality is that many District schools are poor schools and have been that way for a considerable amount of time.  Over the last decade, MNPS has obtained consistently poor marks in the area of student performance, an outcome that has disproportionately affected African-American students in the Pearl-Cohn Cluster.

33

Under the No Child Left Behind law, school districts and individual schools must make adequately yearly progress by meeting a set of pre-determined benchmarks the state negotiates with the federal government. The benchmarks consider test results in math and reading, as well as graduation and attendance rates. (Transcript at 1398:5-12.) In terms of difficulty, Tennessee's benchmarks rank forty-sixth out of the fifty states. (*Id.* at 606:11-16.) Despite these relatively lenient benchmarks, MNPS has repeatedly fallen short. It failed the benchmarks in 2003, becoming a "Target" system. It failed again in 2004, entering "System Improvement 1" status. After making annual yearly progress in 2005, it failed again in 2006, entering "System Improvement 2" status. Finally in 2007, another failure placed the District in "Corrective Action" status. MNPS was one of the first two districts in Tennessee to reach "Corrective Action" status.[30]

Once the District reached "Corrective Action" status, the No Child Left Behind law mandated intervention by the State of Tennessee, led by Connie Smith, Assistant Commissioner of the Department of Education and Tennessee's Director of Accountability. Smith coordinated the State's management role in MNPS and implementation of prescriptive measures to turn around the District's academic performance. Whereas Smith could previously communicate to the District only through Garcia (as the Director of Schools), the "Corrective Action" status empowered her to meet directly with the School Board. When she did so for the first time in the late summer of 2007, Smith found the School Board members "blind-sided" by the gravity of the situation, although the announcement of MNPS's "Corrective Action" status had already been made public. (Transcript at 619:18—620:3.) In a subsequent report to the School Board in

---

[30] MNPS and the Robertson County school system went into corrective action at the same time in 2007. No other school district in the state preceded them.

November 2007, Smith identified specific areas for improvement, including the over-identification of African-Americans in special education programs, inadequate numbers of highly qualified teachers and administrators in the schools of greatest need, and a lack of career technical offerings in the high schools.

State officials had trouble obtaining Garcia's cooperation during the corrective action phase. In a letter dated October 22, 2007, Smith indicated that Garcia had instructed school principals not to communicate or share problems with the Exemplary Educators, *i.e.*, the retired teachers and administrators loaned from the state to assist schools in need of improvement. (Def. Trial Exhibit 106; *cf.* Transcript at 3432:16-20.) Indeed, Smith's letter observed that the District's central office staff had branded the Exemplary Educators as "spies" for the state. (*Id.*) Furthermore, Dr. Timothy Webb, then the Tennessee Commissioner of Education, testified at the preliminary injunction hearing that his department had discovered Garcia impermissibly using federal school improvement funds to purchase school buses. (*Id.* at 1402:3-14.)

According to the consistent testimony of School Board members, Garcia's failure to warn them of the gravity of the District's "Corrective Action" status, lack of cooperation with the State officials brought in to remedy the situation, and perceived indifference to his job obligations while interviewing for another position out of the state caused him to lose their confidence. The School Board negotiated a severance agreement with Garcia in January 2008. His final evaluation reflected particularly poor marks in the area of student academic performance. Although he coincidentally withdrew his comprehensive re-zoning proposal during the same time frame, the proposal did not play a role in the School Board's decision to push out Garcia.

The Board ultimately hired Register, who had served for more than a decade as Director of Hamilton County Schools in Chattanooga, Tennessee, to become the next Director of MNPS.

35

Under his leadership, the District has made efforts in recent years to improve the quality of its academic offerings and the diversity of its schools. In 2009-10, the District applied for and received a three-year, $12 million federal grant from the United States Department of Education's Magnet School Assistance Program ("MSAP") to fund the implementation of thematic magnets. Register testified that the MSAP focuses on districts with high percentages of minority enrollment and seeks to reduce minority group isolation. The creation of thematic magnets is intended to broaden choice and encourage diversity in schools that might otherwise be racially and socioeconomically isolated.

Retaining a national consultant and focusing on the "urban core," the District chose Pearl-Cohn Cluster schools to host three of the six thematic magnets: Churchwell Elementary, John Early Middle, and Pearl-Cohn High.[31] (Transcript at 3858:6—3859:19.) Pearl-Cohn High has an entertainment industry magnet program that takes advantage of Nashville's strengths in media production. The District has constructed a production studio and sound studio and is collaborating with Warner Brothers Records to make Pearl-Cohn the first high school in the nation with a recording studio. According to the testimony of Cecil Jay Steele, MNPS Associate Superintendent for High Schools, the District placed this magnet at Pearl-Cohn because it is geographically closest to the music publishers, record labels, and entertainment colleges of Music Row. Churchwell Elementary and John Early Middle are companion museum magnet schools that partner with local museums to develop their curricula. Museum magnet schools started during Register's tenure in Chattanooga subsequently received national recognition. In

---

[31] The other three programs were science, technology, engineering and math ("STEM")-themed magnets at Hattie Cotton Elementary (Maplewood Cluster), Bailey Middle (Stratford Cluster), and Stratford High. (*See* Def. Trial Exhibit 6 (brochures summarizing all the new thematic magnets).)

addition the District has designated John Early Middle as a pipeline to Hume-Fogg Academic Magnet High School. Any John Early student who meets the academic requirements for admission is guaranteed a placement at Hume-Fogg.

Despite these efforts to improve educational opportunities in the Pearl-Cohn Cluster, the District's progress in student performance remains more of a prospective hope than an accomplished reality. Only twenty-eight District schools were in good standing as of 2011, but none of the schools in the Pearl-Cohn Cluster met that standard. (*Cf.* Transcript at 4212:3-6.) Indeed, as of March 2012, the District designated three Pearl-Cohn Cluster schools—Buena Vista Elementary, Churchwell Elementary, and John Early Middle—as "priority schools" because they ranked in the bottom five percent of student achievement in Tennessee under the state's new accountability standards. [32] Three of the priority schools—the two museum magnets plus Bailey Middle in the Stratford Cluster—are thematic magnet schools implemented as a result of the MSAP grant. (Pl. Trial Exhibit 221.)

In contrast to the Pearl-Cohn Cluster schools, all but two of the Hillwood Cluster schools—Hillwood High and Westmeade Elementary—were in good standing as of 2011. The following charts, taken from Plaintiffs' trial exhibits 229, 231-233, and 235-241, depict academic achievement grades for Pearl-Cohn and Hillwood Cluster elementary and middle schools from 2009-2011 in four subject areas: math, reading, social studies, and science. The grades are based on student performance on TCAP achievement tests and expressed on an "A" to "F" scale.

---

[32] Since Register became Director of MNPS, and pursuant to the federal Department of Education's waiver from No Child Left Behind, the State has implemented a new accountability system. It focuses on improving student proficiency and narrowing achievement gaps between different ethnic and socioeconomic subgroups. It also moves away from the old system's focus on the satisfaction of particular proficiency standards.

| Academic Performance of Pearl-Cohn Cluster Elementary and Middle Schools, 2009-11 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Math | | | Reading | | | Social Studies | | | Science | | |
| School | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 |
| Buena Vista ES | F | F | F | F | F | F | F | F | F | F | F | F |
| Cockrill ES | D | D | D | D | D | D | F | F | D | F | F | D |
| Park Avenue ES | F | D | D | D | F | F | F | F | F | F | F | F |
| John Early MS | F | F | F | D | F | F | F | F | F | F | F | F |
| McKissack MS | F | F | F | F | F | F | F | F | F | F | F | F |
| District | | | B | | | C | | | B | | | C |

| Academic Performance of Hillwood Cluster Elementary and Middle Schools, 2009-11 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Math | | | Reading | | | Social Studies | | | Science | | |
| School | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 |
| Charlotte Park ES | D | C | B | F | D | C | F | D | C | F | D | C |
| Gower ES | C | C | B | C | C | B | C | C | B | D | C | C |
| Harpeth Valley ES | A | A | A | A | A | A | A | A | A | A | A | A |
| Westmeade ES | C | C | B | C | C | C | C | C | B | D | C | C |
| Bellevue MS | B | B | B | B | B | B | B | B | A | B | B | B |
| H.G. Hill MS | D | C | C | D | D | D | D | D | C | D | F | D |
| District | | | B | | | C | | | B | | | C |

Similarly, the following chart, taken from Plaintiffs' trial exhibits 230 and 234, compares academic achievement grades for Pearl-Cohn and Hillwood High Schools with scores throughout the entire district. The grades are expressed as average scores on the four sections of the ACT

standardized test, with a higher number signifying a better score and 36 being the maximum in any given subject area.[33]

| Academic Performance of Pearl-Cohn and Hillwood High Schools, 2009-11 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | English | | | Math | | | Reading | | | Science Reasoning | | |
| School | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 | 2009 | 2010 | 2011 |
| Pearl-Cohn HS | 14.9 | 14.0 | 13.6 | 16.1 | 16.0 | 15.3 | 16.0 | 15.0 | 15.2 | 16.8 | 16.1 | 15.5 |
| Hillwood HS | 18.3 | 16.8 | 17.1 | 18.0 | 16.7 | 17.4 | 19.5 | 17.8 | 18.1 | 19.2 | 18.1 | 18.1 |
| District | | | 18.8 | | | 18.6 | | | 19.2 | | | 19.1 |

The poor performance of the overwhelmingly African-American Pearl-Cohn Cluster schools is just one instance of a pervasive racial achievement gap within MNPS. The following charts, taken from Plaintiffs' trial exhibits 210 and 211, compare by race the percentage of students District-wide both in K-8th grades and in high school who scored proficient or advanced on No Child Left Behind tests in math and reading in 2010 and 2011.

| Percentage of K-8 Students Scoring Proficient/Advanced, 2010-11 | | | | |
|---|---|---|---|---|
| | Math | | Reading | |
| | 2010 | 2011 | 2010 | 2011 |
| African-American | 17 | 22 | 32 | 36 |
| Asian | 51 | 56 | 57 | 58 |
| Hispanic | 21 | 28 | 32 | 36 |
| White | 42 | 49 | 57 | 60 |
| All | 27 | 33 | 41 | 45 |

| Percentage of High School Students Scoring Proficient/Advanced, 2010-11 | | | | |
|---|---|---|---|---|
| | Math | | Reading | |
| | 2010 | 2011 | 2010 | 2011 |
| African-American | 32 | 45 | 52 | 51 |
| Asian | 55 | 56 | 79 | 71 |
| Hispanic | 34 | 43 | 47 | 51 |
| White | 54 | 63 | 75 | 76 |
| All | 39 | 51 | 60 | 60 |

[33] North testified that, effective in 2010, the School District began to require all high school juniors take the ACT. Accordingly, average scores tended to drop District-wide that year.

These charts reflect that MNPS has a substantial achievement gap (more than fifteen percentage points both years and in both categories) between African-American and white students. The District is not making meaningful progress in narrowing the gap, and, in some instances, the distance is widening.

## G.    Facts Relevant to Named Plaintiffs

The named plaintiffs in this lawsuit provide representative case studies to understand the implementation and operation of the 2008 re-zoning plan. Frances Spurlock testified that she and her family moved to Nashville from Louisiana in June 2008. Spurlock and her family are African-American. The family settled in a North Nashville area that was, at the time, classified as a non-contiguous zone for purposes of school assignment. During the 2008-09 school year, Spurlock's child attended Bellevue Middle School in the Hillwood Cluster. While there, the child qualified for the honor roll, made a racially diverse group of friends, and behaved well.

The first letter that Spurlock received from the District regarding the 2009-10 school year gave her a choice between John Early Middle School as the zoned school and H.G. Hill Middle School as the zoned option school. Spurlock independently went online and discovered that both of these schools had poor scores on TCAP achievement tests. In particular, these scores were significantly lower than the scores of Bellevue Middle School. Spurlock also wanted her child to remain in Bellevue Middle School to avoid uprooting her again. Therefore, she crossed through both choices, wrote in Bellevue Middle School, and mailed the letter back to the District.

The District's second letter described John Early Middle School as a magnet school. Spurlock thought a magnet school might be acceptable for her child, but then she went online and found that John Early was "failing under the No Child Left Behind [Act]." (Transcript at 2576:8.) Therefore, she refused to send this form back in.

40

Spurlock later received a third letter stating that, because John Early Middle School and H.G. Hill Middle School were both in corrective action under No Child Left Behind, she had the option of sending her daughter to LEAD Academy, a charter school. Spurlock went online again, this time to discover that LEAD Academy was "not faring any better than the other two" schools the District was offering. (Transcript at 2576:21.)

While considering her options, Spurlock received an unsolicited home visit from a District representative. According to Spurlock's uncontroverted testimony, the representative said that most parents in the neighborhood were choosing the zoned school—John Early Middle School. The representative also said that the availability of transportation to H.G. Hill Middle School would depend on how many students chose it as their zoned option school. Spurlock interpreted this communication as "saying you're either going to pay for this yourself or you need to put [the child] in John Early." (Transcript at 2589:23-24.) At the time, Spurlock was not aware of the District's open enrollment policy.

Spurlock's child ultimately began the 2009-10 school year at John Early Middle School. The child received no homework assignments and cried on the way to and from school because peers picked on her. Approximately a week and a half into the school year, Spurlock attended a parents-teachers meeting, where each of her child's teachers indicated that students would not be assigned books that school year but would have to share books. Spurlock then filed the present lawsuit. On September 1, 2009, the Hon. William J. Haynes, Jr. entered a temporary restraining order directing Defendants to allow Spurlock's child to transfer to Bellevue Middle School for the 2009-10 school year and to provide textbooks to all sixth-grade students at John Early Middle School. (*See* Docket Entry No. 25.)

Spurlock testified that she wants a racially diverse school for her child, but not at the expense of a quality education: "I want her to be with whites, blacks, Hispanics, and all that. But if the school is not performing, if they don't have teachers that [are] actually teaching the kids where they can pass TCAP [achievement tests], what's the use of having blacks and whites and Hispanics together all failing?" (Transcript at 2591:9-13.) When cross-examined about subsequent changes in the No Child Left Behind status of H.G. Hill and Bellevue Middle Schools, respectively, Spurlock testified that she had not looked at those data since the original choice period, when the District was "telling me I had to move my child." (*Id.* at 2592:10-11.) Spurlock was satisfied with the academic progress that her child made at Bellevue Middle School from 2009-2012. For the upcoming school year, the Spurlocks have exercised the zoned option choice and selected Hillwood High School for their child.[34]

At the preliminary injunction hearing, Carroll Lewis testified that she lived in North Nashville and had custody over her grandchild, who attended Martha Vaught Middle School in the Hillwood Cluster for the 2008-09 school year. Lewis and her family are African-American. Lewis received a letter from the district in late October 2008, stating that the re-zoning plan would close Martha Vaught Middle School. Lewis's grandchild would have the option of attending John Early Middle School as the zoned school or Bellevue Middle School as the zoned option school. The District's second letter of February 2009 asked for a choice of one of these schools. Lewis checked the box for John Early Middle School for her grandchild and returned

_____

[34] The record reflects a sharp factual dispute regarding an academic magnet school application that Spurlock submitted but the District claims it never received. Because Plaintiffs challenge the constitutionality of the 2008 re-zoning plan as it relates to zoned schools and zoned option schools, rather than the operation of magnet schools, the Court declines to make factual findings regarding the academic magnet school application.

the form.[35]  Lewis chose John Early Middle School because, at the time, it was a magnet school, as evidenced by a large sign that Lewis had observed on the school property.  Furthermore, the District's third letter of May 2009 stated that her grandchild's school assignment for the 2009-10 school year would be "John Early Paideia Magnet School."  (Def. Trial Exhibit 81, at 3.)

Accompanying her granddaughter on the first day of school in the fall of 2009, Lewis learned that John Early Middle School was no longer a magnet school.  Instead, Lewis discovered that "[i]t was basically just . . . a majority black school."  (Transcript at 25:1-2.) Lewis then filed a Request for Emergency Hardship Transfer asking that her grandchild be reassigned to Bellevue Middle School.  In the narrative explaining the emergency hardship, Lewis described how she had thought that John Early Middle School was a magnet school and how she did not want the neighborhood kids to influence her grandchild.  Lewis explained that transportation would be available because her grandchild already had a sibling enrolled at Bellevue Middle School.  Within a week, the District informed Lewis in writing that her request had been denied.

According to Weber's testimony, the District denied Lewis's request for an emergency hardship transfer for the 2009-10 school year because it did not meet the standard of "an extraordinary, unforeseen event or situation which occurred after the deadline."  (*Cf.* Def. Trial Exhibit 81, at 5.)  Because the school year had already begun, Lewis's opportunity to exercise the zoned option choice for that school year had expired.  Weber testified that, if Lewis timely exercised the zoned option choice, she would not have needed to invoke the sibling preference

---

[35] Lewis's daughter, the biological mother of the grandchild, actually signed the form.  (Def. Trial Exhibit 81, at 2.)  At the preliminary injunction hearing, Lewis testified that she agreed with the choice of John Early Middle School, and there was no particular reason why the mother had signed this form instead of Lewis.  (Transcript at 32:1-7.)

policy because the zoned option choice "trumps" the sibling preference policy. (Transcript at 2790:24—2791:3.)

Prior to the 2010-11 school year, Lewis timely exercised the zoned option choice for her grandchild. For that school year, the grandchild attended Bellevue Middle School until the family moved out of the formerly non-contiguous zone.

## II. CONCLUSIONS OF LAW

While the Fourth Amended Complaint articulates six discrete counts for relief, the gravamen of all of Plaintiffs' allegations is that the re-zoning plan pushes African-American students, including those living in the formerly non-contiguous transfer zones, out of racially diverse schools and forces them to choose among academically inferior, racially homogeneous schools. All of Plaintiffs' claims hinge on the resolution of a single legal issue: whether the 2008 re-zoning plan violates the Equal Protection clause of the United States Constitution. Plaintiffs can make out a violation in one of three ways: (1) individual classification on the basis of race, (2) de jure segregation, *i.e.*, intentional discrimination on the basis of race, or (3) the absence of a rational basis for the plan. The Court will consider each argument in turn.

### A. Individual Racial Classifications

"It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720. Strict scrutiny review, if applicable, would require the District to "demonstrate that the use of individual racial classifications in the assignment plans here under review is 'narrowly tailored' to achieve a 'compelling' government interest." *Id.* (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). The only compelling interests

44

recognized to date by the Supreme Court are "remedying the effects of past intentional discrimination" and, in the context of higher education, student body diversity. *Id.* at 720, 722.

To trigger the application of strict scrutiny, an assignment plan must consider the individual student's race in making school assignments. In the *Parents Involved* decision, one of the defendant school districts used the student's race as a tiebreaker in making assignments to over-subscribed schools, and the other school district would not assign a student to particular schools if the student's race would exacerbate the racial imbalance. 551 U.S. at 712, 716. By contrast, where the school district's plan is facially race-neutral and assigns students, *e.g.*, on the basis of where they live, strict scrutiny does not automatically apply. *See Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011), *cert. denied*, 2012 WL 871260 (June 18, 2012); *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82 (1st Cir. 2004).

Before trial the Court denied summary judgment on this question, citing the Fifth Circuit's *per curiam* opinion in *Lewis v. Ascension Parish School Board*, 662 F.3d 343 (5th Cir. 2011). In that case, the district court granted summary judgment for the school board, holding that its re-districting plan was facially race-neutral and the plaintiff had failed to produce adequate evidence of a discriminatory motive. However, the Fifth Circuit reversed and remanded for additional findings of fact. According to the appellate court, "the [district] court's assumption that it might be justifiable to use racially-based decisions for the 'benign' purpose of maintaining post-unitary 'racial balance' among the schools in the system is at least in tension with the Supreme Court's decision in *Parents Involved*[.]"[36] *Id.* at 349.

---

[36] Ultimately, the Fifth Circuit declined to consider *Parents Involved* in greater detail because the record showed a triable question of fact on discriminatory motive. 662 F.3d at 349.

Here, Plaintiffs again seek to rely on the *Lewis* decision, but this case has now advanced to a different procedural posture that makes *Lewis* inapplicable. *Lewis* stands for the proposition that a district court should not refrain from strict-scrutiny review at the summary judgment phase where there is evidence in the record that a zoning plan makes school assignments on the basis of race, even if for purportedly benign reasons. *Lewis* does not preclude a court, after fully developing the record at trial, from concluding that a re-zoning plan does not assign students on the basis of race. In this case, the proof established that the 2008 re-zoning plan does not consider race in a student's school assignment. Weber offered this testimony about the decision-making process of the Office of Student Assignment Services:

> Q:    Hypothetically speaking, if someone comes into your office and says I need to know where my child is going to be going to school for the fall, what information do you need from that parent to be able to make that determination?
> A:    The address.
> Q:    Is that all?
> A:    Well, we need to know the grade level of the child, their address. Where they live and what grade level and what options they're interested in.
> Q:    Do you need to know the child's race?
> A:    No.
> Q:    Does that in any way factor in that child's student assignment?
> A:    No.

(Transcript at 2692:8-22.)

Weber's testimony about the re-zoning plan's operation is bolstered by the trial testimony of Brian Heuser, who resides in the Hope Gardens area just north of downtown Nashville.[37] Heuser testified that the Hope Gardens area is racially and socioeconomically diverse. When Heuser and his family moved to the neighborhood in 2006, its zoned schools were located in the

---

[37] While Heuser is a professor of international education policy at the Peabody School of Education and Human Development at Vanderbilt University, he testified only as a fact witness in this case. Although Plaintiffs called Heuser as a witness, the Court concludes that his testimony actually benefits Defendants on the subject of explicit racial classifications.

46

Hillsboro Cluster. Pursuant to the 2008 re-zoning plan, the Hope Gardens neighborhood was re-zoned to schools in the Pearl-Cohn Cluster, including the "failing" Buena Vista Elementary. (Transcript at 2056:5-8.) Based on his interactions with his racially diverse neighbors, Heuser became concerned that "the quality of the education that the children in our area would receive would drastically decline." (*Id.* at 2058:4-6.) From the perspective of both the District's representative and an affected parent, the re-zoning plan assigned students to schools based on the area where they lived and did not consider race.

Because the 2008 re-zoning plan is facially race-neutral and does not make individual classifications based on race, Plaintiffs are unable to trigger strict scrutiny pursuant to *Parents Involved*. The Court now considers the other avenue to strict scrutiny review: the claim for de jure segregation.

## B. De Jure Segregation

"'A finding of de jure segregation requires a showing of three elements: (1) action or inaction by public officials (2) with a segregative purpose (3) which [a] actually results [b] in increased or continued segregation in the public schools.'" *Nat'l Ass'n for Advancement of Colored People v. Lansing Bd. of Educ.*, 559 F.2d 1042, 1046 (6th Cir. 1977) (quoting *Oliver v. Mich. State Bd. of Educ.*, 508 F.2d 178, 182 (6th Cir. 1974)). The Court will consider each of these elements in turn, although the analysis of segregative purpose is deferred until the end for purposes of clarity and completeness.

### 1. Action or Inaction

In this case, the District indisputably "acted" in the sense that it adopted a comprehensive re-zoning plan. As explained by one of Defendants' experts, Dr. Leonard B. Stevens, the challenges of drawing a student assignment plan are formidable:

It's complex because a student assignment plan involves a variety of variables, all of which affect families as well as the administration of a school district.

The variables include school capacities, the concentration of families in the district. Some districts have rural areas and high concentrations of population in other areas.

It includes consideration of natural barriers, whether they be mountains, rivers, or lakes. It includes consideration of the routing system, the transportation routing system in the district.

And, obviously, it includes consideration of the racial composition of schools.

(Transcript at 4235:19—4236:6.)

This juncture in the analysis provides an appropriate opportunity for the Court to address the kinds of factors beyond the School Board's control that bear on school zoning and the demographic composition of schools. Courts have frequently opined on these many causes of racial segregation in public schools and the limited circumstances when judicial intervention is appropriate for dealing with that segregation. In a 1971 Supreme Court decision reinstating a district court's desegregation plan for Charlotte, North Carolina, Chief Justice Warren Burger wrote on behalf of a unanimous Court:

We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. . . . The elimination of racial discrimination in public schools is a large task and one that should not be retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of [*Brown v. Board of Education*, 347 U.S. 483 (1954)] to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination. . . .

Our objective in dealing with the issues presented by [school desegregation] cases is to see that school authorities exclude no pupil of a racial

48

minority from any school, directly or indirectly, on account of race; it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools.

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 22-23 (1971).

Subsequently, Justice Lewis Powell, Jr. observed the following when he concurred in the Court's judgment to vacate and remand a "remarkably sweeping" desegregation plan for the public schools in Austin, Texas:

As is true in most of our larger cities with substantial minority populations, Austin has residential areas in which certain racial and ethnic groups predominate in the population. Residential segregation creates significant problems for school officials who seek to achieve a nonsegregated school district. In Austin those problems are perhaps accentuated by the geography of the city.

*Austin Indep. Sch. Dist. v. United States*, 429 U.S. 990, 992 (1976) (Powell, J., concurring).

Justice Powell then applied his observations about Austin to the nation at large:

The principal cause of racial and ethnic imbalance in urban public schools across the country North and South is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing whether public or private cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns.

*Id.* at 994 (footnote omitted). Later that decade, Justice William Rehnquist connected these housing patterns to trends in school assignment:

Virtually every urban area in this country has racially and ethnically identifiable neighborhoods, doubtless resulting from a mélange of past happenings prompted by economic considerations, private discrimination, discriminatory school assignments, or a desire to reside near people of one's own race or ethnic background. It is likewise true that the most prevalent pupil assignment policy in urban areas is the neighborhood school policy. It follows inexorably that urban areas have a large number of racially identifiable schools.

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 512 (1979) (Rehnquist, J., dissenting); *cf.*

*Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 434 (1976) (reversing a district court's

49

injunction against having a majority of any racial minority in any district school where "subsequent changes in the racial mix in the Pasadena schools might be caused by factors for which the defendants could not be considered responsible") (Rehnquist, J.).

Advancing forward to the 1992 decision in *Freeman v. Pitts*, the Supreme Court held that a district court had the authority to withdraw its supervision over those specific aspects of a court-ordered desegregation plan with which the suburban Atlanta, Georgia school district was in compliance. 503 U.S. 467, 471 (1992). Rejecting the appellate court's assumption that a school district must take "heroic measures" to create racially balanced schools in a court-supervised school system, Justice Anthony Kennedy's majority opinion described the legal (in)significance of segregated schools created by private individual decisions:

> Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

> . . . But though we cannot escape our history, neither must we overstate its consequences in fixing legal responsibilities. The vestiges of segregation that are the concern of the law in a school case may be subtle and intangible but nonetheless they must be so real that they have a causal link to the *de jure* violation being remedied. It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation. And the law need not proceed on that premise.

> As the *de jure* violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith.

50

*Id.* at 495-96. Justice Antonin Scalia's concurrence explained that the multiplicity of factors in play made the causal relationship between previous discrimination and current segregation nearly inscrutable:

> Racially imbalanced schools are hence the product of a blend of public and private actions, and any assessment that they would not be segregated, or would not be *as* segregated, in the absence of a particular one of those factors is guesswork. It is similarly guesswork, of course, to say that they *would* be segregated, or would be *as* segregated, in the absence of one of those factors. Only in rare cases . . . , where the racial imbalance had been temporarily corrected after the abandonment of *de jure* segregation, can it be asserted with any degree of confidence that the past discrimination is no longer playing a proximate role. Thus, allocation of the burden of proof foreordains the result in almost all of the "vestige of past discrimination" cases. If, as is normally the case under our equal protection jurisprudence (and in the law generally), we require the plaintiffs to establish the asserted facts entitling them to relief—that the racial imbalance they wish corrected is at least in part the vestige of an old *de jure* system—the plaintiffs will almost always lose. Conversely, if we alter our normal approach and require the school authorities to establish the negative—that the imbalance is *not* attributable to their past discrimination—the plaintiffs will almost always win.

*Id.* at 503 (Scalia, J., concurring).

The litigation to desegregate the Oklahoma City, Oklahoma public schools, originally filed in 1961, illustrates the application of these limiting principles. After seven appeals and one Supreme Court opinion, the litigation concluded with the Tenth Circuit's decision in 1993. *See Dowell ex rel. Dowell v. Bd. of Educ. of Okla. City Pub. Schs., Indep. Dist. No. 89*, 8 F.3d 1501, 1505 n.2, 1520 (10th Cir. 1993). The district began operating in 1972 under a desegregation decree that used busing to integrate schools and was declared unitary in 1977. *Id.* at 1505. Then, the school district introduced a new student assignment plan in 1985 that abandoned busing for elementary school students and returned to neighborhood school assignments. *Id.* at 1506. The new plan created an equity officer/committee and provided transportation for elementary students to transfer from a school where their race was the majority to a school where their race

51

was the minority. *Id.* Plaintiffs challenged the new plan because it resulted in a significant increase in the number of schools that were more than 90% one-race. *Id.* After the district court dissolved the desegregation decree and the Tenth Circuit reversed, the Supreme Court remanded to the district court to determine "whether defendant had complied with the decree in good faith, and 'whether the vestiges of past discrimination had been eliminated to the extent practicable.'"[38] *Id.* at 1507 (quoting *Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch. Dist. No. 89, Okla. Cnty., Okla. v. Dowell*, 498 U.S. 237, 250 (1991)).

In answering the second question in the affirmative, the district court reviewed local housing patterns and "determin[ed] that residential segregation in Oklahoma City today results from individuals making private choices in response to economic and social forces over which the school board had no control." *Id.* at 1516. Reviewing for clear error, the Tenth Circuit affirmed the district court's factual findings that resulted in the dissolution of the desegregation decree. *Id.* at 1518. Nonetheless, the court made this statement in its concluding analysis about the remaining obstacles for African-Americans to obtain a quality public education, as mediated through the problems of poverty and housing segregation:

> It is clear from the record developed through the long history of this case that the current housing patterns in Oklahoma City originated with *de jure* segregation which helped create and perpetuate a social and economic underclass of black people. Although legal impediments have been removed and blacks, with the aid of civil rights laws, have made many economic and social gains, private discrimination remains and many blacks continue to comprise an economic underclass. No doubt many blacks choose to live in predominantly black inner-city neighborhoods. But it also seems clear that the many blacks who remain poorer than most of the white population cannot afford to move, and when they do move it is to nearby neighborhoods, to homes vacated by white residents

---

[38] The Supreme Court further instructed that, if the school district was entitled to have the desegregation decree dissolved, the district court must go on to analyze the new plan under equal-protection principles. The district court found that the school district did not have discriminatory intent in adopting the new plan, and the Tenth Circuit affirmed. 8 F.3d at 1519.

fleeing to residential areas that many blacks cannot afford. The result is that poor blacks remain concentrated in urban neighborhoods, where both the housing stock and the public school buildings are older and frequently substandard.

*Id.* at 1520.[39]

The Court has surveyed the academic literature, which confirms the role of income and private housing decisions in mediating the ability to obtain a quality public education. Research shows that access to better public schools (as well as other local amenities) factors into housing prices and results in the sorting of neighborhoods by income. *See* Paul Cheshire, *Segregated Neighbourhoods and Mixed Communities: A Critical Analysis* 26 (Joseph Rowntree Foundation 2007), available at http://www.jrf.org.uk/sites/files/jrf/2066-segregation-mixed-communities.pdf. Greater levels of economic inequality make it correspondingly more likely that lower-income households will be excluded from the best public schools.[40] *See id.* at 29. For example, a 2011 study compared the prices of geographically proximate homes on different sides of school attendance zone boundaries in California's Bay Area. *See* Patrick Bayer & Robert McMillan, *Tiebout Sorting and Neighborhood Stratification* 12-13 (Nat'l Bureau of Econ. Research, Working Paper No. 17364, 2011), available at http://www.nber.org/papers/w17364.pdf. The study found that, on average, houses zoned to the better school cost $18,700 more (out of a mean

---

[39] For a district court's perspective on the limited ability of court-mandated school segregation to alter underlying demographic trends, see *Hampton v. Jefferson County Board of Education*, 102 F. Supp. 2d 358, 373-76 (W.D. Ky. 2000).

[40] As explained in another publication co-authored by the same scholar, "Schools may be 'free' but poorer households still face an income constraint on access to quality education, except that it operates through the market in housing rather than through the payment of school fees." Paul Cheshire & Stephen Sheppard, *Capitalising the Value of Free Schools: The Impact of Supply Characteristics and Uncertainty*, 114 Economic Journal F397, F423 (2004). Although Cheshire analyzes data from the United Kingdom, his research also cites to comparable findings from American sources.

value of $250,000) and were assigned to schools with test scores that were 74 points higher. The costlier houses were more likely to be inhabited by households that are white, higher-income, and better-educated. *Id.*

Indeed, scholars have postulated a "social multiplier" by which improvements in school quality increase housing prices directly, but also indirectly through the attraction of better-educated, higher-income households that make the neighborhood more attractive to those of similar social status. *See* Patrick Bayer, Fernando Ferreira & Robert McMillan, *A Unified Framework for Measuring Preferences for Schools and Neighborhoods*, 115 Journal of Political Economy 588, 627-28 (2007). Overcoming this income stratification depends on the dispersal of affordable housing out of inner-city projects and into middle-income neighborhoods so that public services are distributed more equitably. *See* Thomas J. Nechyba & Randall P. Walsh, *Urban Sprawl*, 18 Journal of Economic Perspectives, no. 4, 2004 at 193. By contrast, traditional land use regulations such as low-density zoning limit the supply of affordable housing, with the consequences of excluding low-income families and segregating racial and ethnic minorities. *See* Arthur C. Nelson, Rolf Pendall, Casey J. Dawkins & Gerrit J. Knaap, *The Link Between Growth Management and Housing Affordability: The Academic Evidence* 34 (Brookings Inst. Ctr. on Urban & Metro. Policy 2002), available at http://www.brookings.edu/~/media/research/files/reports/2002/2/housingaffordability/growthmang.pdf; *accord* Jonathan T. Rothwell, *Racial Enclaves and Density Zoning: The Institutionalized Segregation of Racial Minorities in the United States*, 13 American Law & Economics Review 290, 347-48 (2011).

These findings assume, of course, that low-income households are even able to buy a home in the first place. Homeownership matters because, as compared to renting, it creates greater incentives for contributing to community quality and social organization. *See* Mark L.

54

Joseph, Robert J. Chaskin & Henry S. Webber, *The Theoretical Basis for Addressing Poverty Through Mixed-Income Development*, 42 Urban Affairs Review 369, 386-88 (2007); Karla Hoff & Arijit Sen, *Homeownership, Community Interactions, and Segregation*, 95 American Economic Review 1167, 1167 (2005).  Nonetheless, research findings show that, in addition to taking a longer time to achieve homeownership, lower-income families rarely move past their first home to re-enter the housing market later to buy a different (and presumably better) home. Thomas P. Boehm & Alan M. Schlottmann, *The Dynamics of Race, Income, and Homeownership*, 55 Journal of Urban Economics 113, 114-15 (2004).  Indeed, after obtaining homeownership, these families slip back into renting at disturbingly high rates.  *Id.*  All of these findings are especially pronounced among minorities, who have a nearly one-in-four probability of returning to renting after becoming homeowners.[41]  *Id.* at 128.

The Court has surveyed the Supreme Court's jurisprudence and social science literature to make the following point:  unfortunately, the big-picture problems confronting public education in Nashville are beyond the scope of the question presented for the Court's resolution in this case.  The background milieu of poverty and housing segregation described in the literature certainly exists within MNPS, as indicated by the proof presented in this case.[42] According to the testimony of Paul Changas, MNPS's Executive Director for Research,

_____

[41] Additionally, the Boehm and Schlottmann study found that, regardless of income level, minorities were less likely to move to second and third owned homes at levels comparable to white households.  55 Journal of Urban Economics at 129.

[42] Indeed, the Goldring and Smrekar research on which Plaintiffs rely so heavily makes these very points.  A key thesis of the journal article North provided to the Task Force is that "concentrated poverty leads to concentrated disadvantage in the social and geographical space shared between high-risk neighborhoods and nearby schools."  (Pl. Trial Exhibit 95, at 001974.) The article concludes that successful education reforms must also include housing policy reform. (*Id.*)

Assessment, and Evaluation, eighty percent of the District's African-American students and fifty percent of the District's white students come from low-income families. MNPS shows a "very high correlation" between student achievement levels and poverty, in that seventy-five percent of the variation among schools in TCAP achievement test scores can be explained by FARM statistics. (Transcript at 4192:6-18.) Furthermore, parts of Nashville remain racially segregated: in particular, portions of North Nashville, including most of the Pearl-Cohn Cluster, are more than 90% African-American. (*Cf.* Def. Trial Exhibit 13.)

The Court does not have the authority, however, to integrate Nashville's neighborhoods either by income or by race, nor is the Court empowered to compel academic improvement among students from low-income families. Indeed, the Supreme Court has made clear that it is not even the Court's responsibility to ensure the racial integration of Nashville's schools in perpetuity. Instead, the Court must only determine whether the zoning plan enacted in 2008 and first implemented in the 2009-10 school year violates federal constitutional principles of equal protection. The Court's limited inquiry is dictated by binding precedent, and the Court's adherence to that precedent should not be construed as an endorsement of the historically poor performance of District schools or the racial and socioeconomic segregation of Nashville neighborhoods. Those problems remain within the purview not only of the School Board, but also of the civic bodies responsible for the public policies that combat poverty, create access to affordable housing, and improve race relations within the Nashville community.

### 2. Actual Result

According to the definition of de jure segregation, any cognizable segregative effect must be attributable to the state action. On this issue of causation, Dr. Leonard Stevens, a full-time consultant in the field of school desegregation and other race-related educational issues, testified

56

as an expert witness on Defendants' behalf.  Early in his career after obtaining a doctorate in education from the University of Massachusetts-Amherst, Dr. Stevens worked for a decade as the federal court monitor of a school desegregation case in Cleveland, Ohio.  His subsequent clients have included the NAACP, NAACP Legal Defense Fund, ACLU, Lawyers Committee for Civil Rights Under Law, and the United States Department of Justice.  In the approximately forty school desegregation cases that he has worked on during his career, Dr. Stevens has never served as an expert for a defendant school district until now.

Dr. Stevens' testimony is integral to Defendants' theory of causation, *i.e.*, that any segregative effects of the plan are attributable to parental choice rather than the actions of Defendants.  As Dr. Stevens views the plan, "When a parent is issued two tickets—one to a school in Hillwood, one to a school in Pearl-Cohn—all the parent has to do is use one of the tickets." (Transcript at 4258:6-8.)  Simply by entitling a student to a seat in a Hillwood school and providing bus transportation, Dr. Stevens opines that Defendants have taken the necessary steps to make the zoned option school a viable choice. (*Id.* at 4256:23—4257:11.)  Concerning the reduction of the African-American population in Hillwood schools after the implementation of the plan, Dr. Stevens testified, "The cause of that is not mandatory reassignment by the district, but rather is a result of an option to a school in Hillwood not being exercised by a quantity of parents, which is their choice." (Transcript at 4299:1-4.)

Dr. Stevens's testimony on causation is contingent on a critical assumption: the District provided named Plaintiffs and members of the class with adequate resources to make an informed choice.  However, Dr. Tommie Morton-Young offered contrary expert testimony on Plaintiffs' behalf.  Dr. Morton-Young holds a doctorate in social psychology from Duke University, with a concentration in learning theory.  Among other academic assignments, she

57

taught for twenty-four years in the University of North Carolina system. With respect to the 2008 re-zoning plan, Dr. Morton-Young testified about those families offered a zoned option school:

> The population that we have under discussion here is one that tends not to take advantage of choice. The parents generally are hard-working people. They work long hours. They are harried and tired when they get in.
>
> There are also many [who] rely heavily on the concept of the village. And that is my child is going—leaving here, going to school. So whatever they do there, I'm going to trust that it's going to be all right.
>
> So choice historically and specifically is not a viable concept as regards to this population.

(Transcript at 278:4-13.) Another of Plaintiffs' experts, Dr. William C. Rock,[43] similarly testified that, in areas with high concentrations of poverty, parents are reluctant to visit schools or go to meetings at school buildings. Furthermore, because of different work schedules, these parents are simply unavailable for many school-related meetings. Instead of exercising an informed choice, "when a Board of Education says this is good for your children and you're a parent, you tend to believe the Board of Education." (*Id.* at 261:14-16.)

The Court does not adopt the full import of the testimony by Plaintiffs' experts, *i.e.*, that families within the formerly non-contiguous zones of Metro Center may be incapable of making choices for their children's education. However, based on the facts adduced at trial, the Court concludes that the District failed to do enough for families living in the formerly non-contiguous zones to make an informed choice. Dr. Changas testified that someone without his academic

---

[43] Dr. Rock's educational and professional credentials are described *post* in the section on segregative effect.

Case 3:09-cv-00756   Document 352   Filed 07/27/12   Page 58 of 80 PageID #: 13446

background[44] would have difficulty interpreting the data about student achievement and academic standards. (Transcript at 4193:20-23.) In this case, the District failed to organize the academic data in a way that would be easily understood by laypersons choosing a school for their children. In fact, the District did not even make the data readily available and instead directed families to online sources. Those sources are especially insufficient in the Pearl-Cohn Cluster, where about half of the families lack Internet access in their homes and may not be able to access publicly available computers during business hours. Furthermore, the record indicates that, until this year, families logging onto the District's website would receive incorrect information about the availability of transportation to the zoned option school.

Besides making information difficult to access and providing incorrect information in certain instances, the District also resorted to platitudes about families having a choice of "good" schools when it knew that the schools included in the zoned option choice were making inadequate progress under No Child Left Behind and were, in some cases, performing worse than the school that these children had been attending. The District's marketing efforts also failed to communicate the extent of the achievement gap in the zoned option choices. Parents were not sufficiently apprised of the fact that they were, in many cases, choosing more than between two schools selected for them by the District. They were often choosing between the potential social benefits of sending their child to an academically inferior school closer to home and the potential intellectual advantages of sending their child to a better school farther away from home. Despite purporting to maintain and improve diversity under the 2008 re-zoning plan, the District also

---

[44] Dr. Changas has a bachelor's and doctoral degrees in psychology from the University of Tennessee with a particular focus in psychometrics, *i.e.*, educational and psychological measurement and testing. (Transcript at 4149:24—4150:4.)

failed to provide adequate information about the racial and socioeconomic homogeneity of the zoned schools that parents were now being invited to choose.

The District's shortcomings are most obvious when considering the named Plaintiffs who represent the class. Frances Spurlock testified that she went online to investigate the academic status of the schools the District selected for her zoned option choice. She had to do independent research to discover that all school choices offered to her by the District were failing under No Child Left Behind, while the school her child already attended was in good standing. Spurlock testified without rebuttal that, during a home visit, the District's social worker communicated that transportation to the Hillwood Cluster would be contingent on availability. Spurlock interpreted this statement as meaning that she could either send her child to the Pearl-Cohn Cluster school or provide her own transportation to the Hillwood Cluster school. Spurlock also testified that the District's social worker indicated most families in the vicinity were choosing the Pearl-Cohn Cluster school. Omitting critical information, providing misinformation, and including editorial remarks are inconsistent with the straightforward choice between two tickets that Dr. Stevens described.

Carroll Lewis offered similar testimony. The District advertised her zoned school in the Pearl-Cohn Cluster as a magnet school, both on its sign during the prior semester and in at least one of the letters sent to her home. When Lewis brought her grandchild to school for the first day of class, she discovered that the school was not, in fact, a magnet school. By that juncture, according to the District's racially neutral application of its emergency transfer policies, Lewis no longer had recourse to enroll her child in the Hillwood Cluster. Lewis enrolled her grandchild in the Pearl-Cohn Cluster school for the 2009-10 school year not because it was her informed choice but because the District provided her with wrong information during the timeframe for

60

making a decision. If the District had provided Lewis with the correct information, she would have chosen the Hillwood Cluster school.

In short, Defendants cannot point to parental choice as an intervening cause of any segregative effects of the 2008 re-zoning plan. To the contrary, the evidence at trial shows that flaws in the District's implementation of the zoned option choice—including both misinformation and the absence of material information—resulted in the increased enrollment within Pearl-Cohn Cluster schools of predominantly African-American children who lived in the formerly non-contiguous zones of Metro Center. The Court concludes that Plaintiffs have satisfied the causation prong of a de jure segregation claim.

### 3.    Segregative Effect

The parties called competing experts to testify on the question of whether the 2008 re-zoning plan had a segregative effect. Plaintiffs offered the testimony of Dr. William C. Rock, Distinguished Service Professor Emeritus at State University of New York—Brockport. (*Cf.* Pl. Prelim. Inj. Exhibit 121 (Rock's resume).) Rock has a doctoral degree in educational administration from the Columbia University Teachers College. He served as a teacher in New York public schools while obtaining his graduate degree and worked afterward in educational administration in Rochester, New York. He has worked for the federal government as Deputy Associate Commissioner for Equal Education Opportunity and received professional awards for his work with the Emergency School Assistance Program, in which he reviewed desegregation plans submitted by school boards to determine their eligibility for federal funding.

Rock testified that, in the context of a school district (such as MNPS) where almost half of the students are African-American, the key questions for evaluating segregative effect are how

many African-American children are in racially isolated schools[45] and whether that number is increasing.  (Transcript at 190:21-25.)  In the Hillwood Cluster, the 2008 re-zoning plan resulted in a decrease of 432 African-American students and an increase of 211 white students.  In the Pearl-Cohn Cluster, the plan added 631 African-American students to five schools, all of which were already more than 90% African-American in their enrollment.  In addition to being racially isolated, Pearl-Cohn Cluster schools were socioeconomically isolated, as measured by the percentage of FARM students, and achieving at a lower level academically, as measured by performance on TCAP achievement tests.  Based on his professional experience and knowledge of research in the field of education administration, Rock testified that school districts have not been successful in overcoming the effects of socioeconomic isolation by providing additional resources.  In summary, "[r]emoving children from integrated schools and returning them to racially isolated schools is a clear step backward that can do nothing but harm to the children involved."  (*Id.* at 215:11-14.)

Defendants offered the testimony of Mr. Milan R. Mueller, founder and president of the Omega Group in San Diego, California.  (*Cf.* Def. Trial Exhibit 49 (Mueller's resume).)  Mueller has a masters degree in geography from the University of California—Los Angeles.  His work involves strategic and tactical planning for public agencies.  He testified that he has worked on over a hundred student assignment plans in his career, although his resume primarily lists local police and fire departments as his representative clients.

Mueller opined that the 2008 re-zoning plan did not segregate on the basis of race but instead made the District more diverse.  He pointed to data showing a steady increase in the

---

[45] Given the racial composition of MNPS, Rock defined a racially isolated school as having an African-American student enrollment of at least 80%.  The sides have disputed whether 80% or 90% is the proper baseline for identifying a racially isolated school.

number of zoned schools without a particular racial or ethnic group in the majority and in the number of "multi-racial" schools with three racial or ethnic groups having at least 10% representation among the student body. The number of zoned schools with at least 90% of a single group remained steady during the implementation of the 2008 re-zoning plan and then began to decline. The incremental increases (1-2%) in the African-American population of Pearl-Cohn schools during the first year of the plan reflected the concentration of African-American families already living within the cluster. In some Pearl-Cohn schools, the percentages of African-American students subsequently declined back to their pre-plan levels, and, according to Mueller's testimony, the percentage of the student body is more important than the number of students enrolled in the isolated schools. Dr. Stevens, Defendants' other expert witness, testified similarly.

On the issue of segregative effect, the Court finds Plaintiffs' expert testimony more persuasive and concludes that the 2008 re-zoning plan had a segregative effect. While Defendants attempt to focus on the expansion of diversity throughout the District as a whole, the named Plaintiffs properly focus the Court on the developments in the Pearl-Cohn and Hillwood Clusters. The statistics are particularly compelling in the Hillwood Cluster, where the percentage of African-Americans dropped by more than 10% when the re-zoning plan took effect and has continued to tick downward. Furthermore, as Rock testified, the absolute number of students in racially isolated schools is even more significant than the exact percentages in a school with more than 80-90% African-American enrollment.

Defendants contend that any change in the racial composition of schools in these clusters does not rise to the requisite magnitude of "a substantial portion of students, schools, teachers, and facilities within the school system[.]'" *Lansing Bd. of Educ.*, 559 F.2d at 1045 (quoting

63

*Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 201 (1973)). By Defendants' own admission, however, there is no bright-line numerical floor that Plaintiffs must surpass to establish a substantial portion. In the context of this case, the testimony revealed that the Task Force spent a considerable amount of time on the Pearl-Cohn Cluster because it presented some of the most difficult questions. The reconfiguration of the formerly non-contiguous zones—most of which are located in the overwhelmingly African-American Metro Center area—resulted in the reassignment of the greatest number of students. Furthermore, the movement of those students is the mechanism for the meaningful and sustained decline of the African-American population of Hillwood schools. Because of the significance of that student population in the 2008 re-zoning plan, the Court concludes that the reassignment of those students is enough to satisfy the "substantial portion" requirement.

In summary, by substantially reducing the number and percentage of African-American students in Hillwood Cluster schools and by increasing the population of African-American students in Pearl-Cohn Cluster schools that were already racially isolated, the 2008 re-zoning plan actually resulted in increased segregation in MNPS.

### 4.    Discriminatory Intent/Segregative Purpose

The Supreme Court has explained the relationship between a state action's discriminatory impact and the inquiry into intent:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," *Washington v. Davis*, [426 U.S. 229, 242 (1976)], may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. The evidentiary inquiry is then relatively easy. But such cases are rare.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (internal footnotes and citations omitted). Subsequent developments in the law have made clear that mere awareness of segregative consequences is insufficient to establish a discriminatory intent for government action. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994). Discriminatory intent means that the decisionmaker took "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. An inference of discriminatory intent based solely on statistical evidence of discriminatory effect is "a finding [that] remains the exceedingly rare exception." *United States v. Thorpe*, 471 F.3d 652, 661 (6th Cir. 2006).

In a 1977 decision involving a proposal to re-zone a parcel of land to construct housing for low- and moderate-income tenants, the Supreme Court set forth five factors for determining whether a racially discriminatory purpose was a motivating factor in the challenged decision: (1) "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes," (2) "[t]he specific sequence of events leading up [to] the challenged decision[,]" (3) "[d]epartures from the normal procedural sequence," (4) "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and (5) "[t]he legislative and administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Vill. of Arlington Heights*, 429 U.S. at 267-68. If intent is found through the analysis of these evidentiary sources, the plaintiff has established a prima facie case, and the burden shifts to the defendant:

> [A] finding of intentionally segregative school board actions in a meaningful portion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions.

*Keyes*, 413 U.S. at 208. The defendant then has the heavy burden of showing that segregative intent was not among the factors that motivated the challenged decision. *Id.*

The Court begins its analysis with an overview of each of the five factors set forth in the *Arlington Heights* decision. The first factor looks to the historical background of the decision for a pattern of discriminatory motivations. The *Arlington Heights* decision itself cited two education cases for this proposition. In *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964), the school board attempted to establish a publicly funded system of private, segregated schools rather than follow a court-ordered desegregation decree. Although school authorities claimed they were motivated by an attempt to preserve an atmosphere "conducive to the educational benefit of [the] people," the Court inferred discriminatory intent from the board's eight-year-old resolution not to operate integrated schools. *Id.* at 222 & n.6., 223. Similarly, in *Keyes*, the school board contributed to segregation over a ten-year period by changing boundary zones and using portable classrooms to preserve the predominantly white character of some schools while isolating the increasing number of African-American students entering the district through local population growth. *See Keyes v. Sch. Dist. No. One, Denver, Colo.*, 313 F. Supp 61, 65 (D. Colo. 1970). Although not applicable to this case, the Supreme Court has also identified racial discrimination in faculty hiring and assignment as one of the most important historical indicia of segregative intent. *See Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 535-36 (1979); *Swann*, 402 U.S. at 18.

66

The second *Arlington* factor refers to the specific sequence of events leading up to the challenged decision. For example, officials may change their policy when they learn of circumstances that would give the policy an integrative effect. *See Arlington Heights*, 429 U.S. at 267 n.16 (citing *Progress Dev. Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)). In the context of school desegregation, a district court invalidated a school's policy of allowing a small group of white students to avoid a school with a rapidly growing African-American population and instead enroll at a neighboring, majority-white school. *Reed v. Rhodes*, 422 F. Supp. 708, 752 (N.D. Ohio 1976). The court rejected the school's proffered explanation of student safety because that justification would apply equally to African-American students in the same area who were not given the option. The court further inferred an intent to maintain segregation from the school's decision to terminate the arrangement after fifteen years, once the population of both schools became almost entirely African-American.[46] *Id.*

Taken together, the third and fourth *Arlington* factors describe departures from the normal procedural sequence, or substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. The district court in *Arthur v. Nyquist* offered several examples of this pattern in school desegregation cases:

> The plaintiffs' proof that some white students were allowed to transfer to avoid black schools for reasons that were inadequate under official [b]oard policy, that others were allowed by individual principals to transfer instead of following normal procedure and applying to the Office of Pupil Personnel Services, and that some white students were able to avoid black schools because some predominantly white areas were made optional

---

[46] Evidence of the events leading up to a challenged decision (factor two) and relevant historical information showing intent to discriminate (factor one) can often be found in the actions of other government officials, such as housing authorities, but courts often refuse to consider the actions of government entities not joined in the litigation. Eric S. Stein, Note, *Attacking School Segregation Root and Branch*, 99 Yale L.J. 2003, 2006 (1990).

areas, are examples of such procedural and substantive irregularities that can support a finding of invidious purpose.

429 F. Supp. 206, 212 (W.D.N.Y. 1977).

The first two examples constitute what courts have called "special transfers" or "specific transfers." As an illustration, the Eighth Circuit Court of Appeals overturned a district court's finding of no segregative intent where a transfer policy was neutral on its face. *United States v. Sch. Dist. of Omaha*, 521 F.2d 530, 540 (8th Cir. 1975). For the two years when the policy was in effect, a third of the white elementary students zoned for majority-black schools—and twice as many white junior high students—were allowed to transfer to majority-white schools. Far fewer transfers were granted to African-American students. The appellate court stated that a presumption of intent arose where the transfer policy had the "foreseeable and actual result" of increasing the segregated nature of almost all the majority-black schools in the district. *Id.*; *see Reed*, 422 F. Supp. at 784-85 (considering the grant of 850 transfer applications by white students out of majority-black schools over a ten-year period as evidence of school officials' acquiescence in an emerging pattern of racial isolation, where application forms did not request a student's race but school officials hand-coded "W" on a white student's application).

Another related method of departing from school policy is the use of an optional attendance zone, *i.e.*, "an area between two attendance zones, the student residents of which are free to choose which of the two schools they wish to attend." *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 412 n.8 (1977). Optional zones have a segregative effect either by allowing white students to transfer out of majority-black schools or by allowing African-American students to transfer out of majority-white schools. *Reed*, 422 F. Supp. at 751. They are inherently suspect when there is a notable difference in the racial composition of the two schools involved. *Id.* at

68

734. Courts have inferred intent where the officials could have achieved the same purpose through less segregative means or where the official action could not possibly have achieved its alleged purpose, such as relieving overcrowding or promoting safety. *See, e.g.*, *id.* at 721, 765; *Arthur v. Nyquist*, 415 F. Supp. 904, 939 (W.D.N.Y. 1976), *rev'd on other grounds*, 573 F.2d 134 (2d Cir. 1978); *Penick v. Columbus Bd. of Educ.*, 429 F. Supp. 229, 260-61 (S.D. Ohio 1977) (inferring segregative intent from the creation of optional zones without a race-neutral explanation, combined with discriminatory patterns in faculty assignment and school construction), *aff'd sub nom. Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979); *but see Higgins v. Bd. of Educ. of City of Grand Rapids, Mich.*, 395 F. Supp. 444, 470-71 (W.D. Mich. 1973) (declining to find segregative intent where the option freed space in the district and did not affect the racial balance of the schools).[47]

The fifth and final *Arlington* factor seeks evidence of subjective intent among the decision's "legislative and administrative history." *Arlington Heights*, 429 U.S. at 267. In *Berry v. School District of City of Benton Harbor*, 442 F. Supp. 1280, 1330-35 (W.D. Mich. 1977), the district court reviewed extensive records of board meetings, including documentation of opposition to integration plans, and concluded that the school board's acquiescence to this pressure constituted segregative intent. Indications that school officials considered racial justifications for a given decision can justify a finding of segregative intent. *See Spangler v.*

---

[47] School officials have also deviated from standard practices by gerrymandering district lines to contain African-American students, *see Taylor v. Bd. of Educ. of City Sch. Dist. of City of New Rochelle*, 191 F. Supp. 181, 184-85 (S.D.N.Y. 1961), or by selecting sites for the construction of new schools so as to preserve segregated conditions, s*ee, e.g.*, *Penick*, 429 F. Supp. at 242 (finding that officials could have foreseen the probable racial composition of new schools and chosen a more integrative alternative). *But see Alexander v. Youngstown Bd. of Educ.*, 454 F. Supp. 985, 1004 (N.D. Ohio) (1978) (finding site selection based on neighborhood school policy acceptable even where it resulted in additional segregated schools, partly because the court did not find a more integrative alternative).

*Pasadena City Bd. of Educ.*, 311 F. Supp. 501, 508 (C.D. Cal. 1970) (reviewing expressions of racial motivation made during public meetings and concluding that "race was a crucial factor in the decision"); *Armstrong v. O'Connell*, 451 F. Supp. 817, 827 (E.D. Wis. 1978).

Turning to the 2008 re-zoning plan at issue in this case, the Court first considers its historical background and notes that the settlement of the *Kelley* litigation in 1998 resulted in a declaration of unitary status for MNPS. To obtain unitary status, a school district "must establish that [it] has eliminated racial segregation to the extent practicable and that the existence of any racially identifiable schools is not traceable to its actions." *Reed v. Rhodes*, 179 F.3d 453, 481 (6th Cir. 1999) (citing *Penick*, 443 U.S. at 465 n.13). A unitary school district is relieved of the affirmative legal obligation to integrate schools or to avoid actions that result in segregation. *Dowell*, 498 U.S. at 250-51; *cf.* Wendy B. Scott, *Dr. King and* Parents Involved: *The Battle for Hearts and Minds*, 32 N.Y.U. Rev. L. & Soc. Change 543, 553-54 (2008). Such a district "remains subject to the mandate of the Equal Protection Clause of the Fourteenth Amendment." *Dowell*, 498 U.S. at 250. However, the unitary district is not responsible for remedying racial imbalance in its schools resulting from independent demographic factors unrelated to a prior system of de jure segregation. *Freeman*, 503 U.S. at 494; *NAACP, Jacksonville Branch v. Duval Cnty. Sch.*, 273 F.3d 960, 974 (11th Cir. 2001).

Besides the segregative effects of the 2008 re-zoning plan, Plaintiffs allege the sequence of events leading to Dr. Garcia's separation from his position as Director of Schools shows that the School Board acted with discriminatory intent in the re-zoning. According to Plaintiffs' interpretation of events, Garcia drastically scaled back his re-zoning plan after discovering racist constituents within the Hillwood Cluster who urged the return of African-Americans to neighborhood schools in Metro Center so that white parents in Hillwood would again send their

children to public schools. Previously supportive School Board members succumbed to these constituent pressures and turned against Garcia. The School Board's purported concern for poor student performance was pretextual, since the MNPS had consistently under-performed throughout Garcia's tenure.

Because this trial pertains to the merits of the 2008 re-zoning plan, rather than the lawfulness of Garcia's separation from MNPS, the Court need not make specific findings why the School Board entered into a severance agreement with Garcia. For purposes of analyzing the intent behind the re-zoning plan, the Court must merely take note that the circumstances of Garcia's separation from MNPS were more complex than the fate of a single re-zoning proposal. In the fall of 2007, MNPS entered "Corrective Action" status under No Child Left Behind, triggering a significant level of prescriptive intervention by the Tennessee Department of Education. School Board members testified to their surprise about the ramifications of "Corrective Action" status and their concern that Garcia had painted an overly rosy picture of the District's academic progress. Throughout the fall of 2007, the School Board reviewed correspondence describing the District's lack of cooperation with state education officials, as instigated by Garcia. At the same time, Garcia missed at least one meeting with the mayor to interview for a job with another school district out of the state.

Furthermore, the sequence of events leading up to the enactment of the 2008 re-zoning plan undercuts Plaintiffs' theory that the scuttling of Garcia's plan was motivated by racial discrimination. Garcia's plan would have placed elementary and middle school students from the Metro Center area back into their neighborhood schools. High school students from the non-contiguous zones in Metro Center would continue at Hillwood High School for the time being, but subject to further study. There were no appropriations of additional resources for Pearl-Cohn

71

Cluster schools. By contrast, the Task Force plan allowed Metro Center students from each of the three educational tiers to continue attending a school in the Hillwood Cluster, with transportation provided, and recommended additional resources for students who chose zoned schools in the Pearl-Cohn Cluster. Therefore, the School Board members who allegedly pressured Garcia to withdraw his plan and forced him out of office somehow went on to ultimately support a re-zoning plan that offered more opportunities for African-American students in Metro Center to continue attending Hillwood Cluster schools and more resources for those who switched to Pearl-Cohn Cluster schools. If School Board members had opposed Dr. Garcia's plan because it did not do enough to push African-American students from Metro Center back into their neighborhood schools, they should have responded even more critically to the Task Force proposal they instead voted to adopt.

Furthermore, according to Mueller's unrefuted expert testimony, the 2008 re-zoning plan offers MNPS students in the formerly non-contiguous zones more choices than families in comparable situations in other districts across the nation. Mueller testified that school districts are generally trending away from non-contiguous zones and instead assigning students to schools closer to their physical residences. (Transcript at 3542:16—3543:2.) These other school districts may offer temporary zoned option choices for a grandfathering period that eventually phases out. (Transcript at 3577:9-19.) Likewise, any offer of transportation to both schools expires over time, and most districts typically offer transportation to only one school. (*Id.* at 3577:20—3578:3.) Therefore, the MNPS plan is distinctive because it offers zoned option choice and transportation to both the zoned school and the zoned option school in perpetuity. These aspects of the 2008 re-zoning plan further refute the argument that the School Board intended to relegate African-American students to inferior neighborhood schools.

The record is also devoid of the kinds of procedural or substantive departures that would create an inference of intent. The School Board has previously used task forces to provide recommendations on educational issues. While the School Board entrusted this Task Force's composition to the discretion of individual members, nothing in the selections suggests that the various appointments involved racially suspect criteria. The list of factors submitted for the Task Force's consideration, including a broadly defined concept of diversity, reflect typical issues to be addressed in a re-zoning plan and, in particular, the longstanding concerns of political leaders and educators in Metro Nashville. Once the Task Force drafted a proposed plan, North gave a detailed presentation at the School Board's May 2008 meeting. District officials hosted meetings in various locations throughout June to solicit public input. The Task Force then added details to its plan to respond to School Board members' comments and the public's concerns. Consistent with School Board procedure, the final plan was distributed to the School Board the week before its July 8, 2008 meeting. At that meeting, the Board carried out a series of votes according to its normal parliamentary procedures that resulted in the adoption of the Task Force's plan by simple majority. Plaintiffs have complained of unfair treatment during the implementation of the plan, but a careful review of the facts does not support the conclusion that the District treated Plaintiffs differently on the basis of their race.

Turning to the legislative and administrative history, Plaintiffs theorize that the Task Force's and School Board's consideration of racial demographic statistics during the development of the 2008 re-zoning plan amounts to discriminatory intent. In a school re-districting opinion that followed after and considered the Supreme Court's decision in *Parents Involved*, the Third Circuit Court of Appeals made the following comments about the difference between the consideration of racial demographics and a racially discriminatory purpose:

> To ascertain whether there was discriminatory intent in the development and selection of [the re-districting plan], Appellants and the District Court appear focused on the administrative history, especially on statements made by [School] Board members and the information included in reports and presentations. Appellants pay particular attention to when racial demographics only or racial demographics in addition to other socioeconomic demographics were or were not included in report estimates, slide presentations, personal notes, and on the District's website. Awareness of such data or omitting such data, however, does not constitute discriminatory intent. "[C]onscious awareness" of a racially disparate impact of a facially neutral policy is *irrelevant to equal protection analysis*.

*Lower Merion Sch. Dist.*, 665 F.3d at 553 (emphasis added) (quoting *United States v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992)). The Court considers the Third Circuit's analysis, bolstered by the Supreme Court's decision to deny certiorari, to be a correct statement of the law. Applied to this case, the upshot is that the Task Force's request for and consideration of data showing the demographic effects of various re-zoning proposals did not manifest a racially discriminatory intent.

Admittedly, the record includes expert testimony about the phenomenon of politicians using racially neutral code words—*e.g.*, "neighborhood schools" and "at-risk students"—to disguise racially charged motivations. (*See* Transcript at 277:15-20, 278:14-17 (Morton-Young), 371:1—372:5 (Zorwick).) Plaintiffs similarly object to the School Board members' concern about declining white enrollment in MNPS (*cf.* Transcript at 1018:22—1020:8) and the Task Force's ongoing monitoring of the public schools' market share in the community (*cf.* Pl. Prelim. Inj. Exhibit 131, at 2). Essentially, Plaintiffs contend that, because so many minority students are already enrolled in the public school system, efforts to attract more students to MNPS must inevitably target white families at the expense of African-American students. And, the record indicates evidence of racial bias within the Hillwood Cluster, both among constituents who live there and the faculty who teach in its schools. *Cf.* Linda Renzulli & Lorraine Evans, *School*

74

*Choice, Charter Schools, and White Flight*, 52 Social Problems 398, 399-400 (2005) (summarizing research on efforts by white parents to avoid sending their children to public schools with increasing African-American enrollment, either through moving to heavily white neighborhoods or taking advantage of private/charter schools). *But see* John M. Clapp, Anupam Nanda & Stephen L. Ross, *Which School Attributes Matter? The Influence of School District Performance and Demographic Composition on Property Values*, 63 Journal of Urban Economics 451, 452, 454 (2008) (finding small or statistically insignificant negative correlations between housing prices and the percentage of African-Americans in local schools).

However, the Court is not persuaded that Plaintiffs have presented the evidence to tie such tendencies and biases to the actual decisionmakers in this case. School Board and Task Force members used vocabulary such as "neighborhood schools" and "at-risk students." However, the Court concludes that, by "neighborhood schools," Defendants referred to the plain meaning of the term, instead of some racial subtext. Upon reviewing the record, the Court concludes that Defendants acted in good faith to give students in the Pearl-Cohn Cluster the opportunity to enroll in a school close to home, with the potential access to such benefits as greater participation in extracurricular activities and more parental involvement because of the proximity between home and school. As for "at-risk students," Dr. Webb testified that the term is used almost universally in the educational world. (Transcript at 1403:11-14.) Under federal law, it means FARM-eligible students, but it can also carry the colloquial meaning of students lacking family support for their education. In this case, School Board and Task Force members used the term "at-risk students" within either of the above meanings, and not as a term for race. Related geographical terms such as "North Nashville" or "inner city" simply reflect the reality that poverty is concentrated in these areas of the county.

75

If anything, the District has strengthened its case on the issue of discriminatory intent since the preliminary injunction hearing in November 2009. Register's testimony concerning the District's application for and implementation of a federal grant for magnet schools reflects an effort to make schools in the urban core, including the Pearl-Cohn Cluster, more attractive to families from other clusters and to incentivize those families to choose those schools through open enrollment. Because other clusters are more racially diverse, attracting families to magnet schools in the Pearl-Cohn Cluster has the potential to combat the segregative effects of the re-zoning plan. As Dr. Stevens testified, "[a] district that goes to the trouble of applying for a federal grant to support magnet schools . . . [and] that obtains such a grant and locates magnet schools supported by the grant in dominantly [African-American] schools is interested in integration." (Transcript at 4245:4-5, 8-10.) Plaintiffs' theory that the District wishes to isolate African-American students permanently inside the Pearl-Cohn Cluster is difficult to reconcile with the District's allocation of significant funds to attract students from outside the cluster. Admittedly, the implementation of the magnet program remains in its early phases, and the District still needs to make tangible progress in the academic performance of these schools. Nonetheless, the totality of the evidence at trial concerning greater magnet school opportunities within the Pearl-Cohn Cluster provides relevant administrative history indicating that the District lacks a discriminatory motive.

In summary, while Plaintiffs have established the segregative effect and causation prongs of a de jure segregation claim, their case ultimately falters on their failure to show Defendants' discriminatory intent in adopting and implementing the 2008 re-zoning plan. Such intent certainly does not exist among the Task Force, a racially diverse body of laypersons who showed commendable effort in devising a solution to a problem that had stymied the School Board on

76

numerous prior occasions.  Nor can the Court locate such intent among the School Board, which delegated to the Task Force a list of legitimate considerations in preparing the re-zoning plan and essentially rubber-stamped the Task Force's work product.  While the School Board might be chastised for its bitter divisiveness and lack of political will, the Court cannot locate an intent to use the re-zoning plan to discriminate on the basis of race.[48]

## C.    Rational Basis Review

Having determined that the 2008 re-zoning plan neither relies on individual racial classifications nor constitutes de jure segregation, the Court still must review the plan under the rational basis test.  The inquiry focuses on whether the plan "is 'rationally related to legitimate government interests.'"  *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997)).  To show that a government action lacks rational basis, the challenging party must negate any conceivable basis to support the action or demonstrate the motive was animus or ill will.  *Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005).  The Court's analysis must seek "'any reasonably conceivable

---

[48] Based on the record, the Court is persuaded that Defendants prevail on the issue of discriminatory intent, as a matter of law.  Nonetheless, the Court feels compelled to point out that many of Plaintiffs' witnesses on the question of intent, such as Won Choi, testified only at the preliminary injunction hearing before another department and were not recalled to testify at trial before this Court.  Many of these witnesses testified to disputed statements they heard from Task Force members and present and former School Board members in private conversations.  To the extent that Defendants called those members at trial (even if their testimony pertained to other subjects), the Court was able to determine their credibility.  Plaintiffs' strategic decision, however, to refer the Court instead to the transcripts from the preliminary injunction proceedings limited the Court's ability to assess the credibility of Plaintiffs' witnesses.  The Federal Rules of Civil Procedure defer to the trial court's factual findings on the theory that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see* Fed. R. Civ. P. 52(a)(6).  Deprived of the opportunity to observe these qualities in many of Plaintiffs' witnesses, the Court is likewise unable to find their testimony credible.

state of facts'" and resort to "'every reasonable construction'" to uphold the government action. *Johnson v. Bredesen*, 624 F.3d 742, 746-47 (6th Cir. 2010) (quoting *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.* 508 U.S. 307, 313 (1993), and *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).  The "highly deferential" standard of review means a declaration of unconstitutionality "only in rare or exceptional circumstances."  *Mich. Dep't of State Police*, 490 F.3d at 501.

The 2008 re-zoning plan survives rational basis review because it accomplishes (at least in part) several of the School Board's legitimate objectives, as articulated in the factors originally submitted for the Task Force's consideration.  Concerning facility utilization, the re-zoning plan achieved and sustained meaningful decreases in the number of under-utilized schools.  It reduced by about a quarter the number of schools at less than 70% capacity.  Initially, the plan also reduced the number of schools operating above 100% capacity, although the number of over-utilized schools has ticked back up over time as student enrollment in MNPS increased. Although Plaintiffs complain that the re-zoning plan could have taken more steps to address the under-utilization of Pearl-Cohn Cluster schools (by, *e.g.*, offering students outside the cluster a zoned option choice to Pearl-Cohn schools), the re-zoning plan actually expanded the size of the Pearl-Cohn Cluster to include Hope Gardens, Germantown, and more parts of Downtown Nashville.  The downtown loop of Interstate 40 makes for a natural boundary line for the expansion of the cluster.

The plan and its aftermath have also provided more school choices for students and parents.  As reflected in the Corrected Stipulation of the Parties No. 1, a little more than two-fifths of the families in the District's formerly non-contiguous zones are choosing an educational option other than the zoned school.  Within the Pearl-Cohn Cluster, that number is a little less

78

than two-fifths. The District is offering more open enrollment options and has opened more magnet schools. While the District has not done enough to inform families of the choices available for them, as discussed *supra*, the execution of the plan is rationally related to the District's objective of increasing choice.

Related to its provision of choice for the formerly non-contiguous zones, the plan also enables families to take advantage of the benefits of neighborhood schools, including greater opportunities for increased parental involvement. Plaintiffs strenuously object to the concept of neighborhood schools, citing to research that the social liabilities of particular neighborhoods outweigh the benefits of attending school close to home and that the very concept of "neighborhood schools" is a cover for re-segregating the school system. Nonetheless, at this final stage of review and subsequent to its finding that Defendants did not have a discriminatory motive in adopting the re-zoning plan, the Court must defer to the testimony of the Task Force and School Board members concerning the benefits of students attending a school close to their home. Some of this testimony reflected their own experience as students and/or parents in the MNPS system. Although this position may have thin support in the academic literature, the testimony of the Task Force and School Board members concerning neighborhood schools provided enough support to give the Court a reasonably conceivable state of facts for upholding the plan on these grounds.

Finally, the re-zoning plan provided stability and certainty for families considering their options. It created stable feeder patterns across all twelve clusters and implemented a standardized three-tier grade configuration.[49]

---

[49] The Court concludes that the 2008 re-zoning plan did not achieve the objective of increasing diversity, broadly defined as "the benefit of different perspectives and backgrounds to the

79

In summary, the 2008 re-zoning plan is rationally related to Defendants' objectives of dealing with facility utilization, providing more choices, enabling families to benefit from neighborhood schools, and creating stability and certainty. Therefore, the plan survives rational-basis review and passes constitutional muster.

### III. CONCLUSION

The re-zoning plan that the Metropolitan Nashville School Board adopted in 2008 does not classify students on the basis of race. While the School Board's action caused a segregative effect, the Court is unable to conclude that the School Board adopted the plan with a segregative purpose. The plan is rationally related to multiple legitimate government objectives. Therefore, it passes muster under federal constitutional principles of equal protection. Defendants are entitled to judgment in their favor on all counts pled in the Fourth Amended Complaint, and the Court shall dismiss the case with prejudice.

An appropriate Order shall enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

student, the classroom, the school, and the school system as a whole." Instead, the plan had the effect of increasing the District's stratification along socioeconomic and racial lines. The plan's failure to increase diversity is not fatal, however, because of the other four legitimate government objectives that all provide conceivable bases for upholding the plan.